## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FULTON FINANCIAL ADVISORS,** | : | **CIVIL ACTION** |
| **NATIONAL ASSOCIATION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 09-4855** |
| | : | |
| **NATCITY INVESTMENTS, INC.** | : | |
| | : | |
| **Defendant** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                      **October  15, 2013**

Plaintiff, Fulton Financial Advisors, National Association ("Fulton"), brought this action in the Court of Common Pleas of Lancaster County against Defendant NatCity Investments, Inc. ("NatCity") alleging violations of the Pennsylvania Securities Act ("PSA") sections 1-402 (Count I), 1-401 (Count II), and 1-403 (Count III), as well as state law claims for equitable rescission (Count IV), negligent misrepresentation (Count V), negligence (Count VI), breach of fiduciary duty (Count VII), common law fraud (Count VIII), and aiding and abetting common law fraud (Count IX).  The case, which was removed to this court on October 22, 2009 based on diversity jurisdiction, arises out of the collapse of the market for Auction Rate Securities ("ARS").  Presently before the Court is NatCity's Motion to Dismiss the Complaint, filed pursuant to Fed. R. Civ. P. 12(b)(6).  NatCity contends that Fulton has failed to plead its fraud-based claims with sufficient particularity, and that Fulton cannot have reasonably relied upon NatCity's alleged misrepresentations.  For the following reasons, I will grant NatCity's Motion to Dismiss the three PSA claims, the negligent misrepresentation claim, the claim for common law fraud, and the claim for aiding and abetting fraud.  I will deny the Motion as to the

negligence claim and the breach of fiduciary duty claim. Finally, I will grant the Motion as to the claim for equitable rescission, since that is a remedy for fraud and not a separate cause of action, and I will strike the request for attorneys' fees and costs.

I.    **BACKGROUND**[1]

ARS is a category of securities that include bond-like financial instruments issued by municipalities and student loan entities (generally known as "auction rate certificates" ("ARCs")), and preferred stock issued by closed-end mutual funds (generally known as "auction preferred shares"). Compl. ¶ 4. This case involves student loan ARCs, which are interest bearing certificates backed by pools of student loans. They have long-term nominal maturities that pay interest rates set and reset by auctions conducted at pre-determined intervals, usually seven, twenty-eight, or thirty-five days. Id. ARCs enable investors to secure long-term debt, while paying interests rates only slightly higher than the rates applicable to short-term debt. Id. at ¶ 5. Investors were led to believe that ARCs could be readily disposed of at par through periodic auctions and that they were purchasing low-risk, safe, liquid and secure investments with reliable short-term liquidity. Id. at ¶¶ 5-6.

A number of actors participate in the creation and issuance of ARS. The "issuer" is the borrower that issues the ARS and, as the debtor, assumes the obligation to pay principal and interest owing on the ARS. The issuer engages an "underwriter" to distribute the issue and an "auction agent" to conduct the auctions at which interest rates are reset. Id. at ¶ 7. The issuer also selects a broker-dealer ("BD") whose purpose is to solicit bids from existing ARS owners and potential investors. Id. at ¶ 8. Those BDs that have entered into a broker-dealer agreement

---

[1]  The facts are gleaned from the complaint and the extrinsic documents upon which it is based. For the purposes of this motion, the allegations are presented in the light most favorable to Fulton as the non-moving party, and are accepted as true with all reasonable inferences drawn in its favor. See GSC Partners, CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004).

with respect to an ARS issue are "Contractual BDs" ("CBDs"). Id. Unless they are CBDs, BDs have no direct access to the auction process. Id. BDs must submit their customers' buy and sell orders through a CBD. Id. The CBD acts as broker for the ARS owner and potential purchaser in the auction process, thereby allegedly imposing fiduciary duties on the CBD in favor of the customer. Id. Through a "Dutch auction" process, investors specify the number of shares they wish to purchase and the lowest interest rate they are willing to accept. Id. at ¶ 10. Existing ARS holders specify the number of shares they wish to sell, either on an unqualified basis or at a specific interest rate, and the number of shares they wish to continue to hold. Id. The bids and offers are conveyed to an auction agent, who ranks each bid and offer according to the interest rate. Id. The lowest bid rate at which all shares offered for sale can be sold establishes the interest rate to be paid until the next auction. Id. A "failed auction" occurs when there is a lack of demand and no clearing bid is established. Id. at ¶ 11. If this occurs, the holders will keep their position at the maximum interest rate until the next auction has a successful clearing bid. Id.

For a number of years prior to 2006, Fulton maintained an institutional investment account with NatCity, for which NatCity acted as Fulton's securities broker. Id. at ¶ 12. Around 2005, NatCity allegedly recommended to Fulton that it invest in ARS, in keeping with Fulton's desire to invest in only the highest quality and safest debt investments. Id. at ¶ 14. An unspecified portion of these ARS were from NatCity's own inventory. Id. Fulton currently holds $175 million in ARS. Id. at ¶ 15. NatCity also allegedly acted as a CBD for a number of the ARS issues it recommended to Fulton, for which NatCity typically earned a yearly fee of

0.25 percent of the value of the transaction.[2]  Id. at ¶ 18.  For transactions where NatCity was not the CBD, it received a portion of the CBD's fee, a fact not disclosed to Fulton, for directing the Fulton trade to the CBD.  Id.

The country's major securities firms earned fees as the principal underwriters and marketers of ARS and ARCs, acting as CBDs.  Id. at ¶ 19.  These fees were so lucrative that securities firms became secret "guarantors" of the success of the auctions. Id. at ¶ 20.  If there was insufficient investor interest in a particular auction, such that there were not enough buyers to match the sellers, then the auction was at risk of failure.  Id.  This threatened the entire market, which was based on investor confidence in access to short-term liquidity on demand.  Id.  To protect the broader market from seizing up, and to protect their stream of underwriting fees and auction management fees, securities firms, including NatCity, allegedly entered proprietary bids for their own accounts ("support bids") to ensure that the auctions succeeded, thereby creating the illusion of an efficient, completely liquid market.  Id. at ¶¶ 20, 21.  NatCity made proprietary support bids to prolong the life of the ARS market that was generating lucrative underwriting and BD fees.  Id. at ¶ 22.  It also stood to lose money on its own ARS if the auction market failed.  Id.  Fulton alleges that these purchases were intended to manipulate the markets for ARS by creating the false appearance that those markets were broad-based, sustained by investor demand for ARS by third parties with true investment intent, and that the ARS markets were active, efficient and independent, when there was far from sufficient real demand by disinterested parties with true investment intent to keep the auction markets from failing.  Id. at ¶ 23.  NatCity never informed Fulton of its role in the ARS markets or that it was placing support bids for its own account to support the auction markets; thus its interests conflicted with Fulton's

_____

[2]  Fulton asserts that for such transactions, NatCity "may have also acted as the underwriter for that issue."  Id. ¶ 18.

interests.  Id. at ¶ 28.  NatCity never disclosed material information to Fulton that the success of auction markets was entirely dependent upon support bids; that it had no true investment intent in making proprietary ARS purchases; that the purpose of its purchases was to generate fees and protect the value of its own holdings; that true investment demand was far lower than necessary to maintain liquid ARS markets; and that NatCity and the other CBDs could withdraw their support at any time causing widespread auction failures resulting in total illiquidity and loss in value to Fulton's ARS.  Id. at ¶ 29.

This was the practice until the summer of 2007 when the credit crisis struck, and demand for ARS collapsed.  Id. at ¶¶ 30-32.  Securities firms allegedly reacted with enormous increases in their proprietary ARS purchases to conceal the fact that the markets had become illusory and were near failing.  Id. at ¶¶ 31, 34, 35.  In February and March 2008, the ARS auction markets failed entirely.  Id. at ¶¶ 38, 39.  Fulton alleges that, during this time period, NatCity was aware of these failures and understood the materiality of this information, but failed to disclose this information to Fulton, even as it continued to sell ARS to Fulton while also selling its own inventory of ARS.  Id. at ¶¶ 34, 36, 37.

Fulton's student loan ARCs were not redeemed for the most part, because their maximum rates were below market rates.  Id. at ¶¶ 40-41.  Fulton currently holds ARS purchased between 2005 and 2008 from NatCity for a price of more than $175 million.  Id. at ¶ 15.  It has been required to write down the value of its ARS by an amount in excess of $10 million.  Id. at ¶ 43. Fulton makes numerous allegations that state and federal regulators have determined that NatCity and the other major underwriters of ARS manipulated the ARS markets and deceived ARS investors.  Id. at ¶¶ 44-53.  It also alleges that NatCity had special knowledge and expertise in the ARS auction markets that it did not possess.  Id. at ¶¶ 54-56.  Because of its superior

knowledge and role in the auction markets as Fulton's BD, Fulton alleges that NatCity owed it fiduciary duties, as well as duties of fairness, honesty, disclosure of material information, and undivided loyalty. Id. at ¶¶ 57-62.

Attached to the Complaint are excerpts of regulatory decisions issued by the SEC and various state regulatory bodies imposing penalties upon several ARS market participants. Only one of the fourteen exhibits concerns NatCity. See Compl. Ex. P. On March 13, 2009, the Financial Industry Regulatory Authority and NatCity entered into a "Letter of Acceptance, Waiver and Consent," in which NatCity conceded that, during the period from May 31, 2006 through February 28, 2008, it had engaged in activities in violation of SEC, NASD and Municipal Securities Rulemaking Board rules concerning its sales and marketing of ARS. Id. NatCity conceded that it had created marketing materials for ARS that were unfair and did not provide a sound basis for its customers to evaluate the facts in regard to purchases of ARS because the materials did not contain adequate disclosure of the risks of ARS, including the risks that ARS auctions could fail, that investments could become illiquid, and that customers might be unable to obtain access to funds invested in ARS for substantial periods of time. Id. at 2.

## II.    STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)). We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. DelRio-Mocci v. Connolly Props., Inc., 672 F.3d 241, 245 (3d Cir. 2012) (citing Warren Gen. Hosp. v.

Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011). Legal conclusions, however, receive no deference, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986) (cited with approval in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Twombly, 550 U.S. at 555 (alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). The complaint must contain "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'" Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). In the end, we will dismiss a complaint if the factual allegations in the complaint are not sufficient "'to raise a right to relief above the speculative level.'" West Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank, 712 F.3d 165, 169 (3d Cir. 2013) (quoting Twombly, 550 U.S. at 555).

In addition to the fundamental requirements of Rule 8(a), complaints alleging fraud must also satisfy the heightened pleading requirements of Rule 9(b). A complaint "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The United States Court of Appeals for the Third Circuit has determined that in order to comply with the particularity requirement of a fraud claim, the following elements must be pled: (1) A specific false representation of material facts; (2) knowledge by the person who made it of its falsity; (3)

ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) the plaintiff acted upon it to his damage. <u>Christidis v. First Pa. Mortgage Trust</u>, 717 F.2d 96, 99 (3d Cir. 1983). "A complaint satisfies Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral representations, who made the statements, the time and place of the statements, the content of the statements and manner in which they misled the plaintiff, and what benefit the defendant gained as a consequence of the fraud." <u>In re Theragenics Corp. Sec. Litig.</u>, 105 F. Supp. 2d 1342, 1348 (N.D. Ga. 2000) (citing <u>Brooks v. Blue Cross and Blue Shield of Fla., Inc.</u>, 116 F.3d 1364, 1371 (11th Cir. 1997)).

Rule 9(b) applies "not only to fraud actions under federal statutes, but to fraud claims based on state law." <u>Christidis</u>, 717 F.2d at 99. Rule 9(b) requires the plaintiff plead "the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 223-24 (3d Cir. 2004) (quoting <u>Seville Indus. Mach. Corp. v. Southmost Machinery Corp.</u>, 742 F.2d 786, 791 (3d Cir. 1984)). "[A]llegations of 'date, place or time' fulfill these functions," but plaintiffs may also "use alternate means of injecting precision and some measure of substantiation into their allegations of fraud." <u>Seville Indus. Mach. Corp.</u>, 742 F.2d at 791. In addition, where plaintiffs allege a fraud scheme, courts have "recognized the impracticality of requiring the plaintiff to plead the facts of each individual claim, particularly where the claims are numerous and extend over the course of several years." <u>United States ex rel. Singh v. Bradford Reg'l Med. Ctr.</u>, Civ. A. No. 04-186, 2006 WL 2642518, at *4 (E.D. Pa. Sept. 13, 2006) (quoting <u>United States ex rel.</u>

Landsberg v. Argentis Med., P.C., Civ. A. No. 03-1263, 2006 WL 1788381, at *4 (E.D. Pa. June 27, 2006)).[3]

The requirements of the Private Securities Litigation Reform Act do not apply to this action. The Act only applies to private actions arising under the federal securities laws. See U.S.C. § 78u-4(b) (stating "In any private action arising under this chapter. . ."). Fulton's claims only assert violations of the Pennsylvania Securities Act, as well as common law claims.

## III. DISCUSSION

### a. Failure to Plead Fraud with Specificity

In its Motion, NatCity argues that each of Fulton's claims are premised upon conclusory allegations that NatCity fraudulently manipulated the ARS market through its placement of proprietary support bids and the failure to reveal this activity, thereby creating the illusion of an efficient, completely liquid market. It argues that the Complaint fails to plead fraudulent conduct with the sufficient particularity required by Rule 9. It contends that Fulton has not alleged any specific instances in which NatCity placed a proprietary bid in support of an ARS auction, let

---

[3] Fulton argues that the requirements of Rule 9 should be relaxed under the circumstances of this case because its claims involve the inside, non-public information concerning NatCity's involvement in the ARS market, for which Fulton has no ability to obtain access prior to discovery. Doc. # 19 at 30-31 (citing In re Craftmatic Sec. Litig., 890 F.2d 628, 645 (3d Cir. 1989) (stating that "courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control") and In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997)). This argument is meritless. In Burlington Coat Factory the Third Circuit stated that "the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control. . . . But even under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice. . . . Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." Burlington Coat Factory, 114 F.3d at 1418 (internal citations omitted). The allegations of NatCity's fraud are not focused on its inside, non-public information, but rather on publicly available information regarding the alleged manipulation of the ARS market. NatCity's role in that alleged manipulation is the basis of the claims to which Rule 9 is applicable. I find, therefore, that Fulton is required to meet Rule 9's specificity requirement with regard to its allegations concerning NatCity's role in the market manipulation.

alone the time, place, and personnel involved in placing such a bid. It contends that Fulton has attempted to create the appearance of a fraud by making generalized allegations of the activities of unidentified market participants, and then merely aver that NatCity acted in the same manner.

In response, Fulton asserts that it has pled specifically how NatCity manipulated the ARS market. It has alleged that NatCity had insider access to the non-public information that there was a substantial gap between the true investment-motivated demand for ARS and the supply of ARS for sale. Id. ¶¶ 18, 20, 30-32. NatCity concealed and failed to disclose to Fulton that ARS auctions had failed in August 2007 because of insufficient demand and because underwriters and CBDs like NatCity had intentionally discontinued the placement of support bids. Id. ¶ 31. NatCity had motivation to maintain the appearance of liquidity in the ARS markets to satisfy its issuer clients, its retail brokerage customers, and to expand its customer bases in both groups, so as to continue generating underwriter and broker-dealer fees. Id. ¶ 20. NatCity had knowledge that, if ARS investors became aware that the market was in danger of failure, there would be a rush to sell, leading to widespread failure of the ARS markets to NatCity's detriment; to avoid this from occurring, NatCity made large proprietary purchases for its own account to conceal the facts that the auction market was near failure, creating a false appearance of demand, and a false appearance that the auction markets were independent, functioning and active, despite its knowledge that the markets were illusory and entirely dependent upon the proprietary trading activities of itself and other CBDs. Id. ¶¶ 21, 27. NatCity failed to advise Fulton that ARS auctions had been prevented from failing only because NatCity and other CBDs had placed support bids for their own accounts, and failed to disclose that the risk that CBDs would discontinue their support bids had risen dramatically, and that such discontinuance was imminent. Id. ¶ 33. Throughout the fall of 2007 and into 2008, NatCity continued to

recommend ARS purchases to Fulton without disclosing the increased risk of owning ARS and that ARS were no longer suitable for Fulton's investment goals, while simultaneously trading ARS for its own account on the basis of its insider knowledge. Id. ¶¶ 35-36. NatCity concealed from Fulton that in the fall of 2007 it was selling its own inventory of ARS, and taking action that favored its own proprietary interests on the basis of non-public information, in violation of its duty as Fulton's broker. Id. ¶ 37. Finally, Fulton asserts that NatCity's purpose was to maintain the market for sales of ARS at par prices which were materially inflated and did not reflect the increasing risk associated with owning ARS; that without proprietary purchases, investors would not have been willing to pay par for ARCs, the market value would have dropped substantially to reflect the true risk, and the interest rate paid by ARCs would have risen substantially. Id. ¶ 66.

I find that Fulton has failed to meet its obligation under Rule 9 to plead the allegations of fraudulent conduct with the required specificity. Notwithstanding the allegations I have recited, Fulton has not alleged specific facts to support its conclusions that NatCity, directly or indirectly, unlawfully manipulated the market by creating the false or misleading appearance that the market for ARS was active in order to induce others to purchase ARC. A close examination of the Complaint reveals that Fulton has only made general averments that NatCity made support bids to prop up auctions that otherwise would have failed, without offering any specific instances in which it did so. Fulton has alleged that NatCity materially aided other underwriters and CBDs in manipulating the market, and it alleges that the conduct of others had an effect upon the market, but Fulton does not state with any specificity how NatCity materially aided these unidentified other actors.

Fulton does not allege any specific auctions where NatCity acted as a CBD, and the allegation that NatCity was an "insider" states only a legal conclusion. Most importantly, Fulton does not allege any specific auction where NatCity placed a support bid to make an auction "appear to be legitimate," let alone how its specific actions constituted market manipulations. The allegation that NatCity made large proprietary purchases for its own account to conceal the fact that the auction market was near failure, to create a false appearance of demand, and a false appearance that the auction markets were independent, functioning and active, is completely unsupported by allegations of specific purchases during the relevant time frame. Fulton's conclusory allegation that NatCity knew that the markets were illusory and entirely dependent upon the proprietary trading activities of itself and other CBDs, also contains no factual basis.

Indeed, the documents that Fulton has appended to the Complaint contradict these legal conclusions. NatCity is not mentioned in 13 of the 14 regulatory decisions that Fulton appended to the Complaint to support its allegations, each of which concerns the activities of other market participants. Fulton's only Exhibit that specifically references NatCity — the March 13, 2009, the Financial Industry Regulatory Authority Letter of Acceptance, Waiver and Consent, which states that NatCity had limited involvement in the functioning of the ARS market. The regulators stated that NatCity acted:

> primarily as a downstream firm,[4] although it did operate outside this traditional role on a few occasions. Specifically, NatCity had very limited involvement in two auction rate security underwritings: it was a co-senior manager in one and a

---

[4] The regulators refer to "upstream firms" as those that actually conducted the ARS auctions by collecting orders from broker-dealers, determining the "clearing rate," and calculating the allocation of the securities among auction dealers. Compl. Ex. P. at 3. "In contrast to upstream firms, firms sometimes known as 'downstream' firms do not act as agents for issuers in any capacity. Instead, downstream firms act in the traditional broker role as agents for their customers and place bids with Auction Dealers and Remarking Agents on the customers' behalf to purchase and sell ARS." Id.

co-manager in the other. Additionally, in four ARS issues, it was an authorized auction participant, which allowed it to directly participate in an auction instead of submitting its customers' bids through a third part broker-dealer.

Compl. Ex. P at 4.

The gist of Fulton's fraud-based claims — as well as the claim for negligent misrepresentation — is that NatCity failed to disclose the deteriorating state of the ARS markets. Specifically, these omissions allegedly included that: ARC auctions in August 2007 had failed; that the risk that CBDs would stop making support bids to prop up the market was rapidly increasing; that the proprietary inventories of NatCity and other CBDs were increasing; that the level of risk of investing in ARCs had changed; that auction failures on January 23, 2008 and during the first week in February 2008 resulted in a rapidly rising risk of total failure of the ARS market; that NatCity was trading for its own account on the basis of non-public information; and that NatCity had intentionally withdrawn from the ARC market. All of these allegations are unsupported by the type of factual matter required by both Iqbal and Rule 9. Fulton has failed to offer any specific allegations relating to NatCity's own alleged manipulation of the ARS market, focusing instead on broad statements of industry-wide fraud regarding the state of the market. Notably, Fulton claims that NatCity concealed and failed to disclose to Fulton the risk that *other* CBDs would choose to discontinue supporting the ARS markets, Compl. at ¶ 33, but never alleges any facts that show NatCity was aware of what other investors, broker-dealers, or auctioneers were planning to do in the context of the declining ARS market.

Instead, Fulton only makes generalized statements about the activities of a number of unnamed market participants and includes NatCity in the group, but alleges no instances where

NatCity actually placed a proprietary bid or the effect of a particular bid on the market.[5]  It alleges that NatCity concealed, *like other* Contractual BDs, that it was off-loading its own inventory of ARCs, see, e.g., Compl. ¶ 37, but there are no allegations of specific sales to support the conclusion that NatCity was "off-loading" its inventory.  These allegations merely speculate about the knowledge and actions of NatCity regarding its participation in the ARS market.  Fulton's sweeping claims about unidentified underwriters, CBDs and BDs, with no particularized facts regarding NatCity's placement of support bids, its decision to discontinue the practice of providing those bids, or any allegations to support that it had knowledge concerning the "unhealthy" state of the market, are insufficient to satisfy its pleading obligation under Rule 9.  Since Fulton does not plausibly assert how NatCity was aware of the activities of other market participants, its fraud based claims fail.

**b.     Failure to plead scienter.**

In the alternative, I find that the fraud-based claims must be dismissed because Fulton has failed sufficiently to allege scienter.[6]  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 and n.12 (1976)).  Where scienter is an element of a cause of action, plaintiffs must "allege facts that show the court their basis for inferring that the defendants acted with 'scienter.'" Burlington Coat Factory, 114 F.3d at 1418.

---

[5]  For example, Fulton alleges that, throughout the summer and fall of 2007, CBDs, including NatCity, continued to make proprietary support bids which resulted in increasing proprietary inventories of ARS.  Compl ¶¶ 31-33.  While it alleges with much detail the number of support bids placed by entities other than NatCity, see Compl. ¶ 24 (alleging that "UBS submitted support bids in 30,367 auctions" between January 1, 2006 and February 28, 2008), it does not allege specific instances of NatCity making support bids.

[6]  Although NatCity does not specifically argue that the Complaint should be dismissed because Fulton has failed to adequately allege scienter, since this is an obvious defect in Fulton's pleading, I conclude that a discussion of the issue is appropriate.

A plaintiff can satisfy the scienter requirement by alleging facts demonstrating "strong circumstantial evidence of conscious misbehavior or recklessness." Oran v. Stafford, 226 F.3d 275, 288-89 (3d Cir. 2000). [7] "A reckless statement is one 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir. 1999) (citing McLean v. Alexander, 599 F.2d 1190, 1192 (3d Cir. 1979)); see also In re Digital Island Sec. Litig., 357 F.3d 322, 332 (3d Cir. 2004) (citing In re Advanta, 180 F.3d at 535).

Count I of Fulton's Complaint alleges a violation of PSA section 1-402, 70 P.S. § 1-402, which declares market manipulation to be a fraudulent and prohibited practice. Section 1-402(b) provides: "It is unlawful for any person, directly or indirectly, in this State: … [t]o effect, alone or with one or more other persons, a series of transactions in any security creating actual or apparent active trading in the security or raising or depressing the price of the security for the

---

[7] In Dirks v. SEC, 463 U.S. 646, 660 (1983), the Supreme Court held that the scienter requirement was adequately plead where the plaintiff alleged that defendant "knew or should have known" that he was trading on improperly obtained insider information. Id. However, the Supreme Court has never held that negligence is sufficient, and has yet to decide whether recklessness, in addition to willfulness, satisfies the scienter requirement. See Matrixx Initiatives, Inc. v. Siracusano, ___ U.S. ___, 131 S. Ct. 1309, 1323 (2011). The Third Circuit has held that scienter for securities fraud includes recklessness. Oran, 226 F.3d at 288-89; Infinity Grp. Co., 212 F.3d at 192; see also SEC v. Smart, 678 F.3d 850, 857 (10th Cir. 2012) ("Section 10(b) . . . require[s] the SEC to establish at least recklessness. . . ."); United States v. Gansman, 657 F.3d 85, 91 n. 7 (2d Cir. 2011) (observing that civil liability under the misappropriation theory may attach if the SEC proves by a preponderance of the evidence that the defendant's conduct was merely reckless, rather than willful).

purpose of inducing the purchase or sale of the security by others."[8]  70 P.S. § 1-402(b).  Count

II alleges a violation of § 1-401, which provides:

> It is unlawful for any person, in connection with the offer, sale or purchase of any security in this State, directly or indirectly:
>
> (a) To employ any device, scheme or artifice to defraud;
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

70 P.S. § 1-401.  Count III alleges a violation of § 1-403, which prohibits broker-dealers from

inducing the sale of any security by means of "any manipulative, deceptive or other fraudulent

scheme, device, or contrivance, fictitious quotation, or in violation of this act or any regulation or

order hereunder."  70 P.S. § 1-403.

These provisions are similar to Section 10(b) of the Securities Exchange Act of 1934, 15

U.S.C. §  78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, a rule promulgated by the

Securities Exchange Commission to enforce section 10(b).[9]  See GFL Advantage Fund, Ltd., v.

Colkitt, 272 F.3d 189, 214 (3d Cir. 2001) (holding that PSA sections are "modeled after Rule

---

[8]  Section 1-402(c) provides it is also unlawful "to induce the purchase or sale of any security by the circulation or dissemination of information to the effect that the price of the security will or is likely to rise or fall[.]"  70 P.S. § 1-402(c).

[9]  Section 10(b) states in relevant part that "it shall be unlawful for any person . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations" promulgated by the SEC. 15 U.S.C. § 78j. Rule 10b-5 provides in relevant part that "it shall be unlawful for any person . . . to employ any device, scheme, or artifice to defraud."  17 C.F.R. § 240.10b-5. Section 9(a) prohibits individuals from effecting "a series of  transactions in any security registered on a national securities exchange . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."  15 U.S.C. § 78i(a)(2).

10b–5 of the federal securities laws, and requires virtually the same elements of proof.") Therefore, the cases hold that the PSA is to be construed in the same manner as similar provisions of federal securities law.[10] See also 70 P.S. § 1-703(a) (stating that the PSA is to be construed "to coordinate the interpretation and administration of this act with related Federal regulation").

In order to maintain a securities fraud claim under Rule 10b–5, a plaintiff must plausibly allege that "the defendant (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury." In re Ikon Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002). To plead the scienter element, a plaintiff must plead facts that plausibly show either (1) circumstantial evidence of either reckless or conscious behavior; or (2) establish a "motive and opportunity" to commit fraud. In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 276 (3d Cir. 2006). "Therefore, the elements of [a cause of action under PSA §§ 1-401 and 1-403] are: (1) that the defendant made misstatements or omissions of material fact; (2) with scienter; (3) in connection with a purchase or sale of securities; (4) upon which the plaintiff relied; and (5) the plaintiff's reliance was the cause of its injury." Fulton Bank, N.A. v. UBS Sec. LLC, Civ. A. No. 10-1093, 2011 WL 5386376, at *8 (E.D. Pa. Nov. 7, 2011) (Stengel J.) ("Fulton I"). The elements of a market manipulation claim under § 1-402 are also identical to the elements of a Rule 10b-5 claim. Id. at *13.

---

[10]   See, e.g., Fulton v. UBS Sec. LLC, Civ. A. No. 10-1093, 2011 WL 5386376, at *7 (E.D. Pa. Nov. 7, 2011) (Stengel J.) ("Fulton I"); McFeeley v. Florig, 966 F. Supp. 378, 382 & n.8 (E.D. Pa. 1997) (stating that "the anti-fraud provisions of the Pennsylvania Securities Act and the 1934 Securities Exchange Act are functionally identical" and that "Section 1-401 substantially echoes Rule 10b-5's language").

Fulton argues that it need not allege scienter because its state securities law claims do not require it. See Doc. # 19 at 26-27. It argues that PSA § 1-501(a), which imposes civil liability for violations of §§ 1-401 and 1-403, and PSA § 1-501(c), which imposes civil liability for violations of § 1-402, contain no scienter requirement.[11] Alternatively, Fulton argues that it has adequately pled scienter by demonstrating the basis and source of NatCity's knowledge of the true state of the market, its intent to manipulate the market, the method by which it manipulated the market, and its purpose in manipulating the market. Id. at 28-30.

The issue of whether the PSA contains a scienter requirement is not settled. The Third Circuit has held that § 1-401 of the PSA is "functionally equivalent" to section 10(b). See GFL Advantage Fund, 272 F.3d at 214 (citing Rosen, 155 F. Supp. 2d at 321 n.14. Thus, the requirement of pleading and proof of scienter is arguably necessary. However, in Gilliland v. Hergert, Civ. A. No. 05-1059, 2008 WL 2682587 (W.D. Pa. July 1, 2008), the court predicted that the Pennsylvania Supreme Court would recognize a distinct, separate cause of action under §

_____

[11]   The statute provides in pertinent part:

(a) Any person who . . . offers or sells a security in violation of sections 401, 403, 404 or otherwise by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the purchaser not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission, shall be liable to the person purchasing the security from him. . . .

. . .

(c) Any person who wilfully [sic] participates in any act or transaction in violation of section 402 shall be liable to any other person who purchases or sells any security at a price which was affected by the act or transaction for the damages sustained as a result of such act or transaction

70 P.S. § 1-501 (a), (c) (footnotes omitted).

1-501 that does not require a plaintiff to prove scienter or reliance, but rather requires a plaintiff to only demonstrate some causal relationship between the misrepresentation and their purchase, but not loss causation.  Id. at *6-7 (citing Kronenberg v. Katz, 872 A.2d 568, 598-99 (Del. Ch. 2004)).

In Fulton I, I addressed Fulton's identical argument that a plaintiff need not plead scienter (as well as reliance) because PSA § 1-501 creates a separate cause of action that does not contain a scienter element.  Id., 2011 WL 5386376 at *7 n.4 ("Plaintiffs contend that because of § 1–501 language to make out a § 1–401 claim, they do not need to prove: (1) that they reasonably relied on any alleged misrepresentations, (2) that UBS acted with scienter, or (3) that the misrepresentations and/or omissions were the proximate cause of their losses.")  I thoroughly analyzed the relationship between § 1-501 and § 1-401, stating:

> § 1–501(a) of the Pennsylvania Act is modeled on § 410(a)(2) of the Uniform Act, which is in turn modeled on § 12(2) of the 1933 Act.  Notably, § 1–501(a) is written in the disjunctive.  Therefore, it definitively provides a civil remedy against "any person who [. . .] offers or sells a security in violation of section § 401."  Although there is some confusion as to whether § 1–501 creates a separate and additional cause of action under § 1–501 itself, it arguably provides that any person who "otherwise" violates the terms of § 1–501(a) "shall be liable to the person purchasing the security from him."  Based on this disjunctive phraseology, the analysis in Kronenberg states that the Pennsylvania Supreme Court does recognize a stand-alone § 1–501 claim, but distinguishes it from a § 1–401 claim. Kronenberg v. Katz, 872 A.2d 568, 596 (Del. Ch. 2004). In In re Suprema Specialties, 438 F.3d at 269–70, the court commented that § 77l(a)(2), from which § 1–501 is modeled, is a "virtually absolute liability provision that does not require an allegation that defendants possessed scienter." Id.  To state a prima facie case under § 1–501, requires Plaintiffs to demonstrate some causal relationship between the misrepresentation and their purchase, but not loss causation, scienter or reliance. Gilliland v. Hergert, 2008 U.S. Dist. LEXIS 51421 (W.D. Pa. July 1, 2008).
>
> *UBS argues that § 1–501 does not modify the private right of action for violations of §§ 1–401 or 1–403.*  Specifically, the Defendant notes that it has been acknowledged by courts "that section 501 provides an independent cause of action[;]" however, courts require that "section 401 claims brought under section

19

> 501 must satisfy the familiar elements of a 10b–5 claim, including scienter." . . . .
> *I agree with Defendants.*

Id. at \*7 n.4 (emphases added; citations omitted).

I conclude, consistent with <u>Fulton I</u>, that scienter is a requirement for Fulton's PSA claims here. While Fulton again posits that it is not required to allege scienter to state a claim under § 1-501, the Complaint does not attempt to state a claim under § 1-501. Rather, it premises claims only under §§ 1-401, 1-402, and 1-403. While, as I noted in <u>Fulton I</u>, there is caselaw that suggests that Section 1-501 creates a *distinct* cause of action from those created by the other sections, I ultimately determined that § 1-501 did not modify the private right of action for violations of § 1-401 and § 1-403. Since Fulton does not premise any of its claims upon § 1-501, the same arguments it raises here are largely inapposite. <u>Accord</u> <u>Fulton I</u> at \*7 n.4 (noting that "regardless of whether § 1–501 independently creates a cause of action other than through § 1–401, Fulton has not alleged a violation under § 1–501. Therefore, it must satisfy the elements of their § 1–401 claim, which is modeled after SEC Rule 10b–5.").

Because Fulton is required to plead scienter, the allegations of the Complaint are insufficient under Rule 9. Fulton alleges that NatCity "knew . . . that the ARC auction markets were illusory, that there was no real liquidity in the market and that, absent support bids the auction markets would fail." Compl. at ¶ 27. However, Fulton fails to assert specific facts showing how NatCity had actual knowledge of information that it withheld from Fulton, upon which I may reasonably infer an intent to deceive, manipulate, or defraud. Specific facts are required to establish scienter and Fulton does not plead specific facts in support of its claim that NatCity made fraudulent material omissions.

Fulton makes only conclusory allegations regarding NatCity's motive for the alleged omissions, which focus principally upon NatCity's desire to earn fees and protect the value of its

own proprietary ARS assets.  See Compl. ¶ 22 (alleging NatCity made proprietary support bids to prolong the life of the ARS market that was generating lucrative underwriting and BD fees and to avoid losses on its own assets); id. ¶ 37 (alleging NatCity concealed that it was off-loading its own inventory of ARS).  This type of conclusory allegation was specifically rejected by the court in In re Citigroup Auction Rate Sec. Litig., 700 F. Supp. 2d 294 (S.D.N.Y. 2009), a case brought under Section 10(b) and Rule 10b-5.  The court noted — albeit applying the more rigorous standard of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2) — that the cases have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter.  Id. at 305 (citing Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ("To accept a generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute."); In re Marsh & Mclennan Companies, Inc. Sec. Litig., 501 F. Supp. 2d 452, 489 (S.D.N.Y. 2006) ("Although an auditor's receipt of consulting fees inordinately disproportionate to its auditing fees may give rise to a proper inference of motive . . . allegations of payment for services rendered are generally inadequate."); Vogel v. Sands Bros. & Co., Ltd., 126 F. Supp. 2d 730, 739 (S.D.N.Y. 2001) ("alleged desire to realize greater transaction fees and its close relationship with [financial services holding company client] are insufficient to show an improper motive [on part of the investment banking firm]").  Likewise, in Ashland Inc. v. Morgan Stanley & Co., Inc., 700 F. Supp. 2d 453, 459 (S.D.N.Y. 2010), the court determined that scienter allegations centered on the insider's desire to increase or sustain demand for ARS, so that it could sell off its own holdings, was not plausible because such a theory — implying the simultaneous making of support bids and the dumping of ARS assets — would be "economically irrational."  Id. at 469.

The assertion that one has the motivation to make profits is not sufficiently concrete to infer scienter. See e.g., Kalnit v. Eichler, 246 F.3d 131, 140 (2d Cir. 2001) (summarizing previous holdings, which articulated motive to show profitability, which is common to all for-profit enterprises, is too generalized to support viable scienter claim); and Defer LP v. Raymond James Fin., Inc., 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009) ("An allegation that defendants' motive was merely to increase or maintain profit such as this is insufficient"). Fulton's generalized accusations of NatCity's profit motive are insufficient to carry its burden to allege an inference of scienter with particularity. Therefore, its fraud-based claims are subject to dismissal for this reason as well.

### c. Failure to plead reasonable reliance.

NatCity next argues that reasonable reliance is an element of Fulton's claims under the PSA, as well as its claims for negligent misrepresentation, common law fraud, and aiding and abetting fraud. It contends that Fulton has failed to allege in a plausible way that it reasonably relied upon NatCity's alleged misrepresentations and omissions. NatCity argues that, as early as May 2006, it became public knowledge that certain broker-dealers were placing proprietary bids in support of ARS auctions. Specifically, on May 31, 2006, the SEC announced the institution of administrative proceedings against, and a settlement with, fifteen broker-dealers for such activity, a group which did not include NatCity. NatCity asserts that the 2006 SEC Order[12] detailed to the public that certain broker-dealers intervened in the ARS market by bidding to prevent failed auctions, bidding to set a market rate, and bidding to prevent all-hold auctions.

---

[12] In deciding a motion to dismiss, we may take judicial notice of matters of public record, such as the 2006 SEC Order concerning ARS practices and disclosure requirements. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994).

NatCity argues that this information was readily available to a diligent investor, especially a sophisticated financial institution investor such as Fulton.

Fulton asserts six arguments in response. It again responds that it simply need not plead reliance for Counts I, II, and III, because reliance is not an element of the cause of action provided by PSA §§ 1-501 and 1-503 for violations of §§ 1-401, 1-402, and 1-403. (Doc. # 19 at 32.) Second, it argues that the reasonableness of a plaintiff's reliance is an issue of fact not properly determined on a motion to dismiss. (Id. at 33). Third, it asserts that, under Pennsylvania law, reliance is presumed in fraud-based claims and need not be specifically pled or proved. (Id.) Fourth, while NatCity relies upon the 2006 SEC Order, that Order by its own terms states that the SEC "does not prohibit broker-dealers from bidding for their proprietary accounts *when properly disclosed.*" 2006 SEC Order at 6. NatCity does not contend that it properly disclosed to Fulton that it was making support bids. (Doc. #19 at 34.) Fifth, what was publicly disclosed in the 2006 SEC Order is not the information that Fulton claims was fraudulently withheld by NatCity. Rather, Fulton's claims are based on NatCity's withholding of its knowledge that: (1) the August 2007 auction had failed and the relationship between supply and demand in the ARS market was out of balance through the Fall of 2007 and into 2008; (2) NatCity was placing support bids to conceal the lack of stability and liquidity; (3) other CBDs were placing support bids; (4) the increase of its own ARS inventory was unsustainable and that it would be unwilling to continue increasing its proprietary exposure to ARS risk; (5) the January 2008 auctions failed; and (6) the February 2008 catastrophic auction failures. (Id. at 34-36.) Finally, Fulton argues that the 2006 SEC Order, at most, operated as a precatory disclosure that CBDs and BDs *might* engage in proprietary bidding, and does not eliminate reliance upon omissions when a risk is, in fact, imminent or actual. (Id. at 36-37.)

23

### 1. Reliance must be alleged.

Fulton's assertion that it need not allege or prove reliance to state a claim under § 1-501 of the PSA is both inapposite and legally incorrect. As discussed above, the Complaint asserts claims under sections 1-401, 1-402, and 1-403, not section 1-501. Even if section 1-501 creates a separate cause of action, Fulton has not asserted such a claim in the Complaint, and section 1-501 does not modify the private right of action for violation of sections 1-401 or 1-403. Fulton I at *7 n.4. As for the claims actually raised, I find, consistent with Fulton I, that since the PSA sections are functionally equivalent to section 10(b) claims, Fulton is required to plausibly plead reliance. See Fulton I at *8 (holding that the section 1-401 and 1-403 claims contain a reliance element); *12 (holding that the § 1-403 claim contains a reliance element).

In Pennsylvania, reasonable reliance is also an element of a claim for negligent misrepresentation, see Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994) (holding that the elements of the negligent misrepresentation include a misrepresentation of a material fact), and common law fraud. Id. (holding that common law fraud contains the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance upon the misrepresentation; and (6) the resulting injury was proximately caused by the reliance); see also Overall v. Univ. of Pa., 412 F.3d 492, 498 (3d Cir. 2005). As with statutory claims under the PSA, allegations of common law fraud are subject to Rule 9(b)'s requirement of pleading with particularity, while the element must be plausibly pled under Iqbal to support the negligent misrepresentation claim.

### 2. Reasonableness of reliance can be determined on a motion to dismiss.

Fulton's argument that reasonableness of a plaintiff's reliance is an issue of fact not properly determined on a motion to dismiss is meritless. Numerous courts have held that the reasonableness of reliance may be determined as a matter of law. See, e.g., Toy v. Metro. Life Ins. Co., 928 A.2d 186, 203-208 (Pa. 2007) (holding that where a plaintiff alleges fraud in the inducement a court may undertake a legal analysis of the reasonableness of plaintiffs' alleged reliance); Olivet Boys' Y Girls' Y Club of Reading v. Wachovia Bank, N.A., Civ. A. No. 08-4702, 2009 WL 1911049 (E.D. Pa. July 1, 2009) (Stengel J.) (dismissing fraud claim because allegation of reasonable reliance was insufficient as a matter of law); WP 851 Assoc. L.P. v. Wachovia Bank, N.A., Civ. A. No. 07-2374, 2008 WL 114992 (E.D. Pa. Jan. 10, 2008) (dismissing fraud claim for failure to adequately allege reliance upon defendant's representations); Ishler v. Chase Home Fin. LLC, Civ. A. No. 10-2117, 2011 WL 744538, at *6 (M.D. Pa. Feb. 23, 2011) (dismissing fraud claim for failure to plead that reliance was reasonable); Warden v. Crown Am. Realty Trust, Civ. A. No. 96-25J, 1999 WL 476996 (W.D. Pa. July 6, 1999) (dismissing securities fraud class action because the plaintiffs had failed to plead reasonable and justifiable reliance). [13]

### 3. Reliance may not be presumed.

In support of its assertion that, under Pennsylvania law, reliance may be presumed where a fraud claim is based upon omissions and failures to disclose information, Fulton cites In re

---

[13] I note that other cases concerning the collapse of the ARS market have also been disposed of through motions to dismiss, though not necessarily on reliance grounds. See, e.g., In re UBS Auction Rate Sec. Litig., Civ. A. No. 08-2967, 2010 WL 2541166 (S.D.N.Y. June 10, 2010); In re Merrill Lynch Auction Rate Sec. Litig., 704 F. Supp. 2d 378 (S.D.N.Y. 2010); Ashland Inc. v. Morgan Stanley & Co., 700 F. Supp. 2d 453; Ashland Inc. v. Oppenheimer & Co., 689 F. Supp. 2d 874 (E.D. Ky. 2010); Healthcare Fin. Grp., Inc. v. Bank Leumi USA, 669 F. Supp. 2d 344 (S.D.N.Y. 2009); Defer LP, 654 F. Supp. 2d 204; In re Citigroup, 700 F. Supp. 2d 294 (S.D.N.Y. Sept. 11, 2009); Aimis Art Corp. v. N. Trust Sec., Inc., 641 F. Supp. 2d 314 (S.D.N.Y. 2009).

Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 314 (3d Cir. 1998) ("Prudential").  The citation to Prudential is taken completely out of context.  Because it is clear that reliance cannot be presumed under the securities law, this argument has no merit.

The context of the discussion in Prudential concerned the predominance requirement of maintaining a class action under Fed. R. Civ. P. 23(b), not the pleading requirements for a fraud claim.  Id. at 314.  Further, the Third Circuit was merely restating the lower court's holding, not making its own legal conclusion.  Nothing in Prudential stands for the proposition that reliance may be presumed under the present circumstances.

Under traditional securities fraud analysis, the plaintiff is required to plead and prove that he purchased or sold securities in reliance on the defendant's misrepresentations, i.e., that he was aware of and directly misled by a specific misrepresentation.  See Semerenko v. Cendant Corp., 223 F.3d 165, 178 (3d Cir. 2000).  Only where a plaintiff asserts a "fraud on the market" claim may reliance be presumed.  See, e.g., In re DVI Inc. Sec. Litig., 249 F.R.D. 196, 208 (E.D. Pa. 2008) (holding that under a theory of "fraud on the market," plaintiffs may establish a presumption of reliance where they can show that misstatements or omissions may have affected the price at which they bought or sold a stock, where there is an efficient and impersonal market for the stock at the date and time of purchase or sale).  An efficient market is defined as one in which "information important to reasonable investors . . . is immediately incorporated into stock prices."  Burlington Coat Factory, 114 F.3d at 1425 (citation omitted.)  Fulton's allegations are the exact opposite of those required to state a fraud on the market claim since it asserts there was no efficient market for ARS.  Thus, Fulton's suggestion that an element of a fraud claim need not be actually pled flies in the face of Rule 9's particularity requirement.  See e.g., Decker v. Massey–Ferguson, Ltd., 681 F.2d 111, 114 (2d Cir. 1982) (holding that a plaintiff cannot rely

upon a presumption of fraud as a substitute for the specific requirements of Rule 9); Howard v. Sun Oil Co., 294 F. Supp. 24, 27 n.4 (D. Miss. 1967) ("Fraud is never presumed but must be pled with particularity under Civil Rule 9(b), and proved by clear and convincing evidence.")

### 4. The sufficiency of the reliance allegations.

The "reasonable reliance" element of the fraud-based claims requires the pleading of specific facts establishing a causal nexus between the misrepresentation/omission and the plaintiff's injury, as well as specific facts demonstrating that the plaintiff exercised the due diligence that a reasonable person under all the circumstances would have exercised to protect his own interests. Fulton I, 2011 WL 5386376, at *11 (citing AES Corp. v. Dow Chem. Co., 325 F.3d 174, 178 (3d Cir. 2003). In the context of Rule 10b-5, the Third Circuit has set forth a non-exclusive list of factors that a court should consider in determining whether a plaintiff's reliance was reasonable. AES at 178-79, (citing Straub v. Vaisman & Co., 540 F.2d 591 (3d Cir. 1976)); see also Leder v. Shinfeld, 609 F. Supp. 2d 386, 397 (E.D. Pa. 2009) (citing Straub). Those factors include the existence of fiduciary relationships, plaintiff's opportunity to detect the fraud, the sophistication of the plaintiff, the existence of a longstanding business or personal relationship, and the plaintiff's access to the relevant information.[14] AES Corp., 325 F.3d at 178-79; Straub, 540 F.2d at 598.

Fulton alleges that it "relied to its detriment on the false appearance, created by the manipulative conduct of NatCity and the other underwriter/Contractual BDs, that the ARC markets were reliable, liquid, independent, and efficient that was created by the manipulative

---

[14] Fulton alleges that NatCity, by virtue of its status as Fulton's ARS broker, owed it a fiduciary duty. This factor weighs in favor of finding reasonable reliance. While Fulton does not allege or argue that its relationship with NatCity was longstanding, I will assume for the purposes of this Motion that this factor also weighs in Fulton's favor.

conduct of NatCity and the other underwriter/Contractual BDs [and] the accuracy and completeness of the information it was receiving from NatCity regarding ARCs." Compl. ¶ 42. It asserts that it relied upon NatCity's expertise in the recommendation and trading of ARS, the status of the market for ARS, in its ability to access the market for ARS. Id. ¶ 57. It also alleges that it relied on NatCity to disclose all material and relevant information about ARS, especially in connection with NatCity's recommendations as to which ARS Fulton should purchase. In particular, Fulton claims that it relied on NatCity to disclose, and not to conceal, all material and relevant information concerning the liquidity of ARS and the level of risk presented by an investment in ARS. Id. ¶ 77. I find that these reliance allegations are insufficient in light of the 2006 SEC Order, which disclosed to the public that the ARS markets were not reliable, liquid, independent, or efficient, as well as the undisputed fact that Fulton is a sophisticated financial institution investor.

I find that Fulton's opportunity to detect the fraud, its sophistication, and its access to relevant information make an inference of reasonable reliance implausible. The omissions upon which Fulton claims to have reasonably relied all relate to NatCity's alleged concealment and failure to disclose that the ARS market was illusory because of the dependence on support bids, that the market had been historically prevented from failing only because of support bids, and the risk, following the August 2007 failed auction, that CBDs would stop making support bids. Thus, it is clear from the Complaint that Fulton attempts to base its reliance upon the same information disclosed by the 2006 SEC Order. This includes the assertions that the CBD's proprietary purchases were intended to manipulate the markets for ARS by creating the false appearance that those markets were broad-based, sustained by investor demand for ARS by third parties with true investment intent, and that the ARS markets were active, efficient and

independent, when there was far from sufficient real demand by disinterested parties with true investment intent to keep the auction markets from failing. Given the content of the 2006 SEC Order, Fulton cannot show it reasonably relied to its detriment upon NatCity's alleged failure to inform it that the ARS market was not efficient and independent.

The allegations that NatCity and the CBDs participated in the ARS markets for their own accounts to support the auction markets, without disclosing that participation to Fulton or that the success of auction markets was dependent upon support bids, is precisely the type of information made public by the 2006 SEC Order. The SEC found that broker-dealers had intervened in the ARS market to prevent failed auctions, and to set the market interest rate for ARS. Based on this public information, the <u>Citigroup</u> court found that any reasonable inference of reliance upon market integrity was belied by a 2006 SEC Order because that Order described the conduct of broker-dealers, "including intervention in the auctions through bidding from their proprietary accounts . . . to prevent failed auctions, to set a 'market' rate, and to prevent all-hold auctions. . . ." <u>Citigroup</u>, 700 F. Supp. 2d at 301-02. The court went on to hold that the 2006 SEC Order, as well as language in the plaintiff's trade confirmations, and the official statements issued in connection with ARS specifically enumerated in the Complaint, "all disclosed that Defendants could engage in the very conduct of which Plaintiff complains, the advantages that Defendants would have if they did engage in such conduct, the ability of such conduct to affect clearing rates and the possibility that the auctions would fail if Defendants did not intervene in them. . . . These documents disclosed that the ARS market was not necessarily set by the 'natural interplay of supply and demand,' but that they could be set by broker-dealers. . . ." <u>Id.</u> at 307. Thus, the court concluded, plaintiffs could not have plausibly relied upon the alleged misrepresentations

that broker-dealers had intervened in the ARS market to prevent failed auctions, and to set the market interest rate for ARS.

The same conclusion applies here as well. Fulton's reliance allegations all assert that proprietary purchases by NatCity and the other CBDs created the false appearance that the ARS market was "set by the 'natural interplay of supply and demand.'" Fulton's allegations concerning the August 2007 auction failure, and subsequent instability in the market due to CBDs deciding to stop making support bids leading to the ultimate failure in 2008, all depend upon an unreasonable assertion of reliance upon NatCity's failure to inform Fulton that a functioning market did not exist in the first place. The 2006 SEC Order placed investors — particularly sophisticated financial institution investors such as Fulton — on notice that they could not rely on an assumption of ARS market integrity, because it was in fact dependent upon the type of insider support bidding that forms the nucleus of Fulton's allegations. Accord Merrill Lynch, 704 F. Supp. 2d at 400 ("Even assuming that the Plaintiffs' allegations are sufficient to form a basis for their alleged reliance on an assumption of the ARS market's integrity, however, the disclosures contained in the research reports, prospectuses, 2006 SEC Order, and Merrill Lynch ARS website render any reliance unjustifiable."); In re UBS Auction Rate Sec. Litig., Civ. A. No. 08-2967, 2010 WL 2541166, at *23 (S.D.N.Y. June 10, 2010) (holding that plaintiffs had not plausibly pled reliance because the 2006 SEC Order "detailed the fact that auction dealers had placed support bids to prevent failed auctions and specifically noted that such conduct was not prohibited as long as it was properly disclosed. . . . [C]ompany-specific disclosures in the prospectuses combined with the publicly available information discussing broker-dealer participation in the ARS market, generally, are sufficient to preclude Plaintiffs from establishing that they reasonably relied on an efficient market free of Defendants' intervention in UBS ARS

auctions, as a matter of law.").[15]  Accordingly, I conclude that the motion must be granted on the alternative ground that the reliance allegations are insufficient, in addition to my conclusion that the motion must be granted for failure to allege fraud and scienter with the required particularity.

### d.    Failure to plead negligent misrepresentation.

The elements of the tort of negligent misrepresentation are: (1) a misrepresentation of a material fact; (2) made under circumstances in which one ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.  Bortz v. Noon, 729 A.2d 555, 561 (Pa. 1999); Gibbs, 647 A.2d at 889.[16]  Whether Fulton has stated a claim for negligent misrepresentation is

---

[15] I recognize that the cited cases each discuss the content of the 2006 SEC Order in conjunction with disclosure information contained on broker-dealer websites, and other disclosures, such as in the offering documents issued by broker-dealers.  Neither party has provided copies of any disclosure material given by NatCity to Fulton, either before or after the 2006 SEC Order was issued.  Thus, I am called upon to decide the reliance issue on the basis of the 2006 SEC Order alone.

I find from the almost unanimity of the case law, holding that the 2006 SEC Order constituted notice to the public that an investor could not rely on an assumption of ARS market integrity, Fulton's undisputed status as a sophisticated financial institution investor, as well as the absence of specific factual allegations demonstrating Fulton undertook any diligent effort to educate itself about the ARS market, that the Order alone constitutes sufficient disclosure to such a sophisticated investor.  Accord Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98-99 (2d Cir. 1997) (holding that reliance is unreasonable as a matter of law where a sophisticated investor fails to take reasonable steps to access critical public information); Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., 478 Fed. App'x 679, 683 (2d Cir. 2012) (same); Terra Sec. ASA Konkursbo v. Citigroup, Inc., 450 Fed. App'x 32, 34-35 (2d Cir. 2011) (holding that the district court correctly concluded that any reliance on defendants' alleged misrepresentations was unreasonable under the circumstances, where the plaintiffs were sophisticated investors, did not conduct any independent investigation prior to making their investments, and where information was not peculiarly within defendants' knowledge).

[16] Pennsylvania draws its negligent misrepresentation claim from Restatement (Second) of Torts, § 552, which provides in relevant part:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for

analyzed under Rule 8 and the <u>Twombly/Iqbal</u> standard, and not Rule 9, since it is not based in fraud. Thus, I ask whether Fulton has alleged sufficient facts to plausibly plead the claim.

The problems identified above concerning Fulton's failure to plausibly plead the misrepresentation/omission element of its fraud-based claims, leads to the conclusion that Fulton has also failed to plausibly plead a misrepresentation upon which it asserts this negligence-based claim. More significantly, all of Fulton's allegations supporting its negligent misrepresentation claim assert failures to disclose information, rather than direct misrepresentations of fact.[17] The Third Circuit has recognized that, under Pennsylvania law, a negligent misrepresentation claim

---

pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
(2) The liability in subsection (1) is limited to loss suffered
(a) By the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
(b) Through reliance upon it in a transaction that he intends the information to influence or know that the recipient so intends or in a substantially similar transaction.
(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts, § 552.

[17] <u>See</u> Compl. ¶ 31 (alleging that NatCity "concealed and failed to disclose to Fulton that ARC auctions had failed [in August 2007] because of insufficient demand and because underwriters and Contractual BDs, like NatCity, had intentionally discontinued the placement of support bids."); <u>id.</u> ¶ 33 (alleging "NatCity failed to advise Fulton, and concealed, that ARC auctions had historically been prevented from failing only because NatCity and other underwriters/Contractual BDs had placed support bids for their own accounts, and NatCity further failed to disclose, and concealed, that the likelihood that underwriters and Contractual BDs would discontinue support bids had risen dramatically, and that such discontinuance was imminent."); <u>id.</u> ¶ 35 (alleging that "NatCity continued to recommend ARC purchases to Fulton . . . without disclosing the risk of owning ARCs had increased . . . and that ARCs were not suitable for Fulton's [investment goals]"); <u>id.</u> ¶ 36 (alleging that "NatCity concealed and failed to advise Fulton that there was a materially increasing risk of loss"); <u>id.</u> ¶ 37 (alleging that NatCity concealed and failed to advise Fulton that, like other underwriters and Contractual BDs, NatCity was . . . off-loading its own inventory of ARCs").

may not be made out on the basis of a mere failure to disclose a material fact, but rather must be based upon an affirmative misrepresentation. Advance Capital Partners, LLC. v. Rossmann, 495 Fed. App'x 235, 238 (3d Cir. 2012) (citing Lazin v. Pavilion Partners, Civ. A. No. 95–601, 1995 WL 614018 (E.D. Pa. Oct. 11, 1995) ("Non-disclosure of a material fact would give rise to a cause of action for fraudulent non-disclosure, not for negligent misrepresentation.") and Lang v. Helios Capital Corp., No. 86–08031, 1989 WL 299241 (Pa. Com. Pl. Jan. 20, 1989) ("non-disclosure would give rise to a cause of action only for fraudulent nondisclosure, and not for fraudulent or negligent misrepresentation.")). Accordingly, I grant NatCity's Motion with regard to this claim.

> **e.** **The breach of fiduciary duty and negligence claims.**

Fulton also asserts claims of breach of a fiduciary duty and negligence. To state a breach of fiduciary duty under Pennsylvania law, a plaintiff must plausibly plead a confidential relationship and: (1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the defendant's failure to act solely for the plaintiff's benefit was a real factor bringing about the plaintiff's injuries. Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 414-415 (E.D. Pa. 2006). A fiduciary relationship exists where there is a relationship involving trust and confidence, and the proof must show confidence reposed by one side and domination and influence exercised by the other. Antinoph v. Laverell Reynolds Sec., Inc., 703 F. Supp. 1185, 1188 (E.D. Pa. 1989). In determining whether a fiduciary relationship exists, the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side. eToll, Inc. v. Elian/Savion

Adver., Inc., 811 A.2d 10, 23 (Pa. Super. Ct. 2002). A confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power. Id.

To make a claim under Pennsylvania law for negligence a plaintiff must plead (1) the existence of a duty or obligation recognized by law, (2) a failure on the part of defendant to conform to that duty or a breach thereof, (3) a causal connection between the defendant's breach and the resulting injury, and (4) actual damages. Wawrzynek v. Statprobe, Inc., 422 F. Supp. 2d 474, 483 (E.D. Pa. 2005).

Fulton claims that NatCity owed it a fiduciary duty to act with the utmost good faith and individual loyalty. Compl. ¶ 105. It claims that NatCity breached a duty of reasonable care to learn and understand Fulton's investment goals and objectives, and failed to provide Fulton with true recommendations regarding the nature and goals for its investments. Id. ¶¶ 99-100. Because these state law claims for negligence and breach of a fiduciary duty do not implicate the heightened pleading standard of Rule 9(b), and they do not have a scienter or reliance requirement — and because NatCity does not discuss these claims in its motion, even though the motion seeks dismissal of the entire Complaint — I find that the arguments raised by NatCity in its motion do not apply to these claims.

Reading these two claims in the context of the complaint as a whole, and applying the Twombly/Iqbal pleading standard of Rule 8(a), the pleadings sufficiently allege a duty, its breach, and resulting damages. Fulton asserts that it communicated specific investment goals, and that NatCity acted as its securities broker, providing advice and counsel for financial investments. The allegations that NatCity was trading in ARS in a manner that was at odds with

Fulton's investment interests are sufficient to plausibly plead a violation of its duty of good faith and fidelity to Fulton. Thus, I conclude that these claims must survive.

**f.  The aiding and abetting common law fraud claim.**

In <u>Fulton I</u>, I stated that "the Pennsylvania Supreme Court has not expressly adopted the Restatement (Second) Torts § 876(b), on which Fulton relies [to state a common law claim for aiding and abetting fraud]. . . . Because this is an unsettled question of law, I will not dismiss the claims under the rationale that an aiding and abetting fraud claim does not exist in Pennsylvania." <u>Id.</u> at *15 (internal citations and footnote omitted). However, I went on to determine that Fulton's allegations that the activity of other CBDs aided and abetted the defendant, "does not rise to the level of aiding and abetting because there is no allegation that UBS knew that PNC or NatCity was perpetuating a 'fraud' on Fulton. Merely running an auction at the request of issuers and paying commissions to brokers does not rise to substantial assistance or encouragement of the specific fraud Fulton is alleging PNC and NatCity committed." <u>Id.</u>

The present complaint alleges that NatCity had sufficient knowledge concerning the market conditions, the auctions, and how the interest rates and securities values were set based on the bidding process. Compl. at ¶ 35. Fulton contends that NatCity's participation in the auctions was done in concert with the other CBDs, with the knowledge that the markets were deteriorating and risk was increasing. <u>Id.</u> ¶ 115.

I find that this claim fails for the same reasons that the other fraud claims fail, namely that Fulton has failed to plead it with the requisite particularity. Fulton makes no specific factual averments about what information NatCity actually possessed concerning other CBDs. Additionally, Fulton makes no mention of what specific actions NatCity took, which would have

substantially assisted or encouraged any fraudulent behavior by other CBDs, or what actions other CBDs took to assist and encourage NatCity's fraudulent behavior. Accordingly, I grant the Motion to dismiss as to this claim.

### g. The equitable rescission claim.

Fulton's claim for equitable rescission must also be dismissed because it is a remedy for fraud, and not a separate cause of action. See Moffatt Enter., Inc. v. Borden, Inc., 807 F.2d 1169, 1174 (3d Cir. 1986) (quoting Scaife v. Rockwell-Standard Corp., 285 A.2d 451 (Pa. 1971) ("A defrauded party may pursue several remedies including . . . rescission . . . based on fraud.")); Prof'l Sys. Corp. v. OPEX Postal Techs., Civ. A. No. 05-2689, 2006 WL 573798 (E.D. Pa. Mar. 8, 2006) (holding equitable rescission is a remedy for fraud, not a cause of action); Germantown Mfg. Co. v. Rawlinson, 491 A.2d 138 (Pa. Super. Ct. 1985); Majer v. Sonex Research, Inc., 541 F. Supp. 2d 693, 713 (E.D. Pa. 2008). However, if a plaintiff alleges fraud in a transaction, a right of rescission is established.[18] Baker v. Cambridge Chase, Inc., 725 A.2d 757 (Pa. Super. Ct. 1999). Even if Fulton had properly pled rescission as a remedy for its fraud claim instead of as a separate cause of action, it would also be dismissed for the reasons stated above regarding the deficiencies in Fulton's fraud-based claims.

### h. The request for attorneys' fees and costs.

The United States Supreme Court has made clear, in the absence of an agreement or statute providing for attorney's fees, the American rule is that "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975); see also Pennsylvania v. Flaherty, 40

---

[18] The purpose of equitable rescission is to return the parties as nearly as possible to their original positions where warranted by the circumstances of the transaction. Gilmore v. Ne. Dodge Co., Inc., 420 A.2d 504 (Pa. Super. Ct. 1980).

F.3d 57, 60 (3d Cir. 1994) (plaintiff cannot recover attorneys' fees from the opposing party unless there is a statute or agreement between the parties that provides for the awarding of attorney's fees). Generally, Pennsylvania state courts also follow the American Rule. <u>See</u> <u>Mrozek v. Eiter</u>, 805 A.2d 535, 538 (Pa. Super. Ct. 2002) (quoting <u>Hart v. O'Malley</u>, 781 A.2d 1211, 1216 (Pa. Super. Ct. 2001)) (citing <u>Merlino v. Delaware Cnty.</u>, 728 A.2d 949, 951 (Pa. 1999) ("This Court has consistently followed the general, American rule that there can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties or some other established exception.")).

Because Fulton does not state a statutory or other basis for its demand for attorneys' fees, and does not dispute in its Response to the Motion that its request for attorneys' fees and costs is improper, the request is stricken from the Complaint.

### i. NatCity's Motion to Strike

Under Federal Rule of Civil Procedure 12(f), a court may order stricken any portion of a pleading that constitutes "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are decided on the pleadings alone, and should not be granted unless the relevant insufficiency is "clearly apparent." <u>Cipollone v.</u> <u>Liggett Grp., Inc.</u>, 789 F.2d 181, 188 (3d Cir. 1986); <u>see also</u> <u>N. Penn Transfer, Inc. v. Victaulic</u> <u>Co. of Am.</u>, 859 F. Supp. 154, 158 (E.D. Pa. 1994) (motions to strike decided on the pleadings alone).

While motions to strike serve the useful function of streamlining litigation, they are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." <u>Id.</u> (citing C. Wright & A. Miller, <u>Federal Practice and Procedure</u> § 1382 (1969)); <u>see also</u> <u>McInerney v. Moyer Lumber &</u>

Hardware, Inc., 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002) ("The purpose of a motion to strike is to . . . avoid unnecessary forays into immaterial matters"). In particular, courts have identified prejudice to one or more of the parties as a touchstone for deciding a motion to strike. See, e.g., Miller v. Grp. Voyagers, Inc., 912 F. Supp. 164, 168 (E.D. Pa. 1996). Although courts exercise considerable discretion in deciding motions to strike, the Rule 12(f) prohibition on "redundant" pleadings "must be read in conjunction with the liberal pleading standards of Rule 8 in general and Rule 8(e)(2) in particular" (under which parties may plead alternative theories of relief). Calloway Golf Co. v. Dunlop Slazenger Grp. Am., Inc. d/b/a Maxfli, 295 F. Supp. 2d 430, 438 (D. Del. 2003); see also Miller, 912 F. Supp. at 168 (noting the discretion afforded in deciding motions to strike); N. Penn Transfer, Inc., 859 F. Supp. at 158 (same).

NatCity argues that paragraphs 19, 24, 45-51 and 52(a)-(i) of the Complaint and Exhibits "A" through "O" reference other entities unrelated to NatCity and simply attempt to tarnish NatCity with the actions of others. Doc. #22 at 15. I find no merit in this argument. These paragraphs and Exhibits do not contain immaterial, impertinent, or scandalous information. Rather they are included in the Complaint to provide background information on the remaining negligence and breach of fiduciary duty claims, and are not unduly prejudicial or scandalous to NatCity. Accordingly, I will deny NatCity' Motion to Strike.

## III.    CONCLUSION

I find that Fulton has failed to allege specific facts to support the misrepresentation, scienter, and reliance elements of its fraud-based claims, and has also failed to plausibly allege the misrepresentation element of its negligent misrepresentation claim. Accordingly, I grant NatCity's Motion to dismiss Counts I, II, and III, asserting violations of Sections 1-401, 1-402, and 1-403 of the Pennsylvania Securities Act, as well as the claims for equitable rescission

(Count IV), negligent misrepresentation (Count V), common law fraud (Count VIII), and aiding and abetting fraud (Count IX). I also find that the claim for attorneys' fees is subject to dismissal. I deny the Motion as to the negligence claim (Count VI) and breach of fiduciary duty claim (Count VII). Finally, I find that NatCity's motion to strike should be denied.

An appropriate Order follows.