## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FULTON BANK, NATIONAL ASSOCIATION,   :
SUCCESSOR TO FULTON FINANCIAL       :
ADVISORS, NATIONAL ASSOCIATION,     :
                                     :
               Plaintiff,     :
                                     :
   vs.                          :     Civil Action No. 09-CV-4855-LS
                                     :
NATCITY INVESTMENTS, INC.,        :
                                     :
              Defendant.   :

## AMENDED COMPLAINT

Plaintiff, Fulton Bank, National Association, through its attorneys, Blakinger

Byler & Thomas, P.C. and Hodgson Russ LLP, alleges for its amended complaint:

**Parties, Jurisdiction, and Venue**

       1.     Fulton Bank, National Association ("Fulton") is the successor by merger

to Fulton Financial Advisors, National Association.  Fulton is a national banking association

formed under the laws of the United States of America, with its principal office at One Penn

Square, Lancaster, Pennsylvania.

       2.     NatCity Investments, Inc. ("NatCity") was, at all relevant times, a

corporation organized under the laws of the state of Indiana and authorized to conduct, and was

at all relevant times, conducting business in the state of Pennsylvania.

       3.     NatCity was, at all relevant times, registered with the Securities and

Exchange Commission ("SEC"), the Financial Industry Regulatory Authority, Inc. ("FINRA"),

and the Pennsylvania Securities Commission as a broker-dealer engaged in the business of effecting transactions in securities for the account of others, as well as itself.

## Auction Rate Securities

4.      "Auction rate securities" ("ARS") is a category of securities that includes: (1) bond-like investments issued by municipalities and student loan entities, generally known as "auction rate certificates" ("ARCs"); and (2) preferred stock issued by closed-end mutual funds, generally known as "auction preferred shares." This case involves student loan ARCs, which are bond-like, interest bearing certificates backed by pools of student loans. ARCs have a long-term nominal maturity with interest rates set and reset by auctions conducted at pre-determined intervals, usually 7, 28, or 35 days.

5.      ARS products were first marketed in the 1980s. Beginning in the early part of this decade, securities firms led a dramatic expansion of the ARS markets in the United States. These debt instruments were marketed as providing benefits to both issuers and investors. Issuers were able to secure long-term debt (*i.e.,* exceeding 20 years), while paying interest rates only slightly higher than short-term rates. Investors were paid slightly higher interest than traditional short-term debt instruments. Investors were led to believe that ARCs could readily be disposed of at par (through the periodic auction process) and that they were purchasing investments with reliable short-term liquidity.

6.      In the securities industry, low interest rates are associated with low risk investments; high interest rates are associated with higher risk investments. This is true because the market demands that investors be paid more for assuming greater risk. ARCs paid extremely low interest, characteristic of low-risk, safe, liquid, and secure investments.

-2-

7.     The creation and distribution of ARCs required the participation of a number of different entities. The "issuer" is the borrower that issues the ARCs. It receives the proceeds from the original sale of the ARCs (net of certain fees, commissions, etc.) and, as debtor, it assumes the obligation to pay principal and interest owing on the ARCs. The issuer engages one or more "underwriters" to structure, underwrite, and distribute the issue. An "auction agent" is engaged by the issuer to administratively conduct the auctions at which interest rates on the ARCs are reset.

8.     The issuer also selects one or more broker-dealers to buy and sell ARCs, both through and outside of the auction market, for the purpose of making a market in, and providing liquidity for, the issuer's ARCs. The duties of the participating broker-dealer(s) are set forth in a "Broker-Dealer Agreement" entered into between each broker-dealer, the issuer, and the auction agent for purposes of permitting the broker-dealer[1] to solicit bids from existing ARC owners and potential investors and to organize and convey those bids to the auction agent on their behalf. A broker-dealer that has entered into a Broker-Dealer Agreement with respect to an ARC issue is referred to below as a "Contractual BD" to distinguish it from broker-dealers that do not have such agreements and which therefore have no direct access to the auction process. If the broker-dealer of an ARC owner or potential ARC purchaser is not a Contractual BD, it must submit its customer's buy or sell order through a Contractual BD to participate in the auction process. The Contractual BD acts as broker for the ARC owner or potential ARC purchaser in executing the trade through the auction process. This creates a direct customer/broker

---

[1]     The term "broker-dealer" as used in the ARC context is different than that generally used in the securities industry to refer to an entity registered with the SEC and/or state regulatory agencies for purposes of trading securities for the accounts of others. *See, e.g.,* 15 U.S.C. § 78c(a)(4)(A) (defining "broker"); 70 P.S. §1-102(e) (defining "broker" under Pennsylvania law).

relationship between the ARC owner or potential purchaser and the Contractual BD, imposing all of the attendant fiduciary and other duties on the Contractual BD in favor of the customer.

9.      The auction agent enters into an "Auction Agreement" with the issuer and is responsible for receiving bids from the Contractual BDs, determining the interest rate at which all sell orders will clear, resetting the interest rate for the next auction period, and acting as liaison between the issuer, brokers, trustees, and security depositors. The auction agent is usually a third-party bank selected by the issuer and is generally disclosed in initial filings.

10.      The interest rate on ARCs is determined through a "Dutch auction" process. Existing holders and potential investors enter a competitive bidding process through the Contractual BDs. Potential ARC purchasers specify the number of shares, usually in denominations of $25,000, they wish to purchase and the lowest interest rate they are willing to accept. Conversely, current ARC owners specify: (i) the number of shares the owner wishes to sell either on an unqualified basis or at a specific interest rate; or (ii) the number of shares the current ARC holder wishes to continue to hold, regardless of the interest rate determined through the auction. If a current ARC holder does not provide any instructions to the Contractual BD with respect to all or a portion of its ARCs, the ARC holder is deemed to have given an instruction to continue to hold its current position. A current ARC holder may also function as a potential ARC purchaser if the current ARC holder is interested in acquiring additional ARCs. The Contractual BDs convey the bids and offers to the auction agent. The auction agent then assembles each bid and order, and ranks them according to size from lowest to highest minimum bid rate. The lowest bid rate at which all the shares can be sold at par establishes the interest rate to be paid for the next period, also known as the "clearing rate."

11.     A "failed auction" occurs when there is a lack of demand and no clearing bid is established. In the event of a failed auction, existing holders will hold their positions at the maximum rate set forth in the official statement or prospectus (*i.e.,* the "default rate"), until sufficient bids are entered to set a clearing bid at a subsequent auction.

## Factual Background

12.     For a number of years prior to 2006, Fulton had an institutional investment account at NatCity (the "Account"). In maintaining, administering, and effecting transactions in the Account, NatCity acted as Fulton's securities broker. The Account invested primarily in money market funds, bonds, and variable rate demand notes ("VRDNs"), with a goal of achieving a high degree of safety and liquidity, and a commensurate rate of return.

13.     As VRDNs became scarce and often unavailable, NatCity recommended to Fulton that it purchase ARCs as an alternative to VRDNs. Based on NatCity's recommendations, Fulton began buying ARCs in addition to VRDNs.

14.     Typically, Fulton would contact NatCity indicating that it had a specific dollar amount to invest and specifying a particular S&P or Moody's rating, almost always AAA or AA for S&P or Aaa or Aa for Moody's. Ratings of AAA and AA are S&P's highest ratings and indicate the highest quality and safest debt investments. Ratings of Aaa and Aa are Moody's highest ratings and indicate the highest quality and safest debt investments. In response to Fulton's general inquiries, NatCity made recommendations to Fulton that it purchase particular ARC issues, in some cases selecting issues NatCity owned in its own inventory.

15.     Fulton currently holds ARCs that were sold to it by NatCity for a purchase price of more than $77 million. These ARCs were purchased by Fulton between 2005 and 2008.

16.     A portion of ARCs purchased by NatCity for Fulton's Account were purchased from NatCity's own inventory, with NatCity acting as principal selling its own securities to Fulton. On the balance of Fulton's ARC purchases, NatCity acted as agent, accessing the auction markets as Contractual BD to fill Fulton's requirements. When Fulton sold ARCs through NatCity, NatCity often purchased them for its own account, again acting as principal.

17.     In recommending, selecting, selling, and purchasing ARCs for Fulton's Account, NatCity acted as a statutory broker-dealer pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(4)(A), and the Pennsylvania Securities Act of 1972, 70 P.S. § 1-102(e).

18.     NatCity also acted as a Contractual BD for a number of the ARC issues it recommended to Fulton and which were purchased and sold in the Account. NatCity typically earned a fee of .25 percent per year on the value of ARCs for which it had acted as the Contractual BD. In instances where NatCity acted as Contractual BD for a particular ARC issue, it may have also acted as the underwriter for that issue. For transactions where NatCity was not a Contractual BD, it received a portion of the Contractual BD's fee in return for directing the Fulton trade to the Contractual BD. That fee was not disclosed to Fulton.

19.     The major securities firms that were the principal underwriters and marketers of ARS and ARCs in the United States included:  Citicorp Securities, Inc. and Citigroup Global Markets Inc. (collectively, "Citigroup"), UBS Securities LLC and UBS Financial Services Inc. (collectively, "UBS"), JP Morgan Securities, Inc. and its affiliate Bear Stearns & Co. (collectively, "JPMS"), Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill"), Banc of America Securities LLC and Banc of America Investment Services Inc. (collectively, "BAS"), Goldman, Sachs & Co. ("Goldman"), and RBC Capital Markets Corporation ("RBC").

NatCity purchased for Fulton's account ARCs underwritten by each of these firms. NatCity purchased ARCs for Fulton's account in auctions for which these firms act as Contractual BD.

20.     Securities firms earned fees for underwriting ARS, for selling them, and for managing the auctions. These fees were so lucrative that NatCity and the other securities firms became secret "guarantors" of the success of the auctions. If there was insufficient investor interest in a particular auction, such that there were not enough buyers to match the sellers, then the auction was at risk of failure. This threatened the auction markets as a group, because they were based on investor confidence in access to short-term liquidity on demand. To protect the auction markets from seizing up, and to protect their stream of underwriting fees and auction management fees, securities firms, including NatCity, regularly entered proprietary bids for their own accounts to support the auctions and ensure that they succeeded, thereby creating the illusion of an efficient, completely liquid market.

21.     These proprietary bids for the purpose of ensuring the success of auctions that would otherwise fail are referred to as "support bids." Underwriters/Contractual BDs including, upon information and belief, NatCity placed support bids under the following circumstances: (1) when there would otherwise be insufficient demand to support an auction and, absent NatCity's support bids, the auction would fail; and (2) when, although the available bids would have resulted in a successful auction, the resulting interest rate would have been so high that the issuer would have been dissatisfied.

22.     NatCity submitted support bids for the purpose of falsely indicating to current ARC holders and prospective ARC purchasers that there were active, functioning, independent, liquid, and efficient markets for ARCs. This was important to satisfy the issuer-clients of NatCity's underwriting group (by manipulatively depressing the interest rates payable

by issuers to ARC owners) and the purchaser-customers of its retail brokerage group (by

maintaining the false appearance of reliable liquidity) and to expand its customer bases in both

groups. NatCity's further purpose in submitting manipulative support bids was to continue

prolonging the life of a market that was generating lucrative underwriting and broker-dealer fees.

Moreover, as a result of its proprietary trading activities, NatCity owned tens of millions of

dollars of ARCs. If the auction markets failed, the value of those assets would drop precipitously

(as they eventually did). NatCity's continued support bids in the ARCs markets were intended,

in part, to avoid these losses.

23.     NatCity and the other securities firms that acted as ARS underwriters and

Contractual BDs had no investment purpose in purchasing ARS and, in fact, were concerned that

ARS were unstable and risky investments with disproportionately low returns. Their purchases

of ARS were intended to, and did, manipulate the markets for ARS by creating the false

appearance that there was broad-based, sustained, and sustainable investor demand for ARS by

third parties with true investment intent, and that the ARS markets were active, efficient, and

independent. In fact, the ARS markets were not independent or efficient and there was far from

sufficient "real" demand by disinterested parties with true investment intent to keep the auction

markets from failing.

24.     The practice of securities firms like NatCity preventing auction failures by

submitting support bids misled investors like Fulton and deceived them into believing that the

ARC markets were independent and efficient, that there was broad, stable demand for ARCs, and

that investors would be able to sell their ARCs at par at any auction.

25.     Fulton and other investors like it were not aware and could not have

learned, even by exercising reasonable diligence under the circumstances, that the auction

-8-

markets were being manipulated by securities firms like NatCity that had non-investment reasons

for purchasing ARCs and were intentionally creating the illusion that the auction markets were

reliable, liquid, and efficient.

26.     Because of NatCity's roles in the auction markets and its activities as a

proprietary trader of ARCs, NatCity knew when it submitted support bids that the ARC auction

markets were illusory, that there was no real liquidity in the markets and that, absent support

bids, the ARC auction markets would fail.  NatCity submitted support bids to conceal this from

ARC purchasers like Fulton.

27.     NatCity never informed Fulton of its roles in the ARC markets or that it

was placing support bids for its own account, to support the auction markets, or to ensure its

issuer-clients were satisfied.  As a result of its various roles, NatCity's interests were different

from and conflicted with Fulton's.  Fulton's interest was to obtain the highest interest rate

consistent with its goal of a high degree of safety and liquidity.  NatCity's interests included

ensuring that interest rates did not rise so high that its issuer clients objected and maintaining the

illusion that the auction markets were independent and effective so that it could continue earning

fees placing trades for Fulton and as a Contractual BD, and earning profits as an underwriter and

trader of ARCs.  NatCity concealed its conflicting interests from Fulton.

28.     NatCity knowingly (or, in the alternative, recklessly) concealed and failed to

disclose to Fulton that the ARC auction markets were illusory or that the success of the auction

markets was dependent on the placement of support bids by NatCity and other

underwriters/Contractual BDs.  More specifically, NatCity concealed and failed to disclose to Fulton

that:  (1) the success of the auction markets was entirely dependent on support bids by itself and

other underwriters/Contractual BDs; (2) that it and the other underwriters/Contractual BDs had no

-9-

investment purpose in making proprietary purchases of ARCs; (3) that the purposes of NatCity and the other underwriters/Contractual BDs in supporting the auctions through undisclosed support bids were to generate fees, maintain their underwriting clients, and protect the value of their own ARC holdings; (4) that the demand for ARCs by third-party investors who purchased for investment-based reasons was far lower than necessary to maintain the reliable and successful operation of liquid ARC markets; and (5) that NatCity and the other underwriters/Contractual BDs could withdraw their support at any time, for non-investment related reasons, causing widespread failure of the auction markets and resulting in total illiquidity and material loss in principal value of Fulton's ARCs. This information was material and would have affected the decision of any reasonable investor to buy or sell ARCs. This information was not available to Fulton and could not have been learned by Fulton in the exercise of reasonable diligence.

29. Because of NatCity's roles in the auction markets and its activities as a proprietary trader of ARCs, NatCity was aware in the summer of 2007, at the latest, that the ARC inventories of underwriters and Contractual BDs, including its own, were rising substantially and that underwriters, Contractual BDs, and broker-dealers were reconsidering whether to continue supporting the ARC auction markets because the risk of owning ARCs was rising substantially.

**Maximum Rate Caps**
**for Student Loan ARCs**

30. Most ARS, including student loan ARCs, provide for maximum interest rates applicable in the event of auction failure. Under normal conditions, when demand for ARCs was sufficient, there was enough bidding competition from investors so that auctions succeeded at clearing rates below the maximum rate.

31.     ARCs backed by student loans (including the NatCity ARCs) typically provided for low maximum caps on the interest rate paid by issuers, relative to other types of ARS. For municipal ARS, maximum rates were typically very high - often 15 or 16 percent - far above any expected market rates. For student loan ARCs, including those purchased by Fulton from NatCity, maximum rates in the event of auction failure were quite low - in the 5 or 6 percent range. The reason for this was that the interest payments on student loan ARCs were supported by pools of student loans with interest rates that could not support higher payments. Low maximum interest rate caps on student loan ARCs were necessary to allow the issuers to obtain AAA ratings.

32.     The disparity in maximum interest rate caps applicable upon auction failure to municipal ARCs and student loan ARCs resulted in special and unique risks associated only with student loan ARCs. In a rising interest rate environment (such as existed in the fall of 2007 and early 2008), there was increasing risk that market interest rates would rise above the maximum rate applicable to student loan ARCs. This would cause student loan auctions to fail because investors unwilling to accept below-market interest rates would not bid - and bids above the maximum rate would not be accepted.

33.     Due to the disparity in maximum rates, the results of auction failure were very different for holders of student loan ARCs and municipal ARCs. Because of their high maximum rates applicable on auction failure - which were in the 15 percent range and were far above market rates - issuers of municipal ARCs had a strong economic incentive to redeem them when auctions fail. Moreover, the owners of municipal ARCs are, at least in part, compensated for their lack of liquidity by receiving interest at above-market rates. In contrast, issuers of student loan ARCs had no incentive (and, in many cases, no ability) to redeem them when

-11-

auctions failed because they were paying low maximum rates (at first, in the 5 to 6 percent range and then far lower) that were well below market rates. Moreover, owners of student loan ARCs were not only damaged by lack of liquidity; they also suffered damage from being locked into ARCs paying below market rates.

34.     Student loan ARCs had additional features known as the "available funds cap" and the "net loan rate" which limited the interest paid by student loan ARCs to the funds "available" in the student loan trust. These features had the effect of driving interest rates payable by student loan ARCs to zero in the early 2008 time frame, further insuring that student loan ARCs would not be redeemed by issuers.

35.     The risks described above actually materialized in 2008 and thereafter. Student loan ARCs failed in far greater percentages than municipal ARCs - because of their low maximum rate caps, available funds caps, and net loan rate caps. In addition, because of their low maximum rates, almost no student loan ARCs have been redeemed, nearly *five years* after the ARS market failure. In contrast, almost all municipal ARCs have been.

36.     These special and unique risks of student loan ARCs, and particularly the fact that they had remarkably higher risk of remaining illiquid for prolonged periods of time, were not disclosed by NatCity to Fulton.

37.     Similarly, the offering materials for student loan ARCs did not disclose these special risks. Further, student loan ARC offering materials did not provide investors with the information necessary to calculate the rates that would be paid in the event of auction failure. While these rates were often linked to publicly available benchmarks (such as LIBOR or U.S. Treasuries), they also depended on the internal expenses and costs of the student loan pools. This information was not available to investors like Fulton.

-12-

38.     These special risks of student loan ARCs are a primary reason that the auctions for Fulton's NatCity ARCs remain failed today and that Fulton's ARCs continue to be illiquid.

**NatCity Concealed the Special
Risks of Student Loan ARCs**

39.     The special illiquidity risks associated with maximum rates, available funds caps, and net loan rate caps were not disclosed by NatCity to Fulton.  Moreover, the facts that student loan ARCs, including the NatCity ARCs, were governed by these limitations, how to calculate them, and how they increased liquidity risk were not disclosed to Fulton, was concealed from Fulton, and was not reasonably accessible to Fulton.

40.     In the fall of 2007, because demand for ARCs from independent investors had collapsed, the auctions for the NatCity ARCs would not have cleared at or below their maximum interest rates without massive intervention by NatCity and other Contractual BDs.  To ensure that auctions would succeed at or below the maximum rate, NatCity and its co-Contractual BDs were required to bid for, and actually purchase, increasing portions of ARCs subject to auction.  This became undesirable to NatCity and the other Contractual BDs because their inventories of now-highly risky ARCs were rising.  To mitigate this, the Contractual BDs (including NatCity, UBS, Citigroup, Merrill, and JPMS) approached issuers and requested that they temporarily waive the maximum interest rate caps, so that additional independent investors would be attracted (based on the temporarily and deceptively inflated interest rates) and the Contractual BDs would not be required to purchase as many ARCs to avoid auction failure.

41.     The temporary maximum rate waivers were not disclosed to investors, including Fulton.  The necessity of obtaining these temporary waivers shows that the Contractual

BDs (including NatCity) were aware of the deteriorating status and imminent failure of the ARC

markets and took affirmative manipulative action to conceal it.  Moreover, the Contractual BDs,

including NatCity, knew that when the waivers expired, if market rates of interest continued to

be above the ARC maximum rates, there would be widespread failure of student loan ARC

auctions.  Because it was contrary to the issuers' economic interests to continue these temporary

maximum rate waivers, the ARC markets were positioned for imminent failure.  NatCity was

aware of this, but concealed it from Fulton and other investors.  Fulton would have sold its ARCs

immediately had it been advised of these facts.

      42.     In August 2007, a number of auctions failed due to insufficient demand

from "true" ARC investors and insufficient support bids by underwriters/Contractual BDs.  This

information was not known to, and could not have been known by Fulton, because it had no

ability to access information about the success or failure of auctions, the bidding process, or the

relative balance (or imbalance) between ARC sellers and purchasers.  This information was

known by NatCity due to its insider roles in the auction markets.  NatCity concealed and failed to

disclose to Fulton that ARC auctions had failed because of insufficient demand and because

underwriters and Contractual BDs, like NatCity, had intentionally discontinued the placement of

support bids.  NatCity further concealed and failed to disclose to Fulton that the risk that

underwriters/Contractual BDs would choose to discontinue supporting the ARC markets on a

broad basis was rapidly increasing in the fall of 2007 and early 2008.

      43.     Throughout the summer and fall of 2007, the ARC inventories of

underwriters/Contractual BDs continued to rise.  Consequently, the risk that the

underwriters/Contractual BDs would decline to support auctions through proprietary bids

continued to rise dramatically.  This resulted in a substantial increase in the risk to ARC

investors that: (1) ARC auction markets would fail, ARCs would become illiquid, and investors would lose access to the funds they had invested in ARCs; and (2) investors would suffer material losses to the principal value of their ARCs. Because of its active insider role in the ARC auction markets, NatCity was aware of the material changes and increases in these risks in the fall of 2007, but failed and refused to disclose them to Fulton.

44.     Moreover, throughout the fall of 2007 and early 2008, as the risk of ARC market failure increased dramatically, NatCity failed to advise Fulton, and concealed, that ARC auctions had historically been prevented from failing only because NatCity and other underwriters/Contractual BDs had placed support bids for their own accounts, and NatCity further failed to disclose, and concealed, that the likelihood that underwriters and Contractual BDs would discontinue support bids had risen dramatically and that such discontinuance was imminent.

**The Failure of the Auction Markets**

45.     On January 23, 2008, Lehman Brothers Holdings, Inc., one of the largest ARC underwriter-broker-dealers, withdrew its support from a number of auctions, allowing them to fail. A few days later, another major underwriter/broker-dealer, Piper Jaffray & Company, withdrew its support and allowed auctions to fail. On February 7, 2008, Goldman Sachs Group, Inc. allowed auctions it was managing to fail. Because of NatCity's wide-ranging participation in the ARC auction markets, NatCity was aware of these failures. Although NatCity understood the materiality of this information and the fact that it indicated the rapidly rising risk of ARC market failure and principal loss, NatCity failed to disclose this information to Fulton — even as it continued to sell ARCs to Fulton.

-15-

46.     Throughout the fall of 2007 and into February 2008, NatCity continued to recommend ARC purchases to Fulton and to purchase and sell ARCs for Fulton's account without disclosing that the risk of owning and purchasing ARCs had increased and was continuing to rise and that ARCs were not suitable for Fulton's goals of a high degree of safety and short-term liquidity.  During this same time, NatCity was contemporaneously trading in ARCs for its own account and for its own benefit, on the basis of this material inside information, which it failed to disclose to Fulton.

47.     NatCity concealed and failed to advise Fulton that there was a materially increasing risk of loss of the underlying principal investment in ARCs in the fall of 2007 and early 2008, in addition to a material increase in risk with respect to loss of liquidity.

48.     NatCity concealed and failed to advise Fulton that, like other underwriters and Contractual BDs, NatCity was marketing, recommending, and selling ARCs for purposes of off-loading its own inventory of ARCs, and the accompanying undisclosed risks, in the fall of 2007 and early 2008.  Thus, in violation of its duties as a securities broker, NatCity was taking action that favored its own proprietary interest over the interests of its customers, all on the basis of undisclosed material inside information.

49.     On February 13, 2008, auctions for ARCs began to fail in large numbers because underwriters and Contractual BDs, including upon information and belief NatCity, had intentionally withdrawn from the ARC market.  NatCity concealed and did not disclose this information to Fulton.  This information was not known by or accessible to Fulton prior to February 2008.

50.     Beginning in March 2008, auctions for the majority of ARCs Fulton held began to fail on a consistent basis.  Since then, virtually all auctions for both public and student

loan ARCs have repeatedly failed, leaving Fulton's principal investment frozen, illiquid, and unavailable. Many of the public-debt ARCs have been redeemed by the issuers and Fulton has received return of its principal but, for the most part, student loan ARCs have not been redeemed and Fulton has been unable to sell its student loan ARCs at auction.

51.     The reason that student loan ARCs have generally not been redeemed by the issuers is because they typically have maximum interest rates that are below market rates. Thus, issuers have no incentive to redeem them. The low maximum interest rates of student loan ARCs were favorable to issuers, including NatCity's investment banking clients, but was highly unfavorable to purchasers because it greatly increased the risk that purchasers would suffer principal loss and sustained loss of liquidity in the event of auction failure. These risks, which were specific and peculiar to student loan ARCs, were not disclosed by NatCity to Fulton. In particular, NatCity never disclosed to Fulton that, in the event of auction failure, issuers of municipal ARS and other types of ARS were likely to redeem their issues, but student loan issuers were not, or that purchasers of student loan ARCs assumed much higher risk of loss of market value and long-term loss of liquidity in the event of auction failure.

52.     Fulton continues to hold more than $77 million ARCs purchased from NatCity, which cannot be sold except outside of the auction markets at a steep loss. Fulton has suffered substantial and material losses in the principal value of the ARCs purchased from NatCity, in an amount exceeding $10 million. In addition, if not for NatCity's wrongful conduct, the ARCs purchased by Fulton would have paid substantially higher interest — to reflect the true risk and the lack of demand for ARCs. Fulton has been damaged by NatCity's conduct in so that Fulton received less interest than it would have been paid in an honest market.

-17-

53.     In purchasing ARCs and in not selling ARCs it owned, Fulton relied to its detriment on the false appearance, created by the manipulative conduct of NatCity and the other underwriter/Contractual BDs, that the ARC markets were reliable, liquid, independent, and efficient that was created by the conduct of NatCity and the other underwriter/Contractual BDs. Fulton also relied on the accuracy and completeness of the information it received from NatCity regarding ARCs. In purchasing and in not selling ARCs, Fulton was damaged due to its reliance on NatCity to disclose all material information regarding the ARC markets and the ARCs it sold to Fulton.

54.     Fulton has been required to write down the value of the ARCs purchased from NatCity by an amount in excess of $10 million. Fulton's losses were directly caused by NatCity's wrongful conduct. The decline in the value of Fulton's ARCs was caused by the lack of demand in the market to purchase ARCs at par and the deterioration and ultimate failure of the ARC markets — the very risks concealed from Fulton by NatCity. If NatCity had not fraudulently concealed but had disclosed the material information described above in paragraphs 27-29, 31-36, 39-44 and 45-48, Fulton would not have purchased ARCs and/or would have sold any ARCs it owned.

**State and Federal Regulators Have**
**Determined That the Major Underwriters**
**of ARCs Manipulated the ARC Markets**
**and Deceived ARC Investors**

55.     As stated above, NatCity sold more than $175 million of ARCs to Fulton. Some of the ARC issues were underwritten by NatCity. Others were underwritten by the major investment banks that were the principal underwriters and marketers of ARCs, including BAS,

Citigroup, UBS, JPMS, Merrill, Goldman, and RBC. Each of these firms underwrote and/or managed auctions for millions of dollars of ARCs sold by NatCity to Fulton.

56. On March 13, 2009, NatCity entered into a Letter of Acceptance, Waiver and Consent with the Financial Industry Regulatory Authority ("FINRA"), determining that NatCity had violated industry rules concerning the marketing of ARS. A copy of the March 13, 2009 Letter of Acceptance is attached as **Exhibit A**. Specifically, FINRA found:

    a. NatCity had used "materials with customers and prospective customers that were not fair and balanced and did not provide a sound basis for evaluating the facts in regard to the purchases of ARS";

    b. NatCity's materials "failed to adequately disclose the risks of investing in ARS, including the risk that ARS auctions could fail, that investments in ARS could become illiquid, and that customers might be unable to obtain access to funds invested in ARS for substantial periods";

    c. NatCity failed "to maintain procedures reasonably designed to ensure that its registered representatives accurately described ARS to customers during sales presentations and that representatives provided customers with adequate disclosure of the risks of ARS; and

    d. NatCity failed "to provide adequate training to its registered representatives regarding the features and characteristics of ARS and the differences between ARS and other investments.

**Exhibit A** at pp. 4-5.

-19-

57.     State and federal regulators have made findings that many other entities

made unlawful misrepresentations in connection with the marketing of ARCs and manipulated

the ARC markets.  Some of these are summarized below.

58.     On September 18, 2008, Linda Chatman Thomsen, the SEC's Director of

the Division of Enforcement, testified before Congress that "broker-dealer firms that underwrote,

marketed and sold [ARCs] misled their customers."  Thomsen continued:

> Through their sales forces, marketing materials, and account
> statements, firms misrepresented to their customers that
> [ARCs] were safe, highly liquid investments that were
> equivalent to cash or money market funds.  As a result,
> numerous customers invested in [ARCs] their savings and
> other funds they needed to have available on a short-term
> basis.  ***These firms failed to disclose the increasing risks
> associated with [ARCs], including their reduced ability to
> support the auctions.***  By engaging in this conduct, ***those
> firms violated the Federal securities laws, including the
> broker-dealer antifraud provisions***.  [Emphasis added].

59.     On May 22, 2009, the California Department of Corporations issued its

"Findings of Fact, Conclusions of Law, and Administrative Consent Order" to BAS (attached as

**Exhibit B**).  That Order determined that BAS marketed ARCs while withholding material

information from investors, that BAS "engaged in a concerted effort to market [ARCs]

underwritten by BAS without advising the retail customers of any of the potential risks

associated with a failed auction or market illiquidity," and that BAS "should have had

knowledge that, during the fall of 2007 and the winter of 2008, the auction markets were not

functioning properly or were at increased risk of failure."  Instead of disclosing this to investors,

BAS placed "increased [auction] support bids" that "had the effect of ***artificially*** propping up the

market and creating the ***illusion*** that the auction market was functioning as normal."  **Exhibit B**

at page 2 (emphasis added).

-20-

60.     On June 2, 2009, the Attorney General of the State of New York (the

"NYAG") entered into an "Assurance of Discontinuance Pursuant to Executive Law § 63(15)"

with JPMS and certain affiliates (including Bear, Stearns & Co.). A copy is attached as **Exhibit**

**C**. The NYAG determined that JPMS "made misrepresentations to certain investors in

connection with the sale of auction rate securities." **Exhibit C** at 3. The NYAG determined that

JPMS supported many of the auctions "for which it acted as the sole or lead broker" by

submitting "support bids" in the form of proprietary orders to purchase ARCs for its own

account. The NYAG further determined that

> Because investors could not ascertain how much of an
> auction was filled through [JPMS] proprietary trades,
> investors could not determine if auctions were clearing
> because of normal marketplace demand, or because [JPMS]
> was making up for lack of demand through support bids. . . .
> While [JPMS] could track its own inventory as a measure of
> the supply and demand for auction rate securities, ordinary
> investors had no comparable ability to assess the operation of
> the market. There was no way for ordinary investors to
> monitor supply and demand in the market or to assess when
> broker-dealers may decide to stop submitting support bids,
> which could cause its collapse.

**Exhibit C** at 4. Thus, the NYAG found that investors like Fulton had no way of knowing about

the illusory and manipulated nature of the auction markets which was concealed from them by

securities firms such as NatCity.

61.     The NYAG also found that, beginning in August 2007, "deteriorating

market conditions strained the auction rate securities market. Some institutional investors

withdrew from the market, decreasing demand for auction rate securities." **Exhibit C** at 4.

"[T]he resulting market dislocation should have been evident to [JPMS]. [JPMS] support bids

filled the increasing gap in the demand for certain auction rate securities, sustaining the

impression that the market was functioning." As a result, "from the fall of 2007 through early

February of 2008, demand for auction rate securities continued to erode and [JPMS's] auction rate securities inventory reached unprecedented levels. [JPMS] knew or should have known of the increasing strains on the auction rate securities market, but nonetheless did not disclose these increasing risks of owning or purchasing auction rate securities to all of its customers." **Exhibit C** at 4. The NYAG found that in February 2008, JPMS "and other firms stopped supporting the auctions for which it acted as the sole or lead auction broker-dealer. Without the benefit of support bids, the auction rate securities market collapsed." **Exhibit C** at 5. The NYAG concluded that JPMS had violated New York's Martin Act, which prohibits misrepresentations in the sale of securities, and violated New York's deceptive business practices statute. JPMS was required to pay a civil penalty of $25 million, and provide assurances that it would cease and desist its unlawful conduct. **Exhibit C** at 12-13.

62.     On December 11, 2008, the Securities and Exchange Commission ("SEC") sued UBS charging it with a wide-ranging fraud in connection with the marketing, offering, and sale of auction rate securities. On that same date, a judgment was entered against UBS permanently enjoining it from violating the anti-fraud provisions of the Securities Exchange Act of 1934 (15 U.S.C. § 78(o)(c)). In connection with the SEC's action, UBS entered into a Consent undertaking certain obligations with regard to auction rate securities, including the obligation to re-purchase ARCs from certain retail and small business customers, to pay certain consequential damages, and to make best efforts to provide liquidity solutions to institutional investors, as well as other relief. Copies of the SEC's complaint, the associated judgment, and UBS's Consent are attached as **Exhibit D**. Similar documents with respect to the SEC's action against Citigroup are attached as **Exhibit E**.

63.     On October 2, 2008, the Massachusetts Securities Division entered into a Consent Order with UBS (a copy of which is attached as **Exhibit F**). That Order contained 80 pages of factual findings detailing a massive and wide-ranging scheme to manipulate the market for auction rate securities, by defrauding investors by leading them to believe that the market was independent, efficient, and liquid when it was not, and by selling billions of dollars in auction rate securities to unsuspecting investors when UBS knew that the market was deteriorating and that failure of the auction markets was imminent.

64.     Additional examples of regulatory findings that securities firms manipulated the ARC auction markets for their own benefit and to the detriment of investors, and made misrepresentations or omitted to disclose material information to investors, are set forth below.

a.     Attached as **Exhibit G** is the NYAG's June 2, 2009 "Assurance of Discontinuance" concluding that Goldman's auction rate securities activities were deceptive and unlawful.

b.     Attached as **Exhibit H** is the NYAG's June 2, 2009 "Assurance of Discontinuance" concluding that RBC's auction rate securities activities were deceptive and unlawful.

c.     Attached as **Exhibit I** is the Montana Securities Department's May 5, 2009 "Consent Agreement and Final Order" concluding that BAS engaged in deceptive and unethical practices in connection with its auction rate securities activities.

d.  Attached as **Exhibit J** is the Montana Securities Department's March 9,
    2009 "Consent Agreement and Final Order" concluding that Citigroup
    engaged in deceptive and unethical practices in connection with its auction
    rate securities activities.

e.  Attached as **Exhibit K**, is the Massachusetts Security Division's April 7,
    2009 Administrative Consent Order concluding that BAS engaged in
    dishonest and unethical practices in connection with its auction rate
    securities activities.

f.  Attached as **Exhibit L**, is the Pennsylvania Securities Commission's July
    14, 2009 Findings of Fact, Conclusions of Law, and Order determining
    that Citigroup had engaged in dishonest and unethical practices relating to
    its auction rate securities activities.

g.  Attached as **Exhibit M**, is the June 1, 2009 Florida Office of Financial
    Regulation's Consent Agreement and Final Order with JPMS, concluding
    that JPMS engaged in deceptive practices in connection with its auction
    rate securities activities.

h.  Attached as **Exhibit N**, is the December 9, 2008 Texas State Securities
    Board's Consent Order, containing findings of fact that Citigroup engaged
    in deceptive and inequitable practices in connection with its auction rate
    securities activities.

i.  Attached as **Exhibit O**, is the June 16, 2009 Arizona Corporation
    Commission's Consent Order, determining that Merrill engaged in

dishonest and unethical practices in connection with its auction rate

securities activities.  Similar consent orders between Merrill and the

regulatory authorities of Colorado, Kentucky, Michigan, California, and

New York are attached as **Exhibits P**.

65.     These regulatory findings establish that the markets for the ARCs sold by

NatCity to Fulton were illusory and were manipulated for the benefit of the securities firms,

including NatCity, that created and controlled these markets, to the detriment of investors like

Fulton.  By virtue of its active insider role, NatCity was aware of and participated in this

improper conduct.

## NatCity's Special Knowledge and Expertise

66.     The ARC auction markets are opaque to investors like Fulton.  They have

no access to information about the number of bids received, the range of interest rates in the bids,

the identity of the bidders, whether the clearing bids are being influenced by (or set by) support

bids from underwriters/Contractual BDs bidding on a proprietary basis, whether the auctions

would fail without the proprietary support bids from underwriters/Contractual BDs, the special

risks of student loan ARCs, etc.  In fact, the only information that an ARC investor receives or

has access to concerning the ARC auction markets is whether its own buy or sell order is

accepted or rejected.  As discussed above, a portion of Fulton's purchase/sales of ARCs were

filled by NatCity acting as principal and, thus, were not processed directly through the auction

system.  In those instances, Fulton received no information at all as to the status of the ongoing

auctions for the issues bought or sold.

67.     Because of its role as an underwriter of ARC issues, as a Contractual BD,

and as an active proprietary trader in ARC issues, NatCity had access to, and received, inside and

non-public information concerning the status of the ARC auction markets. This information included without limitation: (1) the identities of bidders; (2) the relative balance between buyers and sellers at particular interest rates; (3) that the interest rates paid to ARC investors were artificially depressed by the manipulative support bids placed by NatCity and other underwriters/Contractual BDs; (4) that the success of ARC auctions became more and more dependent upon the submission of proprietary bids by underwriters/Contractual BDs with that dependence increasing through the fall of 2007 and into early 2008; (5) that proprietary inventories of ARCs held by underwriters/Contractual BDs were rising dramatically during that time period; (6) that the risk that underwriters/Contractual BDs would therefore discontinue their support of auctions was rising dramatically through that same time period; and (7) that the consequent risk that ARC investors (and especially investors in student loan ARCs, which were characterized by low default interest rates) would suffer a complete loss of liquidity and a loss of principal value was also rising dramatically throughout that time period. Fulton had no knowledge of, or ability to obtain access to, this information. This information was within the special knowledge of NatCity and could not have been discovered by Fulton or any investor acting with reasonable diligence. Indeed, Fulton had no access to or ability to learn any of the information described in paragraphs 27-29, 31-36, 39-44 and 45-48, above.

68.     Moreover, as a securities broker, underwriter, and Contractual BD, and as an active proprietary trader in ARC issues, NatCity had specialized knowledge and expertise in the operation of the ARC auction markets and in the evolving condition and instability in the ARC markets. Fulton did not have this expertise or knowledge.

**NatCity's Duties to Fulton**

69.     NatCity held itself out to Fulton as expert in the recommendation and trading of ARCs, the status of the market for ARCs, and in the ability to access the market for ARCs and to buy and sell ARCs. Fulton relied on NatCity with respect to these topics and for advice concerning the risks and benefits of ARCs. As Fulton's securities broker, NatCity was a fiduciary with the duty to disclose all material information in its possession to Fulton but, as discussed above, it concealed this information and failed to disclose it.

70.     As an underwriter of certain ARC issues, NatCity owed a duty to all investors, including Fulton, to disclose all material information in its possession with regard to the ARC issues. This included the material information discussed above in paragraphs 27-29, 31-36, 39-44 and 45-48.

71.     Because of its specialized and superior knowledge and its status as Fulton's securities broker, NatCity was Fulton's fiduciary, with the attendant duties of fairness, good faith, honesty, disclosure of all material information, and undivided loyalty.

72.     As a broker-dealer of a non-conventional investment, pursuant to NASD Notice to Members 03-71, NatCity has an obligation to conduct adequate due diligence to understand the product, perform a reasonable-basis suitability analysis, provide balanced disclosures of risks to Fulton, and implement appropriate internal controls and training of sales persons regarding such risks and suitability.

73.     As Fulton's securities broker, NatCity owed duties to Fulton to recommend securities only after studying them sufficiently to become informed as to their nature, risk, price and financial prognosis, and to disclose all material information in its knowledge or possession to Fulton with respect to any transactions NatCity executed for Fulton

-27-

and with respect to any recommendations NatCity made to Fulton. NatCity owed a duty to

Fulton to ensure that its recommendations were suitable for Fulton's goals and objectives.

NatCity owed a duty to Fulton to carry out its orders in the manner best suited to serve Fulton's

interests. NatCity owed duties to Fulton to disclose any actual or potential conflicts of interest,

to refrain from self-dealing, and not to favor itself in connection with purchases of ARCs from

Fulton or sales of ARCs to Fulton. NatCity owed a duty to refrain from misrepresenting to or

concealing from Fulton facts material to securities transactions it recommended or executed. As

discussed above, NatCity breached these duties.

      74.     As a party that was in possession of non-public material inside

information (discussed above), NatCity had a duty to either disclose that information or to refrain

from trading. As discussed above, NatCity actively traded for its own account in ARCs during

the timeframe when it was in possession of inside information and it failed to disclose, and in

fact concealed, that information from the public and from Fulton.

      75.     NatCity breached its duties by, among other things:

      a.     Failing to disclose to, and concealing from, Fulton material information in
its possession regarding the illusory nature of the ARC markets and the
deterioration, increasing risk, and imminent failure of the ARC markets.

      b.     Failing to disclose and concealing that the interest rates paid by ARCs had
been artificially depressed by manipulative support bids placed by NatCity
and other underwriter/Contractual BDs.

      c.     Recommending trades in ARCs that were unsuitable for Fulton's
expressed goals of a high degree of safety and liquidity.

d.      Failing to disclose to Fulton, that ARCs had maximum interest rate caps that increased the likelihood of auction failure, illiquidity and loss of market value.

e.      Failing to disclose that maximum rate waivers had been sought by and given to certain ARC issues.

f.      Failing to disclose that the temporary maximum interest rate waivers were certain to expire, leading to widespread auction failures.

g.      Executing ARC trades that were contrary to Fulton's goals and interests but which were calculated to serve NatCity's interests of generating fees and selling ARC inventory owned by NatCity.

h.      Executing transactions that were self-dealing in nature and placed NatCity's interests above Fulton's by engaging in proprietary sales of its own ARCs rather than Fulton's after the ARC market began to deteriorate and by selling Fulton ARCs from NatCity's inventory when it should have been advising Fulton to divest its ARC holdings entirely.

i.      By trading in ARCs for its own account while in possession of non-public material information.

j.      In the alternative, if NatCity was unaware of the deteriorating status and illusory and manipulated nature of the ARC markets (which Fulton denies), then it breached its duty to recommend ARC issues only after becoming sufficiently informed as to their nature, risk, and financial prognosis.

76.    Fulton hereby tenders the ARCs it continues to own to NatCity and demands that NatCity return to Fulton the purchase price of those ARC together with interest.

77.    NatCity's manipulative conduct, including proprietary trading of ARCs and its placement of support bids at auctions, its proprietary trading, and its concealment of the increasing risks of the auction markets, created a false and misleading appearance that the market for ARCs was an independent, functioning, and active market, when it knew that the ARC auction market was illusory and substantially dependent on the proprietary trading of Contractual BDs and broker-dealers, including NatCity. The purpose of NatCity's deceptive conduct was to maintain the market for sales of ARCs at par, prices which were materially inflated and did not reflect the increasing risks associated with ownership of ARCs. In addition, NatCity's deceptive conduct was intended to, and did, induce investors (including Fulton) to purchase and hold ARCs when they would not have purchased ARCs had they been aware of the true facts concerning ARCs and the ARC markets, and would have sold those they held.

78.    NatCity also materially aided others, including but not limited to Citigroup, UBS, JPMS, Merrill, BAS, Goldman, RBC, and other ARC underwriters/Contractual BDs, in manipulating the ARC auction markets and in creating the false and misleading appearance that the ARC markets were independent, functioning, efficient, and active, when it knew the ARC auction markets were illusory and substantially dependent on the proprietary trading and support bids of Contractual BDs and broker-dealers. NatCity's conduct materially assisted ARC underwriters like Citigroup, UBS, JPMS, Merrill, BAS, Goldman, and RBC to conceal from ARC investors that the risk of market failure, and resulting loss of principal and liquidity, was rising dramatically from at least the summer of 2007 through early 2008, such that ARCs had become high-risk investments with disproportionately low returns by summer 2007.

-30-

79.     NatCity's conduct was willful, malicious, outrageous and intentional. NatCity engaged in such wrongful conduct for the purpose of inducing Fulton to purchase ARCs. In the alternative, if NatCity did not have actual knowledge of the illusory and manipulated nature of the ARC markets, NatCity acted recklessly because, as a result of its various insider roles, NatCity had direct access to information (as described in paragraphs 27-29, 31-36, 39-44 and 45-48, above) such that it would have required willful blindness to avoid actual knowledge.

80.     If NatCity did not have actual knowledge of the facts and fraud discussed above, it was deliberately reckless in failing to obtain such knowledge by refraining from taking the steps necessary to discover those facts, the fraud, and the effect of its own conduct.

81.     NatCity's wrongful conduct constitutes a violation of Pennsylvania Securities Act ("PSA") § 1-501.

82.     NatCity is liable to Fulton for damages in an amount sufficient to compensate it for NatCity's violation of PSA § 1-501, which amount exceeds $10 million50,000.

## FIRST CAUSE OF ACTION
### (Negligence)

83.     Repeats the allegations in paragraph 1 through 82.

84.     As Fulton's broker, NatCity had a duty and obligation to learn and understand Fulton's investment goals and objectives, both with respect to the Account and with respect to individual recommendations and transactions.

85.     Fulton advised NatCity that its goals and objectives were to generate income at a level consistent with a very high degree of safety of principal and short-term liquidity. Fulton communicated to NatCity that it was seeking investments that were essentially risk free. NatCity recommended purchases of ARCs to Fulton on this basis. Indeed, NatCity

marketed ARCs to its customers, including Fulton, on a general basis as very low risk and suitable for the short-term cash management needs of the treasury functions of corporations, institutional investors, charitable organizations, etc.  NatCity's marketing representations were false and, if it had acted with reasonable care, NatCity would have known they were false.

86.     Moreover, as discussed above, NatCity had a duty to disclose all material facts to Fulton relating to any transactions it recommended or executed as Fulton's broker. NatCity failed to act with reasonable care and breached this duty by failing to disclose to Fulton that the ARCs purchased through NatCity were not suitable for Fulton's objectives of safety and liquidity.

87.     NatCity's negligence caused Fulton to purchase and hold ARCs, resulting in monetary losses exceeding $10 million.

88.     NatCity is liable to Fulton for damages in an amount sufficient to compensate for NatCity's negligence, which amount exceeds $10 million.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

89.     Repeats the allegations in paragraphs 1 through 88.

90.     As Fulton's securities broker-dealer, NatCity was a fiduciary, holding a position of trust and confidence with Fulton, and owing Fulton a duty of fair dealing and a duty to act with the utmost good faith and individual loyalty.

91.     NatCity breached its duties to Fulton by:  (a) failing to disclose to Fulton the increasing risk of investing in ARCs and the increasing risk that ARC auctions would fail, resulting in illiquidity and loss of principal; (b) failing to disclose to Fulton its various roles in the auction markets, including its role as an underwriter and Contractual BD; (c) failing to

disclose to Fulton that it and other Contractual BDs had historically placed support bids at the ARC auctions to prevent auction failures and/or to support interest rates acceptable to the ARC issuer; and (d) failing to disclose to Fulton that it was selling ARCs to Fulton out of its own inventory for the purpose of reducing its own exposure to the imminent risk of auction failure, loss of liquidity and loss of principal investment, thereby shifting these undisclosed risks to Fulton for its own benefit.

92.     NatCity is liable to Fulton for damages in an amount sufficient to compensate for NatCity's breaches of fiduciary duty, which amount exceeds $10 million.

### THIRD CAUSE OF ACTION
### (Violation of Pennsylvania Securities Act §§ 1-501(a)

93.     Repeats the allegations in paragraphs 1 through 92.

94.     This is a cause of action pursuant to PSA § 1-501(a), charging NatCity with offering and selling "a security by means of any untrue statement of a material fact or [an] omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, the purchaser not knowing of the untruth or omission." This is not a claim for fraud and Fulton is not required to show that NatCity possessed any degree of scienter with regard to the material misstatements or omissions with which it is charged. Instead, pursuant to PSA § 1-501(a), NatCity is liable for its material misstatements and omissions unless it can "sustain the burden of proof that [it] did not know and in the exercise of reasonable care could not have known of the untruth or omission." Fulton's claim in this cause of action is premised on the fact that there were material omissions by NatCity and that NatCity cannot meet its burden of establishing that it did not know and in the

-33-

exercise of reasonable care could not have known of such omissions. *See In re Suprema Specialties, Inc. Sec's Lit.,* 438 F.3d 256, 270-71 (3d Cir. 2006).

95.    NatCity failed to disclose information material and relevant to its recommendations that Fulton purchase certain ARCs and Fulton's decisions to purchase, sell, and enter hold orders for ARCs, including the information set forth in paragraphs 27-29, 31-36, 39-44 and 45-48, above.

96.    If Fulton had been aware of the information set forth in paragraphs 27-29, 31-36, 39-44 and 45-48, it would not have purchased additional NatCity ARCs, it would not have held its NatCity ARCs in the monthly auctions that occurred in the fall of 2007 and early 2008, and it would have sold the NatCity ARCs it owned.

97.    NatCity's material omissions constitute violations of PSA § 1-501(a). NatCity is a seller of securities within the meaning of PSA § 1-501(a).

98.    NatCity is liable to Fulton for damages in an amount sufficient to compensate for its violations of PSA §§ 1-501(a), which amount exceeds $10 million.

**WHEREFORE**, Fulton demands judgment:

a.    On its first cause of action, an award of damages against NatCity in an amount exceeding $10 million.

b.    On its second cause of action, an award of damages against NatCity in an amount exceeding $10 million.

c.    On its third cause of action, an award of damages against NatCity in an amount exceeding $10 million.

-34-

      d.      On the first, second and third causes of action, punitive damages in an amount exceeding $10 million.

      e.      Such further relief as this Court deems proper.

Dated: December 23, 2013

**HODGSON RUSS LLP**

By _____
      Robert J. Lane, Jr.
      Catherine Grantier Cooley
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York  14202
Telephone:  (716) 856-4000
*rlane@hodgsonruss.com*
*ccooley@hodgsonruss.com*

and

**BLAKINGER, BYLER & THOMAS, P.C.**
James H. Thomas
28 Penn Square
Lancaster, Pennsylvania 17603
Telephone:  (717) 299-1100

*Attorneys for Fulton Bank, National Association,*
*Successor to Fulton Financial Advisors,*
*National Association*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2013, I caused to be served, the Amended Complaint, dated December 23, 2013, via Federal Express to the following:

Joseph P. Pohl, III, Esq.
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburg, Pennsylvania   15222-2716
e-mail: jrestivo@reedsmith.com
         jpohl@reedsmith.com

Christopher S. Underhill, Esq.
HARTMAN, UNDERHILL &
BRUBAKER, LLP
221 East Chestnut Street
Lancaster, Pennsylvania  17602
e-mail:  chrisu@hublaw.com

Catherine Grantier Cooley