# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FULTON BANK, NATIONAL** | : | |
| **ASSOCIATION, SUCCESSOR TO** | : | |
| **FULTON FINANCIAL ADVISORS,** | : | **CIVIL ACTION** |
| **NATIONAL ASSOCIATION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 09-4855** |
| | : | |
| **NATCITY INVESTMENTS, INC.** | : | |
| | : | |
| **Defendant.** | : | |

**STENGEL, J.**                                                    **January 19, 2017**

## <u>MEMORANDUM</u>

The case arises out of the collapse of the market for Auction Rate Securities ("ARS"[1]).

Plaintiff, Fulton Bank, National Association, Successor to Fulton Financial Advisors, National

Association ("Fulton"), originally brought this action in the Court of Common Pleas of Lancaster

County against Defendant NatCity Investments, Inc. ("NatCity") alleging violations of

Pennsylvania Securities Act ("PSA") Sections 1-402 (Count I), 1-401 (Count II), and 1-403

(Count III), as well as claims for equitable rescission (Count IV), negligent misrepresentation

(Count V), negligence (Count VI), breach of fiduciary duty (Count VII), common law fraud

(Count VIII), and aiding and abetting common law fraud (Count IX).  Jurisdiction is based on

diversity of citizenship.  In a prior decision, I granted NatCity's Motion to dismiss the three PSA

claims, the negligent misrepresentation claim, the claim for common law fraud, and the claim for

aiding and abetting fraud.  <u>See</u> ECF No. 27 ("the MTD Opinion").  I denied the Motion to the

extent that it sought dismissal of the common law claims for negligence and breach of fiduciary

---

[1] Auction Rate Securities are also referred to as "Auction Rate Certificates" ("ARC").
The acronyms are used interchangeably in the record.

duty.  Id.  Thereafter, I granted Fulton's uncontested Motion for leave to file an Amended Complaint ("AC").  ECF No. 38.  In the AC Fulton reasserted its claims for negligence ("First Cause of Action") and breach of fiduciary duty ("Second Cause of Action") and alleged a new claim for violation of PSA Section 1-501(a) ("Third Cause of Action").  ECF No. 41.

NatCity filed a Motion for summary judgment on all of Fulton's remaining claims.  ECF No. 63.  Fulton requests summary judgment on the Section 1-501(a) claim.  ECF 64.  For the following reasons, I grant summary judgment to NatCity on the remaining PSA claim and deny Fulton's cross Motion on that claim.  I also deny NatCity's Motion in all other respects.

## I.     STANDARD OF REVIEW

Summary judgment is appropriate where, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.").  The Court must not "weigh the evidence and determine the truth of the matter but . . . determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  The moving party has the burden of establishing the basis of its motion and identifying the portions of the record that demonstrate the absence of a genuine issue of material fact.  After the moving party has made this initial showing, then the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322; Goldenstein v. Repossessors Inc., 815 F.3d 142, 146 (3d Cir. 2016) (citing Blunt v.

Lower Merion Sch. Dist., 767 F.3d 247, 265 (3d Cir. 2014)) ("[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.").

## II.     THE SUMMARY JUDGMENT RECORD

NatCity and Fulton have filed statements of undisputed facts and responses thereto.  ECF Nos. 63-3, 64-6, 69-1, 70-1.  Having reviewed those submissions, I find the following facts are undisputed.[2]  In June 2004, Fulton opened a securities account with NatCity.  February 20, 2015 Declaration of Robert J. Lane, Jr. ("Lane Decl.") Ex. A, April 11, 2014 Deposition of Jerome Goodrick ("Goodrick Dep.") at 25-26; Ex. D, May 30, 2014 Deposition of Jeff Suhanic ("Suhanic Dep.") at 41-42; Ex. E, June 4, 2014 Deposition of Keith McBride ("McBride Dep.") at 44-46.

At all times relevant to this litigation, Fulton marketed itself to its clients as a financial institution offering investment management services and specializing in handling fixed-income portfolios.  Def. Ex. A (11/21/2007 email) at FULPNC186472.  In 2007, Fulton managed and administered $5.3 billion in assets.  Id.  David M. Campbell, Fulton's Rule 30(b)(6) designee,[3] testified that Fulton may be fairly characterized as a sophisticated investor since "we have

---

[2] Given my ultimate determination that genuine issues of material fact mostly bar summary adjudication and the limited nature of the disposition I grant in adjudicating these Motions, I defer for purposes of the current discussion any objections raised by the parties based on foundation or admissibility pursuant to Fed. R. Civ. P. 56(e).  I note that the grant of summary judgment on the PSA claim relies on the limited factual determination that the securities involved in the claim were purchased on the secondary market, a fact that is undisputed.

[3] Campbell is the current President of Fulton Financial Advisors, a position he has held since the Fall of 2010.  He joined Fulton Financial Advisors as its Chief Administrative Officer in the Fall of 2009, and served in that role prior to being promoted to President.  Def. Ex. B, May 28, 2014 Dep. of David Campbell ("Campbell Dep.") at 16:7-17:7.

educated and experienced professionals, yes." Campbell Dep. at 189:1-19; <u>see also</u> Def. Ex. A at FULPNC186463 (stating Fulton "provides managed investment" services "tailored to the specific needs of the client").

Fulton offered an investment product known as a Cash Reserve Investment Management ("CRIM") account to for-profit and non- profit institutions, municipalities, and individuals. Def. Ex. D (Jan. 28, 2011 Deposition of Thomas Downing in <u>Fulton v. PNC Capital Markets, LLC</u> No. 09-10838 (CCP Lanc. Cty) ("Downing Dep.") at 31:2-6[4]; Campbell Dep. at 53:3-12; Def. Ex. A at FULPNC186463. Thomas Downing worked for Fulton Financial Advisors or its predecessors from May 1999 until November 2008 and served as a portfolio manager in the fixed income or money market area responsible for managing Fulton's CRIM accounts. Among the investments he used for the CRIM accounts were Auction Rate Securities. Downing Dep. at 8:24-9:1, 10:3-11:16, 12:7-12, 32:5-17.

Fulton designed the CRIM account as a liquidity-management product through which its customers could invest excess cash that was not needed for daily operations. Def. Ex. F at FULPNC185922; Def. Ex. A at FULPNC186463. Fulton had discretion over the investment of its CRIM customers' funds and had a fiduciary relationship with its CRIM customers. Campbell Dep. at 24:8-11, 72:4-75:1, 100:1-16; Downing Dep. at 122:16-123:19; Def. Ex. G (June 16, 2011 Deposition of Gerald Larish[5] ("Larish Dep.") in <u>PNC</u>) at 5:4-8. Fulton's CRIM customers did not have day-to-day input into the investments that Fulton made on their behalf. Campbell

---

[4] Downing was deposed in Fulton's separate case against PNC Capital Markets, LLC ("PNC"), which related to Fulton's ARS trading with PNC from 2005 to 2008. <u>See</u> Def. Ex. E (<u>PNC</u> Complaint) at ¶ 15. The parties have stipulated that discovery material from the PNC case can be used in this case. <u>See</u> ECF 44 (Stipulated Protective Order).

[5] Gerald Larish was a Senior Portfolio Manager and Chief Investment Officer at Fulton beginning in late 2007 or early 2008. In this role, he supervised Mr. Downing. Larish Dep. at 10:11-21; Downing Dep. at 13:17-14:18.

Dep. at 72:4-75:1, 100:1-16; Downing Dep. at 122:16-123:19.   Although Fulton may have communicated with its CRIM customers from time to time, it did not have to obtain day to day permission to invest those customers' cash.   Campbell Dep. at 72:4- 75:1, 100:1-16; Downing Dep. at 122:16-123:19.

Fulton was "contracted to act as the investment manager, and as such, [managed CRIM accounts] based on those guidelines that are provided to the client."   Campbell Dep. at 72:4-12. CRIM accounts were not pooled investments.   Downing Dep. at 31:13- 20; Campbell Dep. at 35:11-13.   Each CRIM account was unique to each CRIM customer.   Campbell Dep. at 35:7-10; Downing Dep. at 31:13-20.   Fulton constructed CRIM accounts that were specific to the CRIM customer's investment objectives, risk tolerances, and liquidity needs.   Campbell Dep. at 24:15- 25:7, 35:14-36:9, 51:8-52:14; 71:15-72:3;   Downing Dep. at 31:2-32:4; Def. Ex. A at FULPNC186463-186464.   To do so, Fulton performed a customer by customer needs analysis when constructing CRIM accounts.   Campbell Dep. at 24:15-25, 52:11-14.

Fulton had a responsibility to make appropriate and suitable investments on behalf of its CRIM customers, given the parameters and the investment objectives of the overall portfolio. Campbell Dep. at 55:19-25, 56:17-20; Downing Dep. at 90:9-91:9; Def. Ex. H (Fulton's Responses to PNC's First Requests for Admissions ("Fulton's PNC RFA Responses")) at #15. Campbell testified that Fulton had an obligation to "have a general understanding" of how the investments into which it placed its CRIM customers' money "worked."   Campbell Dep. at 59:17-60:2.   This obligation included keeping up with market news in relation to the investments into which it placed its CRIM customers' money.   Campbell Dep. at 58:14-59:7; 66:18-67:7; Def. Ex. A at FULPNC186471.

Fulton executives followed financial news concerning ARS by monitoring news media and conversations with the brokerage community and would hold weekly management committee meetings to discuss market developments, particularly when ARS auctions began to fail in the Summer of 2008.  Downing Dep. at 65:16-67:11; Def. Ex. I at FULPNC186556; Def. Ex. L at FULPNC186398-186399; Def. Ex. M at FULPNC185787-185788; Def. Ex. N at NATCITY- FULTON-377940.  At all times relevant to this litigation, Fulton had access to the Bloomberg financial news/data service but did not subscribe to it entire package.  Campbell Dep. at 115:23-117:4.  That service provides access to market news, information on particular issues including municipal bonds, and prospectuses/official statements.  Larish Dep. at 28:12- 30:18. In addition to Bloomberg, Fulton had access to other financial news sources, including the Wall Street Journal, Barron's, and the American Banker.  Downing Dep. at 65:16-66:2; Larish Dep. at 25:5-26:3, 58:6-17; Def. Ex O (June 16, 2011 Deposition of Bevan Kinney[6] ("Kinney Dep.") in PNC) at 18:16-20, 20:23-21:16, 23:15-24:24; Campbell Dep. at 152:24-153:9.

Fulton assembled a team of portfolio managers, who were designated as sector analysts, and assigned each portfolio manager a sector of the financial markets for which he or she was expected to keep abreast of news and developments.  Larish Dep. at 11:20-12:7; Kinney Dep. at 18:13-21.  The sector analysts met weekly to, among other things, discuss market news and to select securities for Fulton's internal funds, like the CRIM accounts.  Larish Dep. at 11:20-12:7; Kinney Dep. at 18:13-20:13; Downing Dep. at 66:3-21.

Fulton began investing its customers in ARS sometime prior to 2004 and as early as 2002.  Fulton's RFA Responses at #45; Campbell Dep. at 187:16-23; Kinney Dep. at 17:4-9.

---

[6] Bevan Kinney is an employee of Fulton.  From 2004 through 2008, she reported to Thomas Downing.  In her role, she traded ARS for Fulton's CRIM accounts.  Kinney Dep. at 15:4-16:10.

Fulton was acting as a fiduciary when it invested in ARS on behalf of its CRIM customers. Fulton's RFA Responses at #14.  Fulton never provided its employees with any formal training on ARS.  Campbell Dep. at 90:22-91:15.  Downing testified that his understanding of how ARS and the ARS market functioned was based primarily on discussions with the brokerage community.  Downing Dep. at 73:14-22.  Downing testified that neither PNC nor NatCity recommended that Fulton begin acquiring ARS as opposed to alternative financial products. Downing Dep. at 50:23-51:6.  Rather, the options were presented to Fulton with "things to consider" about each.  Id.  According to Downing, liquidity had never been a concern with ARS because there "had never been a hiccup, so to speak, in liquidity. . . .  The concern was more credit rating, the credit worthiness of the underlying collateral."  Id.

Fulton also studied the particular nuances of the credit rating of ARS.  It focused on the type of security, that it was normally backed by student loans, and determined it had sufficient credit worthiness to introduce into client portfolios.  Downing Dep. at 43:18-25.  It conducted its own check of background information on Bloomberg and did preliminary reading about particular securities.  Downing Dep. at 43:15-44:10.  Fulton was chiefly interested in purchasing securities that maintained high credit ratings, and thus, focused upon any credit risks associated with ARS.   Downing Dep. at 43:15-25, 51:22-52:3.   Fulton marketed ARS to its CRIM customers as offering daily liquidity through, among other things, "cross trades" or "crossing transactions" between its clients' CRIM accounts, i.e., if one client wanted to sell a position and another wanted to buy a similar position, Fulton would execute the trade within the organization to eliminate commissions and provide the necessary liquidity or investment opportunity for both clients.  Campbell Dep. at 149:13-150:8, 158:14-159:15.

Fulton first opened an institutional investment account at NatCity in 2004.  Def. Ex. X; AC ¶ 12.  Unlike Fulton's relationship with its CRIM customers, NatCity needed Fulton's approval in order to buy a security on Fulton's behalf.   Campbell Dep. at 72:4-75:1; Downing Dep. at 41:24-42:12.  Campbell, Fulton's Chief Administrative Officer and later President, testified that, to his knowledge, Fulton obtained ARS on the secondary market; i.e., it was not buying new public offerings of ARS.  Campbell Dep. at 55:25-56:3, 61:14-15.

Fulton kept the identities of its customers and those customers' risk tolerances and investment objectives confidential.   Campbell Dep. at 69:24-70:21, 131:25-132:5.   When purchasing ARS through NatCity for discretionary investment in its customers' CRIM accounts, Fulton would advise NatCity that Fulton had a particular amount of money that needed to be invested and would specify the investment parameters that it was seeking.  See Campbell Dep. at 133:11-134:3; Downing Dep. at 54:1-10; Kinney Dep. at 37:19- 38:14; Def. Ex. Y at NATCITY-FULTON-271622; Def. Ex. Z at NATCITY-FULTON-294109; Def. Ex. AA at NATCITY-FULTON-070513.  NatCity asserts that it would relay investment options that satisfied those investment parameters to Fulton.  Campbell Dep. at 134:5-10 ("Q.  And then National City would — would go out and look to see what's available and come back to — to Fulton with options; is that right?  A.  I believe that's a fair characterization."); Downing Dep. at 54:11-15 ("Q.  So once Ms. Kinney would convey the parameters of what you were looking for, would PNC come back to you with some options that fit your parameters?  A. Yes.").

Fulton disputes that NatCity simply relayed "investment options."  Fulton asserts that NatCity made recommendations, as that term is defined by FINRA and the MSRB, to Fulton that NatCity believed were suitable based on Fulton's investment objectives, risk tolerances and the parameters conveyed to NatCity.  It adds that it never requested a specific security.  See Pl.'s

Resp. to Rule 56.1 Statement (ECF No. 70-1) at ¶ 42 (citing Goodrick Dep. at 37; Lane Decl. Ex.

C, May 23, 2014 Dep. of Antonio DiPietro ("DiPietro Dep.") at 22-23, 87, 98; and March 15,

2015 Decl. of Elin Cherry ("Cherry Decl."), ECF 70-29, at ¶¶ 5-6.)  I note that, in the citation to

the DiPietro Deposition, he testifies as to the manner in which Fulton would typically place an

ARS order for one of its customers:

> So it started with a phone call from Fulton.  I have money to spend.  I would like
> X, Y, Z as far as parameters.  She would give me parameters, insured, tax free,
> taxable, whatever the case may be.  I then relay that to my trader and say this is
> what Fulton's looking for.  The trader would go on the street, look for something
> that matches the parameters, come back to me and say here's what's out there,
> here are the levels.  I then convey those levels to Fulton.  They say yes or no.  If
> they say yes, I come back to my trader and say okay, they want to buy this.

(DiPietro Dep. at 22.)  Goodrick testified:

> Q.  . . . did you also talk to Fulton about the particular characteristics and benefits
> of the auction rate security you were bringing to its attention?
>
> A.  Yes, I would have.
>
> Q.  And it's also fair to say that you would also bring a security to Fulton's
> attention if you thought it would meet its need and be appropriate for its
> consideration, correct?
>
> A.  That's correct.
>
> Q.  And did you communicate to Fulton in those circumstances that the auction
> rate security you were presenting was in your opinion appropriate for its
> purchase?
>
> A.  Would I tell them?
>
> Q.  Yes.
>
> A.  I would think I would, yes.

Goodrick Dep. at 37.

Fulton's expert, Elin Cherry declares that, pursuant to NASD Rule 2310, which was in

effect during 2005 to 2008 and is now known as FINRA Rule 2111, a broker is considered to

have "recommended" a security when the broker "brings a specific security to the attention of the customer through any means, including but not limited to, direct telephone communication, the delivery of promotional material through the mail, or the transmission of electronic messages."   Cherry Decl. ¶ 5 (quoting FINRA Rule 2111).   She opines that whether a recommendation has been made is an objective inquiry.  Id.  She opines further that, based on her review of the record, NatCity made recommendations to Fulton to purchase ARS, including student loan backed ARS ("SLARS"), since both Goodrick and DiPietro testified that (1) they selected the ARS issues they provided to Fulton because they thought they were suitable and appropriate, (2) they regularly sent Fulton a list of specific securities they recommended; (3) Fulton never asked for a specific issue; and (4) DiPietro conceded that FINRA would characterize every trade he did for Fulton as "solicited" and, therefore, every trade was recommended.  Cherry Decl. ¶ 6 (citing DiPietro Dep. at 22-23, 28-29).[7]

Campbell agreed that the options that NatCity provided to Fulton were within the parameters Fulton had provided.  Campbell Dep. at 135:2-7.  While NatCity asserts that "Fulton then would choose among the options presented and request a specific security at a specific amount," Fulton denies this assertion.  Campbell testified that he viewed the options NatCity presented to be recommendations.  Campbell Dep. at 134:11-14; but see Downing Dep. at 54:16-18 (agreeing that Fulton "would pick something from what they were providing to you").

---

[7] I note that Ms. Cherry has mischaracterized DiPietro's testimony on this last point.  He testified as to his understanding of FINRA's "solicitation" that "FINRA defines a solicitation as anything sold out of your inventory. . . .  My personal — my belief of a solicitation is I call you and ask you if you would like to buy something that I have.  I'm soliciting a specific product. . . . That never happened. . . .  Q.  And using that definition, do you characterize your trades — A. No.  Q.  — the auction rate securities for Fulton as being solicited?  A.  No, I don't, but I think they do.  Q.  You think FINRA does?  A.  I think by definition they do.  Anything that comes out of your inventory.  But I still don't think it's solicited, no."  DiPietro Dep. at 26-29.

Downing testified that he did not believe that PNC or any of his contacts there concealed or failed to inform him as a representative of Fulton of anything material about the ARS that he bought or sold through PNC.  Downing Dep. at 165:15-21.  While NatCity adds that "he did not identify any way in which his dealings with NatCity in that regard differed from his dealings with PNC," Fulton objects that the testimony relates solely to PNC and is irrelevant to its relationship with NatCity.

Fulton knew that it would not be provided with prospectuses/official statements for the ARS that it purchased through NatCity on the secondary market.  Fulton's RFA Responses at #'s 35, 53.  Fulton could obtain prospectuses/official statements for the ARS that it purchased through NatCity from Bloomberg and other sources.  Larish Dep. at 28:12-30:18.

Fulton alleged in a November 18, 2009 letter to FINRA that it acquired SLARS from NatCity issued by (1) the Higher Education Loan Authority of the State of Missouri, CUSIP 606072JF4, (2) the Illinois Student Assistance Commission, CUSIP 452281HQ4, (3) the Connecticut Student Loan Foundation, CUSIP 207784AG4, (4) the State Board of Regents of the State of Utah CUSIP 917546FL2, and (5) the Kentucky Higher Education Student Loan Corp., CUSIP 41930NAD1, among others.  Def. Ex. CC at NATCITY- FULTON-389836-389842.  The official statements for these SLARS can be obtained from Bloomberg.  Def. Ex. DD (Decl. of Joseph P. Pohl III in Support of Def. Mot. for Summ. Judg. ("Pohl Decl.") at ¶ 9).

The official statements contain extensive detailed disclosures about the ARS, including disclosures about auction procedures, interest rates on ARS, and risks associated with owning ARS.  Pohl Decl., Exs. 1, 2-6.  For example, the official statement governing CUSIP 606072JF4 issued by the Higher Education Loan Authority of The State of Missouri discloses that the "initial Broker Dealer" (in this case UBS Securities LLC) is permitted, but not obligated, to

11

submit orders in Auctions and may "routinely" do so in order to prevent "an auction failure event."  Pohl Decl., Exs. 1, 2 at pp. 13-14.  The official statement governing CUSIP 606072JF4 further contains the following disclosure under the heading "Existing Holder's Ability to Resell Auction Rate Securities May Be Limited"

> Existing Holders will be able to sell the ARCs in an Auction only if there are Bidders willing to purchase all the ARCs offered for sale in the Auction. . . . Therefore, "auction failure events" are possible, especially if the security for the 2006 Bonds were to deteriorate, if a market disruption were to occur or if, for any reason, the Broker-Dealer were unable or unwilling to bid.
>
> . . .
>
> The ability to resell the ARCs will depend on various factors affecting the market for the ARCs. . . .  Demand for the ARCs may change without warning, and declines in demand may be short-lived or continue for longer periods.

Pohl Decl. Exs. 1, 2 at pp. 15-16.

The official statement governing CUSIP 606072JF4 also explicitly describes the interest rate to be paid in the event of a failed auction.   Pohl Decl. Exs. 1, 2.  The Auction Procedures attached as Ex. II to the official statement state at p. II-9 that "if Sufficient Clearing Bids have not been made . . . the Auction Rate for the next succeeding Interest Period shall be the Maximum Rate."  Id.  The definition of "Maximum Rate" is set forth in Appendix II (at p. II – 3-4) and in the text of the official statement (at iii, 9).  Id.  This definition states that, under certain circumstances, the Maximum Rate may be limited to the Net Loan Rate, which is based on the interest rate paid on the student loans that fund interest payments on the ARS.  Id.

As a practice, Fulton did not review prospectuses/official statements in relation to ARS in which it invested its CRIM customers' money.  Campbell Dep. at 55:25-56:3 ("we have a responsibility to make appropriate investments on behalf of our clients, given the parameters and the investment objectives of the overall portfolio.  Oftentimes, securities are issued [sic] in the

secondary market where people don't read the prospectus, no matter who you are.  And so in the context of the CRIM portfolios, we, as a practice, were not reviewing prospectuses and  — nor do we believe that was an obligation.").  Mr. Downing testified that Fulton used Bloomberg to obtain prospectuses and "that type of thing" after auctions started to fail in 2008.  Downing Dep. at 70:11-24.  Fulton does not dispute that this was Mr. Downing's testimony, but Fulton does dispute that prospectuses for ARS were available to it as part of Fulton's Bloomberg subscription.  See Kinney Dep. at 23:12-14; Downing Dep. at 43-15-44:10; Campbell Dep. at 11:23-116:12.  Mr. Downing testified that Fulton did not ramp up its oversight of events in the ARS market until 2008.  Downing Dep. at 75:12-76:6. ("We would have followed it summarily, overview.  We did not ramp up our oversight of the events in the market until '08.").

Citigroup provided information on SLARS in a document dated June 23, 2005 entitled "A Guide to Student Loan Auction Rate Securities."  The document included how they functioned, how their interest rates would be determined, what would happen in the event of a failed auction, and what potential risks they posed, such as available funds cap risk.  Pohl Decl. Ex. 13.  In 2005, PricewaterhouseCoopers issued an advisory stating that it was not appropriate to classify ARS as cash equivalents due to, among other things, the risk of auction failure.  Def. Ex. EE.  Fulton did not classify ARS as cash equivalents.  Campbell Dep. at 138:7-19; Kinney Dep. at 63:21-64:22; Fulton's RFA Responses at #'s 33, 34.  Fulton further states that it was NatCity's brokers and "Auction Rate Securities Specialists" who represented ARS as cash equivalents and it was NatCity that sold ARS to customers as cash equivalents.  See Goodrick Dep. at 27-28, 47, 93, 133.

Among the market news regarding ARS that was available to Fulton was a May 31, 2006 Consent Order between the United States Securities and Exchange Commission and certain

financial institutions.  Campbell Dep. at 92:2-95:3; Kinney Dep. at 54:2-5, 56:2-7; Def. Ex. FF (05/31/2006 Notice of Consent Order); Def. Ex. GG (05/31/2006 Consent Order ("Consent Order")); see also MTD Opinion at 30-31 fn. 15.  Fulton concedes that the Consent Order was publicly available but notes that its witnesses testified that they were unaware of it until after the ARS auction failures began to occur in 2008.  Kinney Dep. 54:6-10; 56:6-7.  NatCity was not a party to the Consent Order.

Regarding ARS auctions, their potential failure, and the resulting interest rates, the Consent Order disclosed that "[i]f there are not enough bids to cover the securities for sale, then the auction fails, the issuer pays an above-market rate set by a pre-determined formula described in the disclosure documents, and all of the current holders continue to hold the securities, with minor exceptions."  Consent Order at 4.  The Consent Order also stated that certain financial institutions had violated certain securities laws by failing to adequately disclose that they intervened in ARS auctions by placing bids for their own accounts in order to prevent auctions from failing, set a "market" rate, or prevent all-hold auctions.   Consent Order at 6; Kinney Dep. at 57:17-21.  Bloomberg published at least two articles discussing the Consent Order on May 31, 2006.  Def. Ex. HH (05/31/2006 Bloomberg articles).  The Wall Street Journal published an article discussing the Consent Order on June 1, 2006.  Def. Ex. II (06/01/2006 Wall Street Journal article).  American Banker published an article discussing the Consent Order on June 1, 2006.  Def. Ex. JJ (06/01/2006 American Banker article).

Among other things, the Consent Order ordered the financial institutions to begin making such disclosures.  Consent Order at 9-11.  PNC provided Fulton in August 2006 with a disclosure that informed Fulton that there was no guarantee that ARS could be resold at auction and no guarantee that the ARS auctions would be supported by the underwriter and/or the lead

14

Contractual Broker-Dealer.  Def. Ex. KK (08/23/2006 email) at FULPNC186004 ("[t]here is no assurance you will be able to resell auction securities in the secondary market on the terms you desire. . . .  [T]here is no assurance that your order will be accepted or that the auction will clear at a rate that you consider acceptable.").  Downing testified that he was aware of the substance of PNC's disclosures.  Downing Dep. at 64:7-14.

Both Mr. Kinney and Ms. Larish testified that, when Fulton was purchasing ARS for its CRIM customers, they understood that there was a risk of auction failure.  Kinney Dep. at 48:21-49:5, 65:3-7 ("but I was also aware that no auctions had failed"); Larish Dep. at 33:23-34:5 ("there could be a chance they could fail; but for decades they have not").  On September 21, 2006, NatCity provided Ms. Kinney with a PowerPoint that, among other things, noted that a failed auction could occur and explained how the interest rate typically is set in the event of a failed auction.  Campbell Dep. at 164:17-166:22; Def. Ex. LL (09/21/2006 email) at NATCITY-FULTON-058981, 058987 ("Failed Auction — Maximum percentage of the index rate").

Fulton explained in an October 2006 email to the Commonwealth of Pennsylvania, Office of Insurance Agents & Brokers, the mechanism by which ARS interest rates are set in the event of an auction failure, noting that, "[i]f an auction receives no bids or an insufficient number of bids, the new cycle rate typically becomes 125% of an index."  Campbell Dep. at 80:17-81:15; Def. Ex. MM (10/10/2006 email) at FULPNC-186306.

NatCity provided Ms. Kinney with a PowerPoint on February 26, 2007 that, among other things, noted that a failed auction could occur and explained how the interest rate typically is set in the event of a failed auction.  Campbell Dep. at 159:22-164:10; Def. Ex. NN (02/26/2007 email) at NATCITY-FULTON-048464.  Fulton notes that the PowerPoint also states that ARS "provide liquidity by permitting the investor to sell their position at par and eliminate market

risk," and that "[o]n each reset, the investor has the right to liquidate the securities at par."  It further notes that the product sheet accompanying the PowerPoint contains no mention of a "failed auction."  Def. Ex. NN at NATCITY-FULTON-048465.

Mr. Larish sent an email in November 2007 to a number of Fulton email distribution lists — including CRIM managers, Mr. Downing, and Ms. Kinney.  Campbell Dep. at 95:10-99:18; Def. Ex. L (11/26/2007 email) at FULPNC186398.  The November 2007 email advised that Fulton had made the "short term decision to move our clients (where we have discretion) into treasury money market funds."  Campbell Dep. at 99:19-100:23; Def. Ex. L (11/26/2007 email) at FULPNC186398.  Bruce Williams responded to Larish's November 2007 email that he:

> hope[d] that what [Mr. Larish] outlined in this message was not acted upon. . . . Wholesale moving of CRIM accounts to me doesn't make a whole lot of sense. The majority of CRIM customers who chose VRDN's[8], ARC's, and Commercial Paper A-2/P-2 know what they are doing.  Let's let this cool a little and formulate a Credit Policy that addresses not only today's problems, but creates a Contingency Plan if (1) things that really go into a 'nose dive,' or (2) 'hot spots' continue to flare up in pockets of the investment Economic/Industrial/Military complex then the department can spring into action quickly and apply the Contingency Plan when and where needed.

Campbell Dep. at 102:22-103:9; Def. Ex. L (11/26/2007 email) at FULPNC186398.

Fulton performed a review of its clients' fixed-income holdings in the winter of 2007/2008 that included a review of ARS.  Def. Ex. OO (11/01/2007 email) at FULPNC185938; Def. Ex. PP (12/05/2007 email) at FULPNC185943; Def. Ex. QQ (12/11/2007 email) at FULPNC186228; Ex. RR (12/11/2007 email) at FULPNC186032; Def. Ex. SS (01/02/2008 email) at FULPNC186371.  On January 1, 2008, Mr. Larish directed Downing to schedule a complete review of the current fixed income holdings in order to describe current status and exposure.  Downing Dep. at 132:16-133:22; Larish Dep. at 83:24-84:2; Def. Ex. SS (01/02/2008

---

[8] "VRDN" is an acronym for variable rate demand notes.

email) at FULPNC186371.  Fulton notes, however, that Larish also testified that, although ARS would be included in the category of "current fixed income holdings," the review "was more about other fixed income holdings than it was Auction Rate Securities."  Larish Dep. at 84:10-18.

Mr. Downing had discussions with a PNC representative in early February 2008 regarding ARS auction failures but testified that he did not anticipate that the ARS into which Fulton had placed its CRIM customers' money would experience problems going forward. Downing Dep. at 80:2-22.  Instead, Mr. Downing remained comfortable with the high quality ARS into which Fulton had placed its CRIM customers' money.  Downing Dep. at 79:5-16. Fulton continued to hold ARS through the market failure in February 2008.  Campbell Dep. at 105:12-19.

Fulton advised in a November 2006 email to a client's attorney that it had "no concerns whatsoever about the inclusion of ARC's as an additional investment choice."  Def. Ex. TT (11/22/2006 email) at FULPNC186319.  Nowhere in the November 2006 email is there any discussion of the potential for an auction failure or for the ARS market to freeze altogether.  Def. Ex. TT (11/22/2006 email) at FULPNC186319; Campbell Dep. at 85:4-12.  When asked whether the omission of such a disclosure would be misleading, Campbell responded that he did not see failure or a market freeze as a "legitimate risk," but "[i]f we did see it as a legitimate risk, I would say that that would be misleading, yes."  Campbell Dep. at 85:22-86:5.  He explained that, "in retrospect, there was a legitimate risk, when the markets froze in 2008, but at the time, the auctions had not failed and had been supported, so the — the risk was there, but not presumed and not marketed and — and not discussed."  Campbell Dep. at 86:14-87:2.

17

David Hansen, Fulton's then President and CEO, offered observations on ARS in a May 21, 2008 email to Fulton Senior Management and a number of other Fulton employees, including Larish, Downing, and Kinney.  He wrote the email so that Fulton employees would be "better equipped to discuss our use of ARCs in client accounts."  Def. Ex. T (05/21/2008 email) at FULPNC230087.  Mr. Hansen began by noting that the ARS market was started in 1984, and for 24 years, "virtually no auctions 'failed' and no investor experienced a serious lack of liquidity as a result of owning an ARC."  Id.  Hansen stated that the vast majority of Fulton's ARS holdings for clients "were completely appropriate for the accounts in which they were purchased, and until this unprecedented liquidity crisis, performed exactly as intended."  Id.  Hansen further stated that "although there are those who, with 20/20 hindsight, now claim that ARCs had no place in these portfolios, a short term portfolio is precisely the investment objective for which these securities were created."  Id.  Mr. Hansen noted that:

> Some clients have suggested that we should have seen this liquidity crisis coming and sold out of our ARC positions prior to the auction failures.  The fact is, some of the most sophisticated corporate treasurers in America were caught by surprise by this liquidity crisis.  To suggest that [Fulton] should have see [sic] this coming is absurd.

Id.

Fulton subsequently made the decision to repurchase the ARS from its CRIM customers. Campbell Dep. at 23:13-24:7; Downing Dep. at 145:22-146:3, 147:7- 12, 148:3-15; Def. Ex. UU (05/29/2008 email) at FULPNC230041.  Fulton repurchased the ARS from its CRIM customers "to preserve [its] reputation and — and — and [its] client relationships and [its] standing in the community."  Campbell Dep. at 23:13-24:7.  After repurchasing the ARS from its CRIM customers, Fulton placed the ARS in its own portfolio.  Campbell Dep. at 13:5-7, 23:13-17.

NatCity's Chief Compliance Officer Jeff Suhanic testified that NatCity had the duty to its institutional clients to pass on to those clients material information about investments and potential investments.   Suhanic Dep. at 60; <u>see also</u> Lane Decl. Ex. S, NatCity Written Supervisory Policies & Procedures, at 436 ("Information must be available before a determination can be made as to the suitability of a specific transaction").   Suhanic, however, also testified that there is a difference in scope between NatCity's roles with retail and institutional clients, explaining "with an institutional client [like Fulton], we would be looking to find them quality products that met their desire or need based on their determination.   A retail client, we would help them much more so in making that determination of what they were looking for in a product."   Suhanic Dep. at 59:11-60:13.   Suhanic agreed that NatCity would want to provide its institutional clients with material information relating to an investment. Suhanic Dep. at 60, 65.   NatCity notes, however, that its relationship with Fulton, as detailed in its own factual submissions, was non-discretionary, such that NatCity needed Fulton's approval to make any transaction for Fulton and that Fulton is a sophisticated financial institutional advisor and client of NatCity.   It notes, too, that Downing testified that there were never any recommendations of ARS by NatCity.   Downing Dep. at 50:23-51:6.

NatCity required that all of its registered representatives understand the features of any product offered by NatCity to its clients.   Suhanic testified, after acknowledging that this principal was "generally applicable," that "with any product, you want to make sure that your staff is aware and not — misrepresenting the product, identifying who the product is appropriate for when making a recommendation when it's listing a transaction in that product."   Suhanic Dep. at 88:23-89:15.   NatCity always wanted its sales force to disclose to its clients material facts of which they were aware.   Suhanic Dep. at 65:4-6.   Suhanic testified he did not know if

NatCity did any analysis of Fulton's knowledge or understanding of the features or risks of ARS at any time, and he would not expect there to be any written record of any suitability analysis because Fulton was a bank, and thus an institutional account.  Suhanic Dep. at 43.

Jerome Goodrick was a NatCity Senior Vice President and the registered representative assigned to Fulton's account from June 2004 through January 2006.  Goodrick Dep. at 9:22-24; 17:20-22.  He reported directly to Keith McBride.  Goodrick Dep. at 133-34.  Goodrick was identified by NatCity in a September 2005 email as an "Auction Rate Securities Specialist." Lane Dec. Ex P.  Fulton was NatCity's biggest ARS customer.  Goodrick Dep. at 39-40, 124; DiPietro Dep. at 96-97.  Goodrick's job function while employed by NatCity was to "build customer relationships and sell securities."  Goodrick Dep. at 11.  In that role, he was also expected to find new customers and to contact existing customers to sell them securities. Goodrick Dep. at 11:17-12:5.  Goodrick's contact at Fulton "for everything" was Thomas Downing, but he also dealt with Bevan Kinney.  Goodrick Dep. at 9:22-10:5.  NatCity knew Fulton was looking for investments with "a high degree of safety and liquidity" and "short-term liquid investments."   Goodrick Dep. at 14, 49, 51-52; Lane Decl. Ex. C, May 23, 2014 Deposition of Antonio DiPetro ("DiPetro Dep.") at 91, 158.

NatCity began trading ARS in late 2004 to early 2005.  Lane Decl. Ex. B (May 1, 2014 Deposition of Fred Ruggles) ("Ruggles Dep.") at 11; Suhanic Dep. at 99; Lane Decl. Ex. H (March 22, 2011 Deposition of Jerome Goodrick in Fulton Fin. Advisors, Nat. Ass'n. v. PNC Capital Markets, LLC, No. 09-10838 (CCP Lancaster Cty.) ("Goodrick PNC Dep.")) at 17, 125. NatCity was paid a 12.5 basis point concession fee on the ARS it brokered if a security was held for a 360 day period; otherwise, the commission was 12.5 divided by the number 360 multiplied

by the number of days the security was actually held.  Loeser Dep. at 151:22-153:4; Goodrick Dep. at 55.

The confirmation sent by NatCity to Fulton reflecting Fulton's purchase of ARS from NatCity represented that ARS were a "putable security."  Lane Decl. Ex. X; EE.  A "putable security" is a security with an embedded put option allowing the holder of the security the right to demand an early repayment of the principal.[9]  NatCity admits that ARS are not appropriately characterized as a "putable" security.  Suhanic Dep. at 77-78; McBride Dep. at 91; Lane Decl. Ex. F, June 10, 2014 Deposition of David Loeser ("Loeser Dep.") at 72.   ARS are fixed income (bond) investments that pay an interest rate that is frequently modified over their life.  Ultimately, ARS mature and are redeemed at the same value for which they were purchased ("par value").  Feb. 20, 2015 Decl. of Mark O. Conner ("Connor Decl."), Ex. A, July 17, 2014 Expert Report of Mark O. Connor ("Connor Report") at ¶ 24.

ARS come in four basic forms:  1. municipal debt ARS; 2. student loan asset backed ARS; 3. closed-end bond fund Auction Rate Preferred Shares (ARPS); and 4. structured ARS (also referred to as Asset backed or Derivative ARS).  Conner Report at ¶ 25.  ARS are unique among bond investment securities.  While they are issued as long-term bonds (e.g., original maturity dates of twenty to thirty years), they have a feature that can allow for very short term liquidity at par (i.e., "dollar-in-dollar-out").  This feature is a "Dutch auction" process, allowing the auction participants to transact at the same price (par) while establishing a new interest rate.  Dutch Auctions are conducted every 7, 28, 35 or, less frequently, 49 days.  Conner Report at ¶ 26.

---

[9] Although Fulton provides no citation for this assertion of fact, NatCity does not dispute the definition.

Fulton's expert, Mark O. Conner, opines that, in a normal auction scenario, it can be expected that there would be multiple participants.  These fall into two categories: "Potential Owners" and "Existing Owners."  Potential Owners can submit only BUY orders, but Existing Owners may enter one of four orders, as follows:

a.      BUY – Here, an investor may be purchasing ARS for the first time, may be adding ARS to matching current ARS holdings, or may be buying new, specific ARS. As stated above, a BUY order must include the desired amount and the minimum acceptable interest rate.

b.      SELL – A seller is in need of liquidating their holdings and raising cash. Here, they need only specify the amount they wish to sell. They are indifferent to the possible interest rate because after the auction, they will no longer own the security.

c.      HOLD – This is an order that may only be entered by an Existing Owner of ARS, that is, an investor who owns the ARS immediately before the auction. Such holders enter a HOLD order if they wish to remain invested and are willing to accept an interest rate outcome without attempting to influence the rate. Therefore, a HOLD order needs only specify the amount and no interest rate is indicated.

d.      HOLD AT RATE – Also sometimes called "HOLD AT MARKET," this order may also only be placed by an Existing Owner, but unlike the simpler HOLD order, an investor entering a HOLD AT RATE order may attempt to influence the auction's interest rate outcome. To that end, this order must specify an amount they are willing to continue to hold but only if their minimum interest rate objective is met. If there are other BUY orders or HOLD AT RATE orders that specify a lower interest rate, HOLD AT RATE bidders risk the possibility of being forced to sell their ARS to those bidders.

Conner Report at ¶ 29.

The Dutch Auction is different from a traditional auction in that it attempts to establish a "price" that meets both the highest interest rate goal of investors and the lowest interest rate objective of the issuer, who is obligated to pay that rate to investors.  This is accomplished by serving bidders at the auction by arranging their orders from lowest interest rate to highest interest rate and then executing each order in turn, starting with the lowest interest rate.  When

the last order is fulfilled, the rate associated with that last order becomes the interest rate that all holders will be paid until the next auction.  By this means, all investors get the benefit of the best "price" (interest rate outcome) based on willing bidders, and the issuer avoids having to pay an interest rate that was higher than the last order filled.  Conner Report at ¶ 30.

Connor opines that one of the primary risks of ARS that distinguished them from other short-term bond investments was the possibility that, at any given auction, too few buyers may show up to purchase all of the ARS for sale.  Unlike many other short-term investments, there was no guarantee or alternative source of money to buy unsold ARS at an auction.  ARS sellers could rely only upon the presence of sufficient buyers at each auction in order to get their money. If there were not enough buyers, or if there were no buyers, investors could sell only a portion of their investments or none at all.  This event is called a "Failed Auction."  Conner Report at ¶ 31.

Interest rates set through this auction process could not rise without limit.  Issuers stipulated limits in their offering documents ("indentures") and often described these as the "maximum auction rate."  The methods they specified for determining maximum auction rates came in two basic forms:  formulaic and nominal.  Formulaic maximum rate calculation methods typically tied the maximum rate to a short-term interest rate index, like the 30-day London Interbank Offered Rate (LIBOR) or 91-day U.S. Treasury bills.  Alternative nominal methods for determining the maximum auction rate simply laid out stated rates ranging from 10% to as high as 20%.  Conner Report at ¶ 32.

Peculiar to SLARS is an added restriction to the interest rate known commonly as an "available funds cap" or the "net loan rate."  The effect of this cap is to limit the interest obligation to ARS holders to no more than the interest that the issuer received from student loan

borrowers (less the issuer's expenses).  More simply, the available funds cap helps to prevent the issuer from losing money on the loans that it makes to students.  Conner Report at ¶ 33.

An additional important aspect of ARS is that auctions for ARS represent a repeating transaction and a repeating investment decision on the part of ARS holders.  At each auction, an order of some type must be entered for every outstanding ARS.  Unlike most other securities, after an initial purchase, investors must make serial investment decisions on specific dates.  They must indicate at each auction whether they wish to buy, sell, hold, or hold at a specified minimum rate.  Conner Report at ¶ 34.

Goodrick considered it his responsibility to disclose the risks of ARS to customers who were purchasing them.  Goodrick Dep. at 34:12-16.  He received training on ARS from NatCity Senior Vice President Keith McBride, his direct supervisor, and Fred Ruggles, a municipal trader for NatCity.  Goodrick Dep. at 133-34; Goodrick PNC Dep. at 13; Ruggles Dep. at 10, 14-15, 23, 99; McBride Dep. at 15, 17-19; Suhanic Dep. at 9-11.  When asked whether he focused on any particular section in a prospectus, Mr. Goodrick responded that he did not, and when asked if there was any specific information for which he was looking when he reviewed an ARS prospectus, he identified looking at "what safety there is, is it enhanced, what are the terms, the maturity terms or the auction terms."  He further explained that looking at the "safety" of the product involved looking at whether there was an insurance entity supporting the product.  Goodrick PNC Dep. at 15:3- 23.  Each prospectus, or offering statement, for each ARS was different.   Goodrick PNC Dep. at 129; McBride Dep. at 57.   Goodrick did not read each prospectus, or offering statement, for each ARS he sold.  Goodrick PNC Dep. at 128-29.

When Goodrick started selling ARS to Fulton, he did not investigate whether Fulton had previously purchased ARS or had an understanding of the product.  Goodrick PNC Dep. at 28-

24

29, 125-26.  Goodrick did not recall specifically disclosing the risks associated with ARS to Fulton but testified that "We always discuss risks, though."  Goodrick Dep. at 29-30.  He further testified that when he opened Fulton's account at NatCity, he recognized Fulton as being a sophisticated financial advisor, and that his main contact, Thomas Downing, someone he had worked with in the past and known for years, was "a seasoned securities person with a very good understanding of the markets."  Goodrick Dep. at 28:5-23.  He also stated that "generally, before somebody buys something, especially a new product, we make sure that they're aware of what they're buying, and [Mr. Downing] was a seasoned pro.  He understood the market.  He perhaps even sold auctions in his sales days, I don't know. He was certainly aware of the market — aware of the securities."  Id. at 30:21-31:2.

NatCity never bought ARS at auction when Fulton placed orders.  Instead, the ARS NatCity sold to Fulton came from NatCity's own inventory of ARS, or it purchased the ARS from another broker-dealer, i.e., Goldman Sachs, JP Morgan, Bear Stearns, etc., and then sold it to Fulton.  Goodrick Dep. at 55- 56, 71; Ruggles Dep. at 91, 100-01; Loesser Dep. at 43-44, 151; DiPietro Dep. at 196.

Goodrick stated in a February 2005 email to a NatCity colleague concerning a different client that ARS should be considered as an alternative to a sweep account since "[t]hey provide a high credit quality, liquidity and a substantial yield gain."  Goodrick also represented that "[a]ll purchases and sales and holds of auctions are executed at par, which means there is no fluctuation of principal and no market risk."  Goodrick Dep. at 86, 109; Lane Decl. Exs. M, N, Q.  Goodrick, in an internal NatCity email on March 4, 2005, stated that ARS are "attractive options for someone looking for safety and yield and [who] wants to keep their liquidity between 7 and 60 days."  Lane Decl. Ex. O.  Goodrick represented in September 2005 that ARS "offer the

best yield without compromising any safety or liquidity issues."  Goodrick Dep. at 38; Lane Decl. Ex. L.   Goodrick defined "liquidity" as "the management of cash one year and in." Goodrick Dep. at 44.  NatCity's sales force marketed ARS for use to manage "short term cash." Suhanic Dep. at 113.   NatCity's sales force marketed ARS as "short-term fixed income investments . . . for companies having excess cash for investing on a short-term basis."  Suhanic Dep. at 114-15.

NatCity marekted ARS to customers as "cash equivalents" between June 2004 and January 2006.  Goodrick Dep. at 27, 47, 93, 133.  NatCity considered ARS to be a "liquidity" product during that time and it was Goodrick's regular practice to refer to ARS as a "liquidity" product.  Goodrick Dep. at 38, 44.

In an internal email concerning a different NatCity client, Goodrick stated to a colleague that ARS are an alternative to "sweep accounts."  Lane Decl. Ex. M.  In the same email Goodrick stated that ARS had no market risk.  Lane Decl. Ex. M.     Fred Ruggles, who was involved with training NatCity's registered representatives on ARS, stated that ARS had "market risk," which he defined as "the risk of loss from unanticipated changes  in the conditions of the financial markets in which an institution participates," because of the potential for a failed auction.  Ruggles Dep. 65, 80.  Goodrick's direct supervisor, Keith McBride, was aware that ARS had liquidity risk and that ARS did not eliminate market risk.  McBride Dep. at 90-91, 128.

Goodrick did not learn until after he left NatCity that SLARS had a maximum rate cap provision and he never had any discussions with Fulton about the maximum rate cap provision associated with SLARS.  Goodrick Dep. at 73-75; Goodrick PNC Dep. at 32.  During the time he was with NatCity, Goodrick had no understanding of what "carryover interest" meant as applied to student loan ARS and he never had any discussion with Fulton about "carryover interest."

Goodrick Dep. at 78; Goodrick PNC Dep. at 32.  Goodrick could not recall whether, during the time he was with NatCity, he had an understanding of the "available funds cap" provision associated with SLARS or if he had any discussion with Fulton about the available funds cap provision associated with SLARS.  Goodrick Dep. at 78-79; Goodrick PNC Dep. at 32-33. Ruggles, one of the persons involved in training Goodrick on ARS, was not familiar with how the maximum rate provisions differed between SLARS and municipal ARS.  Ruggles Dep. at 25. Ruggles also was not familiar with the terms "available funds cap" or "carryover interest" and had never heard the term "maximum rate cap waiver."  Ruggles Dep. at 25-26, 84.  One of NatCity's experts, John Maine, testified that the "maximum rate cap," "carryover interest," and "available funds cap" are material terms associated with ARS.  Lane Decl. Ex. G, Dec. 4, 2014 Deposition of John Maine ("Maine Dep.") at 58-59.  Goodrick agreed that it "would have been important" for Fulton to know that SLARS had a greater risk of long-term illiquidity than municipal ARS.  Goodrick Dep. at 82.

Antonio DiPietro ("DiPietro") replaced Goodrick as the NatCity registered representative assigned to Fulton's account at NatCity in January 2006. DiPietro Dep. at 8-9.    From   January 2006 through February 2008, DiPietro was the NatCity registered representative assigned to Fulton's account.  DiPietro Dep. at 8.  DiPietro was a NatCity Vice President from at least January 2006 through February 2008.  Lane Decl., Ex. W.  DiPietro was identified by NatCity in a document dated June 7, 2006 as an "Auction Rate Securities Specialist."  Lane Decl., Ex. W. Goodrick did not convey any information with regard to Fulton and its ARS purchases to DiPietro before Goodrick left NatCity.  DiPietro Dep. at 40.  DiPietro's contacts at Fulton were Downing and Kinney.  DiPietro Dep. at 16-17.

Prior to Goodrick's departure in January 2006, DiPietro had little involvement with ARS and had never had an ARS customer.  He was involved in an ARS related "concerted calling effort" to customers and studied some prospectuses in late 2005, or early 2006.  DiPietro Dep. at 10, 187-189.  DiPietro did not know the investment objectives of Fulton's clients, on behalf of whom it was purchasing the ARS.  He did not ask because he didn't think Fulton would share that information.  DiPietro Dep. at 141-42.  The only training DiPietro received in his first year with NatCity concerning ARS was from a NatCity municipal trader, Fred Ruggles.  DiPietro Dep. 10-12.  Prior to joining NatCity in 2005, Mr. DiPietro had spent sixteen years in the securities industry, during which time he held various roles, including as a fixed income, institutional salesperson.  Id. at 4-6.

DiPietro testified that it was his regular practice to tell his corporate clients that ARS were "used by corporations for their short-term cash needs as a replacement for money markets" and noted that saying this was a "a common sales practice where corporations were looking for extra yield for their excess cash."  DiPietro Dep. at 56:6-24.  He testified with respect to Fulton that, "I didn't tell Fulton anything because the account was already open.  I just continued the relationship."  Id. at 58:11-21.

DiPietro testified that he believed in 2007 that ARS "eliminated market risk" because purchasers were able to sell their positions at par.  DiPietro Dep. at 59-61.  DiPietro stated in an email to Fulton on February 27, 2007 that ARS "instruments provide liquidity by permitting the investor to sell their position at par and eliminate any market risk."  Lane Decl. Ex. U at 3 (NATCITY- FULTON-307615).  However, the material also states that ARS do not have a put feature, that auctions can fail, and that "[l]iquidity on reset date defers market risk."  Ex. U at 5, 9, 12 (NATCITY- FULTON-307617, 307621, 307624).  DiPietro testified that, while "[e]very

security has market risk" but in the time frame of 2006-07, before there were any ARS auction failures, he believed that ARS "carried very little risk."  DiPietro Dep. at 52-53.

The February 27, 2007 email materials stated that ARS "provide liquidity by permitting the investor to sell their position at par and eliminate market risk" and "[o]n each reset, the investor has the right to liquidate the securities at par."  DiPietro Dep. at 60-61; Ex. U.  Suhanic testified that, in retrospect based on what happened in the market in 2008 and 2009, the statement made to Fulton on February 27, 2007 that ARS "provide liquidity by permitting the investor to sell their position at par and eliminate market risk" was untrue but that ARS "did provide that type of liquidity" from 1998 to 2008.  Suhaic Dep. at 50.  Ruggles also testified that ARS did "not completely" eliminate market risk "[b]ecause there's always the potential for a failed auction."   Ruggles Dep. at 65.   McBride testified that he too disagreed that ARS eliminated market risk because "there is no security in the world that is not free from market risk."  McBride Dep. at 128, 131-32.

DiPietro agreed that, during the period between January 2006 and February 2008, ARS "had risk all along."  DiPietro Dep. at 47-48.  He added that, "just because, as I told [Fulton's Bevan Kinney], just because an auction had not failed up to that point didn't mean it couldn't." Id.  He specifically disagreed with the idea that he knew that a statement that ARS eliminated market risk was untrue; he testified that the liquidity crisis caused it to not be true, and that prior to that "we all believed" that it was true.  Id. at 59:8-64:6.

DiPietro knew during the period between January 2006 and February 2008 that ARS were not "putable" securities.  DiPientro Dep. at 31.  DiPietro acknowledged that, during this time, there was a risk ARS could lose principal value.  In response to the question "there was a

risk that [ARS] would lose principal value at all times, right?" Mr. DiPietro answered "Lose principal value, I don't know — yes, I guess, if the auction failed."  DiPietro Dep. at 64.

While Fulton asserts that "During the period between January 2006 and February 2008, DiPietro knew auctions could fail, but never disclosed that to Fulton," he did not testify to these facts.  Rather, he testified that, "I know that [Fulton] understood the product inside and out. What I offered them was within their parameters. Did I in every case that they bought something say this could fail, no, I did not."  DiPietro Dep. at 161:21-162:2.  He further stated that he did not tell Fulton ARS could fail because he knew Fulton knew auctions could fail.  Id. at 162:2-13. When asked if it was true that he never discussed the features of ARS with Fulton, DiPietro disagreed with the assertion, saying "I don't think so, I think when I first met them, I understood that their sophistication was at a level that it should be. . . .  I don't remember, I think I did, but I don't remember."  Id. at 162:14-163:2.  Later, he testified that "I don't know that I didn't discuss that [ARS] couldn't fail at our [his and Fulton's] first meeting."  Id. at 164:1-3.  DiPietro never disclosed to Fulton that ARS may not be suitable for investors with liquidity needs.  DiPietro Dep. at 153.

DiPietro knew during the period between January 2006 and February 2008 what the "maximum rate" provision associated with ARS was and how it operated.  He never discussed the "maximum rate" provision with Fulton.  DiPietro Dep. at 99- 100.  He also never discussed the "available funds" provision with Fulton.  DiPietro Dep. at 163.  He also understood during this time period that SLARS would act differently from municipal ARS in the event of a failed auction.  He never discussed this with Fulton.  DiPietro Dep. at 101, 105-06.  DiPietro knew that in the event of a failed auction, the interest rate paid on SLARS would be fixed at a low rate.  He never disclosed that to Fulton.  DiPietro Dep. at 103-04.

Failed auctions were rare before August 2007.  There were only thirteen known auction failures between 1984 and August 2007.  However, this history of mostly reliable liquidity changed markedly in late 2007, and by mid-February of 2008, about 85% of all auctions for ARS were failing.  Conner Report at ¶ 37.  The twenty-three year "failed auction" history of the ARS market changed substantially in August of 2007.  From August to mid-September of 2007, auctions for at least sixty-two discrete ARS failed and repeatedly failed thereafter.  While this was, at the time, limited to one segment of the ARS market, the event marked a material change in the possibility and probability of failed auctions.  Connor opines that this was material information for investors and was widely observed and understood by broker participants.  He opines that, because of the material nature of this information, NatCity was obligated to disclose it to Fulton no later than the next date on which Fulton would have an auction for any ARS it held.  Conner Report at ¶ 40.

As a result of this wave of auction failures in August and September of 2007, large-scaled selling by some investors ensued, and this selling wave included ARS of all varieties.  During this stress period, dealers continued to enter support bids, and those support bids resulted in increased purchase by dealers.  The increase was very large and resulted in dealer inventories of ARS ballooning to levels that had never before been witnessed.  Conner Report at ¶ 41.

NatCity knew in late 2007 that certain "asset-backed, mortgage-backed security auctions had failed."  Suhanic Dep. at 68.  Although NatCity considered SLARS an asset-backed security, it did not make any effort to discuss the 2007 auction failures with Fulton.  Suhanic Dep. at 68-69.

Further material developments in the ARS market occurred in December of 2007.  According to Connor, at that time, dealers were struggling to attract new buyers to the ARS

market to relieve the selling pressure.  Numerous dealers approached their issuer clients and recommended they modify their bond issue documents to temporarily alter the maximum auction rate formulae associated with their ARS so that rates could be set at higher levels and hopefully attract more buyers.  This was accomplished by two means:  issuers could elect to temporarily raise the maximum rate limit or temporarily waive the available funds cap (or they could do both, as some did).  These actions by issuers were not subject to bondholder approval; therefore there were no direct communications by the issuers to ARS holders regarding these events.  However, the details of these interventions in the market were communicated to dealers because the dealers needed to know at each auction what the bidding limits would be in order to be able to furnish price talk.  For that purpose, auction agents sent written communications to ARS dealers about the modified limits.  Conner Report at ¶ 42.  Three ARS auctions failed on January 22, 2008 including two municipal ARS and one ARPS.  This marked the first time a municipal ARS auction had failed.  Conner Report at ¶ 49.

NatCity continued to sell ARS to Fulton through and until February 13, 2008.  February 20, 2015 Decl. of Bevan Kinney in Support of Fulton's Mot. for Summ. Judg. ("Kinney Decl.") at ¶ 4.  NatCity would provide Fulton with daily liquidity on the ARS it had purchased from NatCity until February 2008.  Specifically, if Fulton wanted to "put back," or sell, an ARS it had purchased from NatCity, NatCity would "take back," or repurchase, the ARS without requiring that Fulton wait for the next auction.  NatCity never refused Fulton's request to "put back" to NatCity any ARS it had purchased from NatCity until February 2008.  Goodrick Dep. at 41-42; Goodrick PNC Dep. at 67, 71; DiPietro Dep. at 69, 73-74, 178-79; Loesser Dep. at 94; Kinney Decl. at ¶ 4.  DiPietro testified that NatCity's decision to "take back" or "repurchase" an ARS

from any customer, including Fulton, was made on a case-by-case basis.  DiPietro Dep. at 69:6-19, 73:2-9.

Fulton learned on February 13, 2008 that auctions for ARS it had purchased from NatCity had failed.  Downing Dep. at 82.  Upon learning that auctions had failed, Fulton immediately adopted a policy to put back all of the ARS held by its CRIM customers and stopped buying ARS.  Downing Dep. at 85; Kinney Decl. ¶ 6.  Fulton's CRIM customers, not Fulton, held all or the vast majority of ARS Fulton obtained through NatCity, until Fulton decided to purchase the ARS from its customers in order to preserve its reputation, client relationships and standing in the community.  Campbell Dep. at 23:13-24:7; Downing Dep. at 145:22-146:3, 147:7- 12, 148:3-15.  As of February 29, 2008, Fulton and/or its CRIM customers held ARS obtained from NatCity with a par value of $216,220,000.  Suhanic Dep. at 32-34.  Although Fulton contends that it continues to be unable to sell at auction, for par value, a number of ARS purchased from NatCity, see Kinney Decl. at ¶7, NatCity notes that Fulton, as part of its summary judgment effort, has not provided a list of the ARS that it alleges it obtained through NatCity on behalf of its CRIM customers, placed in segregated accounts of its CRIM customers, and subsequently purchased from its CRIM customers.  In a letter to a regulator in 2009, Fulton alleged that it "purchased" 70 different ARS issues from NatCity.  Def. Ex. CC (NATCITY-FULTON-389836-837).  NatCity contends that, as of March 25, 2015, only nine ARS from Fulton's 2009 list remain outstanding, and according to Fulton's own expert, all but two of Fulton's ARS have been disposed of at par value.  Connor Report ¶ 75.

## III.   DISCUSSION

In its Motion, NatCity argues it is entitled to summary judgment on Fulton's remaining claims.  Specifically, on the claim of breach of fiduciary duty, NatCity argues that, as a broker

with responsibility for a non-discretionary account, NatCity owed Fulton duties that were very limited and circumscribed, and that the summary judgment record shows that it did not, as a matter of law, breach those cursory duties.   On the negligence claim, NatCity argues that Fulton's own negligence in failing to take even rudimentary steps to understand the securities in which it was investing its customers' funds constitutes contributory negligence as a matter of law, entitling NatCity to summary judgment.   On the claim under PSA § 1-501(a), it argues that, assuming that the Section creates a free-standing cause of action, it is limited to misrepresentations or omissions made in the context of an initial public offering, and it is undisputed that Fulton purchased ARS in the secondary market.   Fulton's Motion also seeks summary judgment on the PSA claim.   It argues that it is entitled to judgment as a matter of law because NatCity admits that it made untrue statements and failed to provide Fulton with material information concerning ARS.

> ### a.   The breach of fiduciary duty claim.

At the pleadings stage of the litigation, I determined that Fulton had stated a plausible claim for breach of a fiduciary duty based on its allegations that (1) it communicated specific investment goals to NatCity; (2) NatCity acted as its securities broker, providing advice and counsel for financial investments; and (3) NatCity was trading in ARS in a manner that was at odds with Fulton's investment interests.   See MTD Opinion at 33-35.   In so finding, I applied the standard generally applicable to an agent's fiduciary duties.   See id. at 33 (stating that under Pennsylvania law, to state a claim for breach of fiduciary duty a plaintiff must plausibly plead a confidential relationship and (1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the defendant's failure to act solely for the

plaintiff's benefit was a real factor bringing about the plaintiff's injuries (citing Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 414-415 (E.D. Pa. 2006).)  I also noted that NatCity did not discuss this claim in its Motion to Dismiss, even though the motion sought dismissal of Fulton's entire Complaint.  Id. at 34.  In its summary judgment Motion, NatCity argues that there is no genuine issue of material fact that it served as Fulton's non-discretionary broker; that Fulton purchased ARS for its own banking customers' accounts; and that Fulton kept the identity of its customers and its customers' risk tolerances and investment objectives confidential, such that NatCity was not in any position to make "recommendations" for those customers' accounts or otherwise to make discretionary investment decisions.  It further contends that under the law governing the duties of a non-discretionary broker, Fulton has failed as a matter of law to demonstrate that NatCity breached any fiduciary duty.

I find there is no genuine issue of material fact that NatCity operated as Fulton's non-discretionary broker.  Pennsylvania law distinguishes the duties owed by a securities broker to a client based on which one of them is making the investment decisions.  See Merrill Lynch, Pierce, Fenner & Smith v. Perelle, 514 A.2d 552, 561 n.9 (Pa. Super. Ct. 1986).  "A non-discretionary account is an account in which the customer rather than the broker determines which purchases and sales to make."  Id. (citing Mullis v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 492 F. Supp. 1345, 1351 n.6 (D. Nev. 1980); Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 461 F. Supp. 951, 952 (E.D. Mich. 1978) aff'd, 647 F.2d 165 (6th Cir. 1981).  Here, the record is clear that neither PNC nor NatCity recommended that Fulton begin acquiring ARS for customer CRIM accounts.  Downing Dep. at 50:23-51:6.  Fulton had discretion over the investment of its CRIM customers' funds and had a fiduciary relationship with its CRIM customers.  Campbell Dep. at 24:8-11, 72:4-75:1, 100:1-16; Downing Dep. at 122:16-123:19;

Larish Dep. at 5:4-8.   Fulton's CRIM customers did not have day-to-day input into the investments that Fulton made on their behalf.  Campbell Dep. at 72:4-75:1, 100:1-16; Downing Dep. at 122:16-123:19.  Further, the record demonstrates that Fulton did not have to obtain day-to-day permission to invest its customers' cash.   Campbell Dep. at 72:4- 75:1, 100:1-16; Downing Dep. at 122:16-123:19.

Fulton's witnesses testified that Fulton constructed CRIM accounts that were specific to the CRIM customers' investment objectives, risk tolerances, and liquidity needs.  Campbell Dep. at 24:15-25:7, 35:14-36:9, 51:8-52:14; 71:15-72:3; Downing Dep. at 31:2-32:4; Def. Ex. A at FULPNC186463-186464.    It performed a customer-by-customer needs analysis when constructing CRIM accounts.  Campbell Dep. at 24:15-25, 52:11-14.  Fulton had a responsibility to make appropriate and suitable investment choices on behalf of its CRIM customers, given the parameters and the investment objectives of the overall portfolio.  Campbell Dep. at 55:19-25, 56:17-20; Downing Dep. at 90:9-91:9; Fulton's PNC RFA Responses at #15.

Unlike Fulton's discretionary relationship with its CRIM customers, NatCity needed Fulton's approval in order to buy ARS on Fulton's behalf.   Campbell Dep. at 72:4-75:1; Downing Dep. at 41:24- 42:12.  Fulton kept the identities of its customers and those customers' risk tolerances and investment objectives confidential.  Campbell Dep. at 69:24-70:21, 131:25-132:5. When purchasing ARS through NatCity for discretionary investment in its customers' CRIM accounts, Fulton would only advise NatCity that Fulton had a particular amount of money that needed to be invested and relay the investment parameters that it was seeking.  Campbell Dep. at 133:11-134:3; Downing Dep. at 54:1-10; Kinney Dep. at 37:19- 38:14; Def. Ex. Y at NATCITY-FULTON-271622; Def. Ex. Z at NATCITY-FULTON-294109; Def. Ex. AA at NATCITY-FULTON-070513.

Because Fulton, and not NatCity, directed which purchases and sales of ARS would be made for Fulton's customers, and only Fulton knew its customers' risk tolerances and investment objectives and did not disclose that information to NatCity, I conclude that there is no genuine issue of material fact that NatCity operated as Fulton's non-discretionary broker in the ARS market. As a non-discretionary broker, the fiduciary duty that NatCity owed to Fulton is not the standard generally applicable to an agent's fiduciary duties. Rather, the duties of a non-discretionary broker are more circumscribed. They include:

> (1) the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price and financial prognosis . . .; (2) the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interests . . .; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security . . .; (4) the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security . . .; (5) the duty not to misrepresent any fact material to the transaction . . .; and (6) the duty to transact business only after receiving prior authorization from the customer.

Perelle, 514 A.2d at 561 (internal citations omitted) (citing Leib, 461 F. Supp. at 953); Robinson Accord Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 337 F. Supp. 107, 111 (N.D. Ala. 1971), aff'd, 453 F.2d 417 (5th Cir. 1972). In addition, the cases recognize that the precise manner in which a broker performs these duties,

> will depend to some degree upon the intelligence and personality of his customer. For example, where the customer is uneducated or generally unsophisticated with regard to financial matters, the broker will have to define the potential risks of a particular transaction carefully and cautiously. Conversely, where a customer fully understands the dynamics of the stock market or is personally familiar with a security, the broker's explanation of such risks may be merely perfunctory.

Leib, 461 F. Supp. at 953 (citing Moscarelli v. Stamm, 288 F. Supp. 453 (E.D.N.Y. 1968)); Shorrock v. Merrill Lynch, Pierce, Fenner & Smith, Inc., Civ. A. No. 74-24, 1977 WL 1064 (D. Or. Nov. 18, 1977); Weiser v. Shwartz, 286 F. Supp. 389 (E.D. La. 1968).

I find that there is no genuine issue of material fact that Fulton was a sophisticated financial institution investor.  Fulton marketed itself to its clients as a financial institution offering investment management services and specialized in handling fixed-income portfolios. Def. Ex. A (11/21/2007 email) at FULPNC186472.  In 2007, Fulton managed and administered $5.3 billion in assets.  Id.  David M. Campbell, Fulton's Rule 30(b)(6) designee, testified that Fulton may be fairly characterized as a sophisticated investor since "we have educated and experienced professionals, yes."  Campell Dep. at 189:1-19.

That does not, however, lead to a conclusion that, as a matter of law, NatCity's "perfunctory" explanation of the risks associated with investing in ARS satisfied its limited fiduciary duty.  Fulton has, I conclude, come forward with sufficient evidence from which a jury could find the existence of a breach.  Specifically, it has shown that NatCity's registered representatives knew they had a duty to understand the products they were selling to NatCity's clients, and the representatives on the Fulton account, Goodrick and DiPietro, were identified by NatCity as ARS specialists.  Both knew that Fulton was looking for investments with "a high degree of safety and liquidity" and "short-term liquid investments."  Goodrick Dep. at 14, 49, 51-52; DiPietro Dep. at 91, 158.  The confirmation sent by NatCity to Fulton for its purchase of ARS represented that ARS were a putable security, but Suhanic, McBride and Loeser each testified that ARS were not appropriately characterized as putable.  Suhanic Dep. at 77-78; McBride Dep. at 91; Loeser Dep. at 72.  Goodrick testified that although he considered it his responsibility to disclose the risks of ARS to his customers, he did not recall specifically discussing the risks with Fulton, and he did not read the prospectuses for each ARS he sold to Fulton.  Goodrick Dep. at 29-30; 34; Goodrick PNC Dep. at 128-29.  He also did not attempt to determine whether Fulton had previously purchased ARS.  Goodrick PNC Dep. at 125-26.

Fulton has come forward with evidence from which a jury could conclude that NatCity's representations in its marketing of ARS as a security that was a "cash equivalent" and "eliminated market risk," because purchasers were able to sell their positions at par, breached its limited fiduciary duty.  In an email to Fulton on February 27, 2007, DiPietro stated that ARS "instruments provide liquidity by permitting the investor to sell their position at par and eliminate any market risk," even though the material also stated that ARS do not have a put feature, that auctions can fail, and that "[l]iquidity on reset date defers market risk."  Ex. U at 5, 9, 12 (NATCITY- FULTON-307617, 307621, 307624).  DiPietro testified that, while "[e]very security has market risk," in the time frame of 2006-07, before there were any ARS auction failures, he believed that ARS "carried very little risk."  DiPietro Dep. at 52-53.  Suhanic testified that, in retrospect based on what happened in the market in 2008 and 2009, the statement made to Fulton on February 27, 2007 that ARS "provide liquidity by permitting the investor to sell their position at par and eliminate market risk" was untrue, but that ARS "did provide that type of liquidity" from 1998 to 2008.  Suhaic Dep. at 50.  Ruggles also testified that ARS did "not completely" eliminate market risk "[b]ecause there's always the potential for a failed auction."  Ruggles Dep. at 65.  McBride testified that he too disagreed that ARS eliminated market risk because "there is no security in the world that is not free from market risk."  McBride Dep. at 128, 131-32.

DiPietro agreed that, during the period between January 2006 and February 2008, ARS "had risk all along."  DiPietro Dep. at 47-48.  He added that, "just because, as I told [Fulton's Bevan Kinney], just because an auction had not failed up to that point didn't mean it couldn't." (Id.)  While he specifically disagreed with the idea that he knew that a statement that ARS eliminated market risk was untrue, he testified that prior to the liquidity crisis, "we all believed"

that it was true, even though during the period between January 2006 and February 2008, DiPietro knew that ARS were not putable securities. Id. at 31; 59:8-64:6.

Fulton has also come forward with evidence from which a jury could find that NatCity breached its duty by failing to inform Fulton that the SLARS in which it invested CRIM funds had added restrictions in the form of the "available funds cap," the "maximum rate cap," and "carryover interest," the knowledge of which would be material to any investment in the security. See Maine Dep. at 58-59. Goodrick agreed that it "would have been important" for Fulton to know that SLARS had a greater risk of long-term illiquidity than municipal ARS, which did not have these restrictions. Goodrick Dep. at 82. DiPietro knew what the "maximum rate" provision associated with ARS was and how it operated but never discussed it with Fulton. DiPietro Dep. at 99-100. He also never discussed the "available funds" provision and the "maximum rate cap" with Fulton. DiPietro Dep. at 99-101; 163.

DiPietro had an understanding from January 2006 to February 2008 that SLARS would act differently from municipal ARS in the event of a failed auction, but he never discussed this issue with Fulton. DiPietro Dep. at 101, 105-06. He never raised that, in the event of a failed auction, the interest rate paid on SLARS would be fixed at a low rate. DiPietro Dep. at 103-04. Although NatCity knew by late 2007 that ARS auctions had failed, Suhanic testified that NatCity did not make any effort to discuss the 2007 auction failures with Fulton. Suhanic Dep. at 68-69. Fulton, meanwhile, has put on evidence that it did not learn about failed auctions until February 2008. Downing Dep. at 82.

From this evidence, a jury could reasonably conclude that NatCity breached its duty to recommend ARS only after sufficient study, or it misrepresented or failed to inform Fulton of the risks involved in purchasing or selling the security. While NatCity argues that Fulton had its

own fiduciary duty to study the investment, understand the risks involved, and not misrepresent the nature of ARS to its own CRIM clients, and that the SEC's Consent Order disclosed to investors that certain financial institutions had intervened in ARS auctions by placing bids for their own accounts in order to prevent auctions from failing, that does not, as a matter of law, abrogate NatCity's independent duties to Fulton.  Rather, it creates the archetype jury issue that cannot be resolved on summary judgment.

Finally, Fulton has also come forward with evidence from which a jury could find that NatCity breached its duty by self-dealing.  There is evidence that NatCity did not purchase the ARS Fulton ordered at an ARS auction.  Instead, NatCity sold ARS to Fulton that came, in part, from NatCity's own proprietary inventory.  Goodrick Dep. at 55- 56, 71; Ruggles Dep. at 91, 100-01; Loesser Dep. at 43-44, 151; DiPietro Dep. at 196.  Because Fulton has put on evidence of NatCity's superior knowledge of the failure in the ARS market at a time when it was selling its own proprietary holdings of ARS to Fulton, Fulton has met its summary judgment burden on this theory of a breach of fiduciary duty claim.[10]

      **b.**      **The negligence claim.**

Because Pennsylvania's comparative negligence statute only applies to cases involving damages to persons or property, and in cases where the alleged damages are financial, principles of contributory negligence continue to apply, see Wescoat v. Nw. Sav. Ass'n, 548 A.2d 619, 623 (Pa. Super. Ct. 1988) (where the Comparative Negligence Act does not apply because there was no destruction or damage to property, then the doctrine of contributory negligence bars recovery if the plaintiff's negligence contributed to its loss), NatCity argues that because Fulton was itself

---

[10] I find, however, that Fulton has failed to come forward with evidence from which a jury could conclude that NatCity failed to carry out Fulton's orders promptly in a manner best suited to serve Fulton's interests or NatCity transacted business without receiving prior authorization.

negligent in its investing CRIM funds in ARS without understanding the nature of the investment, it cannot, as a matter of law, succeed on its negligence claim.  Id. at 621 (citing Pennsylvania Supreme Court authority to explain that contributory negligence bars recovery by a plaintiff when the plaintiff's own negligence, however slight, contributes in a proximate way to the incident in question).   NatCity argues that the undisputed facts that Fulton was a sophisticated financial institutional investor, who acted as a discretionary investment advisor with an unequivocal fiduciary duty to its CRIM customers to know and understand the investments that it made on their behalf, including a duty to keep informed regarding changes in the market which affected its customers' interest and to act responsively to protect those interests, establishes its contributory negligence as a matter of law since the information Fulton asserts it did not know or understand about the true nature of ARS, and particularly the SLARS that it acquired for its customers, was available, either in the official statements for the ARS or in various media sources.   NatCity also cites as evidence that Fulton failed to act with reasonable diligence to obtain the information that it claims it lacked and its affirmative practice of not reading official statements regarding the ARS that it acquired for its customers until after the ARS market failed.

Fulton responds that the question of its own contributory negligence must be decided by a jury and not the court, since a "judicial declaration of contributory negligence" is only appropriate "in clear cases where the facts are indisputably fixed and there can be no reasonable doubt as to the inferences properly to be drawn from them."  Beechum v. Am. Life and Cas. Ins. Co., 65 Pa. D. & C. 4th 370, 380-81 (Pa. Com. Pl. 2003) see also Benevento v. Life USA Holding, Inc., 61 F. Supp. 2d 407, 423-24 (E.D. Pa. 1999) (finding that the issue of a plaintiff's contributory negligence is "usually" submitted to a jury, "unless the facts leave no room for

doubt"). Fulton points to evidence in the record that NatCity's own "Auction Rate Specialists" testified that they failed to provide Fulton with the material facts concerning ARS, that they were unaware of the falsity of their own statements, and that they were themselves lacked knowledge about the features of ARS. It adds that, by virtue of the parties' fiduciary relationship, Fulton was not required to independently investigate NatCity's representations regarding ARS.

I find that the issue of Fulton's own negligence cannot be determined as a matter of law. It has come forward with evidence from which a jury could find that Fulton relied on NatCity's expertise in the ARS market and its representations regarding liquidity and the elimination of market risk. There is conflicting evidence whether Fulton breached a duty to its own customers to investigate the risks of investing in ARS, and I cannot say that the facts are so indisputably fixed that there can be no reasonable doubt as to the inferences properly to be drawn from them.

### c.   The PSA claim.

The AC added a claim under PSA Section 1-501(a)[11] asserting liability premised on material omissions by NatCity concerning its roles in the ARS markets and its knowledge that ARS auction markets were illusory since they were dependent on the placement of support bids by NatCity and other underwriters. Fulton alleges that (1) NatCity concealed that the auctions were entirely dependent on support bids; (2) NatCity and the other underwriters had no

---

[11] Section 1-501(a) provides that:

> Any person who . . . (ii) offers or sells a security in violation of sections 401, 403, 404 or otherwise by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, not misleading, the purchaser not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission, shall be liable to the person purchasing the security from him. . . .

70 P.S. § 1-501(a).

investment purpose in making proprietary purchases of ARS other than to support the auctions, generate fees, maintain their underwriting clients and protect the value of their own ARS holdings; (3) demand was far lower than necessary to maintain the liquidity of the market; (4) NatCity and the other underwriters could withdraw their support at any time, causing widespread failures of the auction markets; and (5) SLARS had unique risk issues like the "maximum cap rate," the "available funds cap," and the "net loan rate cap" not applicable to municipal ARS. (AC ¶¶ 27-28, 31-36, 39-48, 95.)

Fulton's filing of the AC containing the Section 1-501 claim followed my discussion in the MTD Opinion, as well as in the related case of Fulton Bank, N.A. v. UBS Sec., LLC, Civ. A. No. 10-1093, 2011 WL 5386376, at *8 (E.D. Pa. Nov. 7, 2011) (Stengel J.) ("Fulton I"), of the interplay between Section 1-501 and the other PSA sections incorporated therein.  At the pleadings stage, Fulton argued that it need not allege scienter because that was not an element of its state securities law claims under Sections 1-401, 1-402 and 1-403 contained in the original Complaint.  In the MTD Opinion, I addressed the scienter issue by first noting that "[t]he issue of whether the PSA contains a scienter requirement is not settled," but finding that, since it has been "held that Section 1-401 was 'functionally equivalent' to section 10(b)" of the federal Securities Act of 1934, 15 U.S.C. § 78j(b), MTD Opinion at 18 (citing GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 214 (3d Cir. 2001); Rosen v. Comm. Servs. Gp., Inc., 155 F. Supp. 2d 310, 321 n.14 (E.D. Pa. 2001)), "the requirement of pleading and proof of scienter is arguably necessary."  MTD Opinion at 18.  I then addressed Fulton's argument that the disjunctive language in Section 1-501 creating liability for "[a]ny person who . . . offers or sells a security in violation of section 401, 403, 404 *or otherwise* by means of any untrue statement," indicated that

Section 1-501 created a stand-alone claim not incorporating the scienter element applicable to the recited sections:

> [I]n <u>Gilliland v. Hergert</u>, Civ. A. No. 05-1059, 2008 WL 2682587 (W.D. Pa. July 1, 2008), the court predicted that the Pennsylvania Supreme Court would recognize a distinct, separate cause of action under § 1-501 that does not require a plaintiff to prove scienter or reliance, but rather requires a plaintiff to only demonstrate some causal relationship between the misrepresentation and their purchase, but not loss causation.  <u>Id.</u> at *6-7 (citing <u>Kronenberg v. Katz</u>, 872 A.2d 568, 598-99 (Del. Ch. 2004)).
>
> . . .
>
> While Fulton again posits that it is not required to allege scienter to state a claim under § 1-501, **the Complaint does not attempt to state a claim under § 1-501.** Rather, it premises claims only under §§ 1-401, 1-402, and 1-403.  While, as I noted in <u>Fulton I</u>, there is caselaw that suggests that Section 1-501 creates a *distinct* cause of action from those created by the other sections, I ultimately determined that § 1-501 did not modify the private right of action for violations of § 1-401 and § 1-403.  Since Fulton does not premise any of its claims upon § 1-501, the same arguments it raises here are largely inapposite.

MTD Opinion at 18-20 (italics in original; bold added).  After the MTD Opinion was issued, Fulton filed the AC to allege specifically a stand-alone claim under Section 1-501.

NatCity argues that, to the extent that Section 1-501 creates a separate cause of action independent of Sections 1-401, 1-402 and 1-403, such an action would fail as a matter of law since it would be governed by the requirements of § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2).  NatCity contends that, as § 12(a)(2) applies only to claims based on statements in a prospectus or initial offering of securities, and it is undisputed that Fulton purchased all of its ARS in the secondary market, it is entitled to judgment as a matter of law on the claim.  I agree.

Both cases that have recognized a stand-alone Section 1-501 claim also recognized that the section was modeled on the cause of action established by Section 12(a)(2) of the 1933 Act. In <u>Kronenberg</u>, the Chancellor held that,

Section 1-501(a) of the Pennsylvania Act is modeled on § 410(a)(2) of the [1956 Uniform Securities Act], which is in turn modeled on § 12(2) of the 1933 Act. Importantly, § 1-501(a) is written in the disjunctive:  It not only provides a civil remedy against "[a]ny person who . . . offers or sells a security in violation of section[] 401," it also clearly provides that any person who "otherwise" violates the terms of § 1-501(a) itself "shall be liable to the person purchasing the security from him."  Thus, whether or not a 10b-5-like remedy exists for violations of § 1-401 — a point on which courts have reached conflicting conclusions despite the plain language of § 1-501(a) stating just that — § 1-501(a) expressly creates a separate cause of action indirectly modeled on § 12(2) of the 1933 Act. Moreover, under § 1-703(a) of the Pennsylvania Act, I must construe § 1-501(a) in accordance with judicial interpretations of both § 12(2) of the 1933 Act and of states that have adopted § 410 of the Uniform Act.

Kronenberg, 872 A.2d at 596-97 (internal footnotes omitted).[12]

Section 12(a)(2) of the 1933 Act — or "Section 12(2) as it was previously codified and known — is limited to the situation where a purchaser relies on a prospectus that describes a public offering of a securities and does not apply to subsequent private sales in the secondary market.  See Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 578 (1995) (§ 12(2) is "limited to public offerings"); Yung v. Lee, 432 F.3d 142, 147-48 (2d Cir. 2005) (stating that Gustafson "explained that Section 12(a)(2) liability 'cannot attach unless there is an obligation to distribute the prospectus in the first place (or unless there is an exemption).' . . .  No such obligation arises with respect to private or secondary sales of securities because 'the word "prospectus" is a term of art referring to a document that describes a public offering of securities by an issuer or

---

[12] The District Court in Gilliland adopted the Chancellor's holding, stating:

the Court agrees with the analysis in Kronenberg that the Pennsylvania Supreme Court would also recognize a stand-alone § 1-501 claim.  The statutory text of § 1-501 expressly imposes liability on a person who "otherwise" sells a security by means of a misleading statement or omission.  The closest federal law equivalent to § 1-501 is 15 U.S.C. § 77l(a)(2).  The Court of Appeals for the Third Circuit has stated that there is a substantial difference between Rule 10b-5 claims and § 77l claims.

Gilliland v. Hergert, Civ. A. No. 05-1059, 2008 WL 2682587, at *7 (W.D. Pa. July 1, 2008) (internal footnote omitted).

controlling shareholder'" (internal citation to <u>Gustafson</u> omitted);  <u>Luminent Mortg. Capital, Inc.</u> <u>v. Merrill Lynch & Co.</u>, 652 F. Supp. 2d 576, 598 (E.D. Pa. 2009) (concluding, based on <u>Gustafson</u>, that "private sales do not qualify for liability under § 12(a)(2) of the Securities Act").

 Because the PSA "is to be construed in the same manner as similar provisions of federal securities law," MTD Opinion at 16 (citing <u>Fulton I</u>, 2011 WL 5386376, at *7), and PSA Section 1-703(a) specifically provides that the PSA is to be construed "to coordinate the interpretation and administration of this act with related Federal regulation," I find as a matter of law that the stand-alone cause of action contained in Section 1-501 applies only to claims based on statements in a prospectus or initial offering of securities.

The summary judgment record demonstrates that there is no genuine issue of material fact that Fulton did not purchase the ARS at issue in the case as part of a new public offering. Campbell, Fulton's Rule 30(b)(6) witness, testified that Fulton was not buying new public offerings, <u>see</u> Campbell Dep. at 61:14-15 ("To my knowledge, we were not buying new public offerings."), and Fulton has come forward with no evidence to meet its summary judgment burden to establish the existence of this essential element of its Section 1-501 claim. Accordingly, I grant summary judgment to NatCity on Fulton's Third Cause of Action and deny Fulton's cross motion for summary judgment.

## III.    CONCLUSION

I find that Fulton's claim under Section 1-501 of the Pennsylvania Securities Act fails as a matter of law because that Section is limited to misrepresentations concerning new public offerings of securities and all of the securities at issue in the case were purchased in the secondary market.  Accordingly, I grant NatCity's Motion for summary judgment on Fulton's Third Cause of Action and deny Fulton's Motion for summary judgment on that claim.  I deny

the balance of NatCity's Motion since Fulton has met its summary judgment burden to come forward with sufficient evidence upon which a jury could find the essential elements of its claims.

An appropriate Order follows.